## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| GRANT PSTIKYAN, | |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| DEALDASH, INC., | |
| Defendant. | **JURY TRIAL DEMANDED** |

1

1.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Grant Pstikyan brings this class action against Defendant DealDash, Inc. ("DealDash" or the "Company") on behalf of all persons who have purchased bids or merchandise through www.dealdash.com and/or DealDash's mobile device application(s).  Plaintiff makes the following allegations based on the investigation of his counsel and based on personal knowledge as to himself and his own acts.  Plaintiff and his counsel believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

2.      DealDash.com is a popular "penny auction" website that purports to offer consumers the chance to win brand name merchandise for a tiny fraction of the retail price. Consumers pay money in advance for a certain number of intangible "bids," and then spend those bids in daily "auctions" in hopes of winning the offered products at steep discounts. DealDash continually advertises to consumers that they can save up to 90%, or more, off brand name merchandise ranging from electronics, to furniture, to art, to flatware, to clothing and accessories.

3.      Founded in 2009, DealDash has attracted millions of paying users throughout the United States, with American retirees forming the largest demographic among DealDash users. While most of DealDash's substantive operations reside overseas, the Company exclusively targets American consumers and ships its merchandise only into the continental United States. DealDash earns tens of millions of dollars per year in revenue, driven predominantly by consumers' "bid" purchases on the Company's website and mobile app(s).

4.    The problem is that DealDash.com is a sham.  Rather than running true retail "auctions," DealDash is actually running a series of illegal lotteries through its website on a daily basis.  Moreover, the luxury "brand name" products that DealDash offers consumers are not true luxury brands at all; they are cheap, generic brands that do not sell in substantial volumes anywhere, except through DealDash and one of its affiliates.  Yet DealDash represents its products as top-of-the-line, luxury brands that ordinarily command price tags in the hundreds or even thousands of dollars per item.  In fact, DealDash's brands do not and could not command such prices in any legitimate retail market, whether in stores or online.

5.    Most of DealDash's purported "auction" merchandise consists of brand names created only within the last few years by DealDash's twenty-four-year-old founder and controlling owner: William Wolfram of Finland.  DealDash advertises its fake "brand name" products at outrageously high retail prices—totally divorced from economic reality—to attract consumers into its "auctions" (read: lotteries) and deceive consumers into believing they are "bidding" (read: betting) on extraordinarily high-value items.  In fact, consumers are betting on products that are not worth even half their advertised values, and in some cases, not worth one tenth of the advertised value.  Most of DealDash's purportedly expensive, "brand name" products boast no substantial sales anywhere, except via DealDash.  In sum, DealDash secretly creates and offers its own generic brands and grossly misrepresents their true value to the public: all to induce consumers' paid entry into DealDash's unlawful lotteries.

6.    In addition, for each of DealDash's hundred-plus "penny auctions" per day, DealDash.com advertises recent "Winners" of each offered product from prior auctions, along with the (facially) low price that each recent "Winner" paid for that (purportedly) expensive product.  DealDash, however, does not disclose to consumers how many prepaid bids those

"Winners" spent to win each featured product.  Even DealDash's lucky lottery "winners" often end up paying more money in bids and cash than what DealDash's products are actually worth. Meanwhile, DealDash auction losers—all but one participant in each auction—lose *all* of their prepaid "bids" and walk away with nothing.  Thus, when a consumer loses a DealDash "auction," the House wins.  When a consumer wins a DealDash "auction," the House wins. Even "winning" consumers unwittingly lose.

7.    DealDash's penny auctions are perverse lotteries in which U.S. consumers have lost tens of millions of dollars in their fraud-induced pursuit of sham merchandise.  Plaintiff and the Class hereby seek relief from Defendant's ongoing scheme.

## PARTIES

8.    Plaintiff Grant Pstikyan is a natural person domiciled in California.  Between November 2016 and December 2016, Plaintiff purchased and lost thousands of dollars worth of bids on DealDash.com.  He also lost money by spending both cash and paid bids in various penny auctions to acquire DealDash's falsely and misleadingly advertised merchandise.

9.    Defendant DealDash, Inc. is a Delaware corporation with its principal place of business located at 12805 Highway 55, Suite 205, in Plymouth, Minnesota.  DealDash, Inc. is a wholly owned subsidiary of a Finnish company, DealDash Oyj, purportedly based in Helsinki, Finland.  The so-called "penny auction" website, www.dealdash.com, is owned and operated by or on behalf of Defendant DealDash, Inc.  DealDash also operates its penny auctions and interfaces with consumers through its mobile device applications.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5,000,000 and the overwhelming majority of Class members are

citizens of States different from Defendant DealDash, Inc.  Pursuant to 28 U.S.C. § 1391(b), venue is proper because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

**SUBSTANTIVE ALLEGATIONS**

**DealDash the Perverse Lottery**

     11.    The consumer experience on DealDash.com proceeds as follows.  A consumer visits www.dealdash.com and views a webpage that looks like this:



Each box on DealDash's homepage represents a purported "auction" for the pictured product. Consumers can then click on any box of their choice to enter that particular auction's webpage, which looks like this:



12.    Before consumers can actually participate (*i.e.,* "bid") in any auction, they must first create a personal DealDash account by entering, *inter alia*, their email address along with financial account information such as a credit or debit card number.  Next, consumers must purchase some number of intangible "bids," which DealDash sells in bulk "bidpacks" that consist of anywhere from a hundred to a few thousand bids each.  DealDash typically prices its bidpacks such that consumers pay between twelve and fifteen cents per bid.  The more bids a consumer buys, the more chances he or she will have to win an auction.

13.    Each individual "auction" begins at a fixed point in time. At the moment an auction begins, a 10-second clock, like the ones shown in red above, begins to count down. During that 10-second countdown, any user with prepaid bids in their DealDash account can click a bright yellow "BID NOW" button to place the first bid.[1]  The placement of that first bid

---

[1] If nobody places a bid within the first 10 seconds of an auction, then the auction simply ends, and nothing happens.

immediately makes that first-bidding user the "highest bidder" on the featured product: at a price of $0.01. The first bid also immediately resets the countdown clock back to 10 seconds.

14. If nobody bids within the next 10 seconds, then that first bidder wins the auction, entitling them to purchase the offered product from DealDash for the discounted price of $0.01. If someone does bid within the next 10-second countdown, then this second bidder immediately becomes the "highest bidder" on the featured product: at a price of $0.02. And the countdown clock immediately resets back to 10 seconds.

15. If nobody bids within the next 10 seconds, then that second bidder wins the auction, entitling them to purchase the offered product from DealDash for the discounted price of $0.02. If someone does bid within the next 10-second countdown, then this third bidder (which might be the same person as the first bidder) immediately becomes the "highest bidder" on the featured product, at a price of $0.03. And the countdown clock immediately resets back to 10 seconds.

16. This pattern continues until, at some point, the 10-second clock runs out. Each subsequent bid increases the potential price of the product by one cent: hence, the term "penny auction." Each subsequent bid placed by any user amounts to a valuable (albeit intangible) consideration that comes out of the user's DealDash account, with the monetary value of that spent bid being whatever the consumer paid for it: usually between twelve and fifteen cents. DealDash auctions typically last for several hours, or even several days, with the penny-built "auction" prices sometimes going into the hundreds of dollars, depending upon the featured item. If the 10-second clock runs out at a time when the featured item's price has ticked up to $100.00, this means that participating consumers have spent a total of 10,000 bids in the auction, with the last bidder (whoever they are) "winning" the right to purchase the offered product from

DealDash for an additional $100.00. This "winning" bidder might have already spent less than a dollar's worth, or several hundred dollars' worth, of prepaid bids to win that auction. But one thing is certain; consumers collectively just spent over $1,000 worth of prepaid bids (likely between $1,200 and $1,500) in the auction, and everyone *except* the last bidder wins nothing.

17.    When consumers place a paid bid in a DealDash auction, they have no way of knowing, or even reasonably guessing, whether they will be the last bidder, *i.e.,* the auction winner. They place each and every bid hoping that *this* 10-second countdown will be the one that runs out, but they have almost no relevant facts with which to judge whether the clock will run out. This is true for several reasons.

18.    First, while each individual auction page displays the number of users participating in a given auction, a bidder has no information whatsoever about the number of bids the other users have in their accounts.

19.    Second, users cannot see or otherwise discern how many bids other participants have spent so far in the given auction, so there is no way to know how much "skin" other users already have in the game. Perhaps if a competing participant had already lost 1,000 paid bids in this auction, that participant would be less likely to keep bidding than another participant who has only lost a few paid bids so far. But participants have no way of discerning who, if anyone, has gotten in too deep for a particular auction, versus who has plenty of "dry powder" remaining. Therefore, all of the competitors in a given auction are entirely unpredictable to each other (except to the extent that different bidders might collude, but DealDash deems any such collusion cheating and purports to strictly police such cheating).

20.    Third, the advertised dollar value of an auctioned product might theoretically serve as a rational upper bound for "bidding" purposes. But bidding on DealDash rarely, if ever,

continues long enough for the penny-stacked offer price to come anywhere near the advertised value of the auctioned products.[2]  Thus, in substantially all DealDash auctions, the penny-stacked offer price is largely immaterial to the question of whether a subsequent bid will be placed (*i.e.,* immaterial to whether the current "highest bidder" will win the auction); there is always a substantial advertised value to be potentially won by the next bidder: in the form of a steep discount on the advertised product.

21.     Fourth, DealDash offers participants in all of its penny auctions a special "Bid Buddy" feature, which the participant can (unbeknownst to other users) turn on and off at their own behest.  The "Bid Buddy" function allows any user to turn on a fully automated bidding function in any given auction.  The user inputs into Bid Buddy a fixed number of bids from his/her DealDash account, and Bid Buddy will automatically place those bids—one by one—in that auction whenever the countdown clock is about to run out.  The user can then walk away from DealDash for hours or even days on end while Bid Buddy continues to play for him or her.  But users cannot see who else in the auction has their Bid Buddy turned on or off, or how many bids any given user has placed (or is willing to place) into their Bid Buddy or into the auction generally.  Thus, no user can even know whether they are bidding against preprogrammed algorithms or against live human beings, or some combination thereof.   Nor can bidders know whether the other "live" participants in an auction are even sitting at their computers anymore; if other participants in one of these internet "auctions" happened to walk away from their computers or mobile phones for more than 10 seconds, no other users would know this.

---

[2] The one exception to this rule occurs when DealDash runs "free" promotional auctions, in which the last bidder gets the "auctioned" product for free regardless of how many bids are placed in the auction.   In these promotional auctions, the penny-stacked offer price can sometimes ***exceed*** the product's advertised value because that price is ultimately meaningless. The final, winning bidder will pay nothing for the offered product beyond the prepaid bids that he or she spends in the auction.

22.     In the end, while DealDash purports to be a "fair and honest" website conducting mere retail "auctions," DealDash.com is actually running hundreds of illegal lotteries on a daily basis, with each individual "penny auction" amounting to a separate lottery.  The United States Federal Trade Commission ("FTC") has informally stated that, "in many ways, a penny auction is more like a lottery than a traditional online auction."  *See* https://www.consumer.ftc.gov/articles/0037-online-penny-auctions (last visited Apr. 5, 2017). The FTC is certainly correct, but does not go far enough in its assessment.

23.     In a traditional lottery, an increasing number of entries (here, "bids") does not reduce the offered prize or the value thereof.  On DealDash, however, the more entries that are submitted into each auction (in the form of paid "bids"), the smaller the ultimate winner's prize gets in terms of a steep (purported) discount on the offered product.

24.     In addition, consumers can simultaneously play in as many different "auctions" (*i.e.,* lotteries) as they desire.  A single consumer could use Bid Buddy (or a fast clicking hand) to bid (*i.e.,* bet) in many different "auctions" at once, losing every single auction along with all of their prepaid bids, and walking away with nothing.

25.     Even DealDash itself has occasionally warned users of the gambling-like dangers of participating in its so-called "auctions." In a blog post linked to the DealDash homepage on December 3, 2016, titled "Don't Get In Over Your Head on DealDash," DealDash stated the following:

> **Bidding on DealDash can be so exciting that it's easy to get caught up in the moment, and get in over your head. Here are some ways to keep yourself afloat.**
>
> DealDash doesn't want you to get in over your head. DealDash wants you to bid responsibly and enjoy playing in the auctions. However, sometimes bidding and winning are just so much fun that it's easy to get carried away. And once you get

carried away and go over your bidding budget then you're unhappy. DealDash wants you to enjoy your shopping entertainment experience. Here are some suggestions from DealDash to keep you from getting in over your head.

The main way that you can keep yourself from getting in over your head is setting strict bidding limits for yourself for each auction, and sticking to them. If you say that you're only going to spend 100 bids on a particular auction, and you know that you have a very fierce competitive spirit and it's hard for you to stop bidding when you're in the moment, simply input your 100 bid budget into your BidBuddy and walk away. The BidBuddy is there for you to use however you like, from helping you bid while you are asleep or at work, or in this case to help you stick to your bidding budget.

*** 

These are just a few helpful guidelines for keeping your budget and bids in check while playing on DealDash. It's easy to get carried away, just try to follow my suggestions: remember to set a budget, use your BidBuddy, and keep calm. See you on DealDash everyone! Good luck and happy bidding.[3]

   26.    DealDash is not a mere twist on retail auction websites like eBay.  DealDash is a constant series of online lotteries specifically designed to fleece lucky and unlucky consumers alike.  DealDash itself evidently views its auctions this way, referring to its users "playing in the auctions."

**DealDash the False Advertiser**

   27.    DealDash's inducement of consumers to purchase bids and start playing its penny auctions is driven substantially by its advertisements of recent "Winners" across the DealDash website and other consumer-facing media.   For example, right at the top of the DealDash homepage, the Company provides a "Winners" button for consumers to click on:

_____

   [3] *See* https://dealdashblog.com/2016/12/03/dont-get-in-over-your-head-on-dealdash/ (last visited April 13, 2017).



When consumers click on the "Winners" button, they are taken to another page that displays information like the following:



The number of "Winners" displayed is enormous, going far back in time, as the user can continuously "scroll down" to reveal more and more previous winners:



This "Winners" page shows, *inter alia*, the supposed dollar value of each product won, along with the sharply discounted price purportedly paid by each winner.

28.    Similarly, within each individual auction's webpage, the Company displays the recent "Winners" of the particular product being auctioned:



Like the main "Winners" webpage, each individual auction's webpage displays the following information, among other data: (1) the purported price paid by each recent winner for the auctioned product; (2) each recent winner's username on DealDash.com; and (3) the purported "value"/regular price of the auctioned product.

29.     The problem with DealDash's recent "Winners" advertisements is that they do not disclose how many paid bids these "Winners" spent in the process of winning their respective auctions.  For example, DealDash.com boasts a $50 "value" for the hat pictured above, and a purportedly low price of $7.57 paid by a winner named "Smith829."  But DealDash does not disclose how many paid bids Smith829 spent to win the right to purchase that hat.  Given that this particular auction ended with a final "price" of $7.57, two or more consumers collectively spent seven hundred fifty-seven bids in this auction, with each bid typically costing twelve to fifteen cents.  This means consumers (collectively) spent between $90 and $113 in bids to win Smith829 the right to purchase that (purportedly) $50 hat from DealDash for $7.57.  How many of those 757 bids did Smith829 have to spend to win this "auction," and pay DealDash another

14

$7.57?  Potentially up to half of those bids—379—for which Smith829 would likely have paid at least twelve to fifteen cents each.

30.    But consumers are not given such material information.  Instead, DealDash leads consumers to believe that the only material prices paid by recent "Winners" were the prices they paid for the featured product.  However, far from costing Smith829 $7.57 to buy the hat, it actually cost Smith829—the "winner"—between $8 and $64 in paid bids and cash to acquire that $50 hat.   Every non-winner who placed a bid simply lost the money it cost him or her to purchase his or her bids.

**DealDash Misrepresents the "Value" and Nature of its Merchandise**

31.    Plaintiff Grant Pstikyan lost most of the "auctions" he played on DealDash.com from November 2016 to December 2016.  Plaintiff also "won" a few of his auctions.  For example, on December 7, 2016, Plaintiff won a DealDash auction for a handbag called the "Ivens Travel Bag in Nylon and Leather," purportedly from a high-end French brand called "Bolvaint - Paris."  The bag Plaintiff won looks like this:



Plaintiff spent 5,494 prepaid bids at an average buy-in price of approximately 13 cents per bid, bringing his total "bid spend" in this auction to about $714.  Then, upon winning this auction, Plaintiff won the right to, and did, purchase this "Bolvaint" travel bag from DealDash for $164.43.  Thus, Plaintiff spent a total of approximately $878 on DealDash.com to win this bag. Plaintiff did so based on DealDash.com's representations that the true "value" and retail price for this bag was $2,900.

32.    One relatively popular, high-end brand for handbags in the United States is Kate Spade New York, founded in 1993 by a well-known designer named Kate Spade.  Somewhat similar in size, style and materials to the above "Bolvaint" travel bag on DealDash.com, is the following bag from www.katespade.com:



Like the purportedly $2,900 "Bolvaint" bag on DealDash, this Kate Spade New York bag is made of both Nylon and Leather, except with more leather and less nylon than the above

Bolvaint bag that Plaintiff "won."  The regular retail price from Kate Spade New York is $378, but currently on sale for $225.[5]

33.    Another relatively popular and high-end designer of handbags is Michael Kors, which offers the following bag, somewhat similar in size and materials, except this bag is 100% leather:



The retail price for this all-leather bag from Michael Kors is  $328.[6]

34.    Plaintiff's "Bolvaint - Paris" branded bag lists a retail price **ten times higher** than Kate Spade and Michael Kors for similar products.  Thus, "Bolvaint – Paris" must be a brand name of extraordinary value.  But in fact, this Bolvaint brand is pretty much worth nothing at all.  Aside from https://bolvaint.com, this "Bolvaint" company (if it is a company at all) has no

---

[5]    *See*   https://www.katespade.com/products/smith-street-zanna/098689972855.html    (last visited April 6, 2017).

[6] *See* https://www.michaelkors.com/rivington-large-studded-leather-tote/_/R-US_30S7SR7T3L?color=0001 (last visted April 6, 2017).

substantial business operations or sales, much less at DealDash's extraordinarily high prices. Bolvaint has no publicly discernable offices of any meaningful size, no apparent contact phone number for customers (if there are any), no retail outlets or substantial purchases by other retailers. There is nothing but internet offers and advertisements for various "Bolvaint" items on the likes of Amazon.com, social media, and in some internet-based "press releases" touting the prowess of this purported brand. This Bolvaint bag does not have a "value" or regular price of $2,900 as DealDash represents to consumers, nor is it even worth the approximately $878 that Plaintiff spent on it as a DealDash "Winner."

35.    DealDash "auctions" numerous other, purportedly high-end brand names that in fact have no substantial offices, no substantial sales, no contact phone numbers, and no significant distribution channels outside DealDash and its affiliates. These include, *inter alia*:

(a) "The Victor – Handmade Wall Clock" from a home decor brand called "The Barrel Shack," which DealDash.com states has a "Value" of $810:



(b) "Q-Tech Bluetooth Headphones" from an electronics brand called "Schultz," which DealDash.com says are worth $510:[7]



(c) The "Senshi Dual Knife Set with Wooden Display Stand," purportedly from a purportedly authentic, high-end Japanese brand called "Kamikoto," which DealDash.com says is worth $1,375:

---

[7] Bluetooth, noise-cancelling headphones from the iconic audio brand, Bose, go for under $400.



(d) A "Heavy Duty Army Backpack" from an (apparently) high-end outdoor equipment supplier called "Wilson & Miller," which DealDash.com represents as having a $170 value:



(e) Two pair of men's underwear from a purportedly expensive apparel brand, "verdict."[8] DealDash.com says these have a true "value" of $90:



Verdict. Pineapple Express Meets Flamingo Frenzy - Pair of Boxer Briefs (L)

(f) The "Amber Dunes Tall Scented Candle" (ten inches tall) from a rather expensive household accessories brand called "New Haven." DealDash represents to consumers that this candle has a "value" and regular price of $130:

---

[8] This "verdict." brand is also the maker of that star-spangled, purportedly $50 hat shown in ¶28, *supra.*



New Haven - Amber Dunes Tall Scented Candle

36.    Each of the six brands shown in ¶35 above provides many different products to be "auctioned" off on DealDash on a daily basis.

37.    DealDash represents to consumers that all products from the six brand names in ¶35 command extraordinarily high dollar "values" for what they are (*e.g.,* an $810 wall clock, $510 head phones, $1,375 for two kitchen knives, a $170 backpack, $90 for two pair of men's underwear, and $130 for a scented candle).  These brands' purported regular prices match or even surpass the prices of comparable products from some of the most well-known, high-end brand names in the world.

38.    But strangely, none of these six disparate brand names—among others—that flood DealDash's daily "auctions" have any substantial offices, phone numbers, distribution or retail sales channels outside of DealDash and its affiliates.  These "brand name" products are offered only on DealDash, on each brand's own barebones and similarly-styled website, and

sometimes via Amazon.com, social media or elsewhere on the internet.[9] But these "brand name" products are not selling much (if at all) anywhere outside of DealDash, much less at the extremely high "values" or retail prices that DealDash ascribes to them.

39.    There is a reason for this. The reason can be found in the records of the United States Patent and Trademark Office ("USPTO"). As it turns out, each of the seemingly disjointed, extraordinarily expensive brand names in ¶35 was trademarked in the United States (the only country where DealDash attempts to sell to consumers) within the last few years.

(a) A company called Galton Voysey Limited, located in Hong Kong, applied for a trademark with the USPTO for "The Barrel Shack" home décor brand on July 1, 2015, and that trademark was registered on November 1, 2016.

(b) Galton Voysey Limited also applied for a trademark with the USPTO for the "Schultz" electronics brand, on February 3, 2016, and that trademark was registered on September 27, 2016.

(c) Galton Voysey Limited also applied for a trademark with the USPTO for the "Kamikoto" knife brand, on February 3, 2016, and that trademark was registered on March 7, 2017.

(d) Galton Voysey Limited also applied for a trademark with the USPTO for the "Wilson & Miller" outdoor equipment brand, on February 3, 2016, and that trademark remains pending.

(e) Galton Voysey Limited also applied for a trademark with the USPTO for the "verdict." apparel and accessories brand, on February 3, 2016, and that trademark remains pending.

(f) Galton Voysey Limited also applied for a trademark with the USPTO for the "New Haven" candle and home décor brand, on July 1, 2015, and that trademark was registered on December 27, 2016.

40.    Each of the USPTO trademark applications referenced in ¶39 was signed by the purported "Chairman" of Galton Voysey Limited: none other than twenty-four-year-old William

---

[9]    The individual websites for six brand names provided in ¶36 are: https://www.newhavencollection.com, http://www.verdictlife.com, https://wilsonandmiller.com/, https://kamikoto.com/, http://schultzinnovation.com/, and https://thebarrelshack.com.

Wolfram of Finland, the founder, longtime CEO, and still controlling (indirect) shareholder of DealDash, Inc.

41.    DealDash's purportedly expensive, high-end brand names do no legitimate retail business anywhere because they are nothing but the cheap, recent inventions of DealDash and its principal(s).  Consumers, however, are led to believe that DealDash's products are what they purport to be: some of the highest quality, most expensive and luxurious brand names on the planet.  DealDash's brands are no such thing.

42.    Mr. Wolfram and his associates at DealDash have been using their faux-luxury brand names to fraudulently induce participation in their illegal lottery games.  And they are using their illegal lottery games in an attempt to manufacture independent consumer demand for their entirely generic, unestablished brands that have no real consumer demand to speak of. DealDash is welcome to offer Mr. Wolfram's new brands for sale to the public at outrageous prices, but DealDash is not welcome to induce "bid" purchases and illegal lottery participation from consumers by representing that his products have "values" and regular prices and "retail prices" that have no basis in reality.

43.    DealDash, Inc. has misrepresented the quality, origin, and price of the goods it sells, and consumers, led by American retirees, are paying the price.

**Economic Injuries to Plaintiff and the Class**

44.    Between November 2016 and December 2016, Plaintiff personally spent $5,923 purchasing 44,250 bids on www.dealdash.com to participate in DealDash's auctions/lotteries.  In that time frame, Plaintiff spent tens of thousands of bids, for which he paid thousands of dollars, in at least thirty different auctions. Like most DealDash users, Plaintiff lost the large majority of the DealDash auctions in which he participated: losing the money spent on the bids and

obtaining nothing.  Plaintiff participated in and lost many of DealDash's fraudulent online "auctions" because he believed that he was, in fact, participating in lawful retail auctions rather than a fraudulent lottery scheme.  Plaintiff participated in and lost these auctions because he believed he was bidding on high "value," brand name, luxury merchandise.

45.    Moreover, even when Plaintiff "won" some of his DealDash auctions, he still suffered substantial economic losses.   These include:

(a) his December 2016 payment of approximately $879 in bids and cash to win a "Bolvaint" bag worth nowhere near that price, but which DealDash represented as worth $2,900;

(b) his December 2016 payment of approximately $107 in bids and cash to win three "Kamikoto" kitchen knives worth nowhere near that price, but which DealDash represented as worth $1,295;

(c) his December 2016 payment of approximately $151 in bids and cash to win a "New Haven" bathroom scale worth nowhere near that price, but which DealDash represented as worth $229;

(d) his December 2016 payment of approximately $541 in bids in a "free" promotional auction[10], to win another "Bolvaint" bag worth nowhere near that price, but which DealDash represented as worth $2,500;

(e) his December 2016 payment of approximately $281 in bids in a "free" promotional auction, to win a "handmade" sculpture from "The Barrel Shack" worth nowhere near that price, but which DealDash represented as worth $1,530;

(f) his November 2016 and December 2016 payments of hundreds of dollars in bids and cash to win several purported oil paintings from DealDash's bogus "Far East Collection," worth nowhere near the hundreds of dollars that Plaintiff spent, but which DealDash represented as being worth thousands of dollars.

46.    Like Plaintiff, millions of consumers across the United States have lost tens of millions of dollars per year purchasing and losing DealDash "bids" in DealDash's daily lotteries.

47.    Millions of consumers like Plaintiff have also suffered enormous economic losses by purchasing and spending bids to win DealDash's daily lotteries, and then spending additional

---

[10] *See* ¶20, n.2, *supra*.

cash to acquire their products at purportedly steep discounts that are entirely false, misleading and imaginary.

48.    Plaintiff—like substantially all DealDash customers—would not have purchased bids from DealDash or entered any of DealDash's purported retail "auctions" had they known the fact that they were entering an illegal lottery scheme.  Moreover, Plaintiff and other "winning" DealDash users would not have purchased bids, played in DealDash's illegal lotteries, and spent additional cash to acquire purportedly high-"value," brand name merchandise had they known that they were betting on and buying low-value, generic merchandise that is (only) of DealDash, by DealDash, and for DealDash and its principals.

## CLASS ALLEGATIONS

49.    Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") on behalf of all persons who have purchased bids or merchandise through www.dealdash.com and/or DealDash's mobile device application(s) (the "Class").  Excluded from the Class are Defendant, officers and directors of Defendant at all relevant times, members of such individuals' immediate families and their legal representatives, heirs, successors or assigns, as applicable, and any entity in which any Defendant has or had a controlling interest.

50.    Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  DealDash has at least hundreds of thousands of distinct customers located throughout the United States who have purchased bogus bids and/or merchandise from DealDash in recent years.  Moreover, members of the Class are not only ascertainable, but readily identifiable through comprehensive database records maintained by Defendant and/or its affiliates.  Most if not all Class members can be directly notified of this action via the e-mail addresses they provided Defendant upon creating their respective DealDash account(s), and may otherwise be notified by forms of publication notice that are customary in consumer class actions

such as this.   While the exact number of Class members is currently unknown to Plaintiff, Plaintiff estimates that the number of Class members is at least in the hundreds of thousands.

51.    Plaintiff's claims are typical of other Class members' claims, as all Class members have suffered the same harm as a result of the same illegal course of conduct by Defendant.   In addition, Plaintiff's and other Class members' claims for relief arise under precisely the same legal theories, as Minnesota law properly applies to each and every Class member's claims, regardless of where he or she resides.   Indeed, Defendant has *all* consumers agree to the exclusive application of Minnesota and/or U.S. federal law to any and all disputes regarding their relationships with DealDash.   All Class member injuries may be similarly remedied by an award of damages and injunctive relief as requested herein.

52.    Plaintiff will fairly and adequately protect the interests of Class members and has retained counsel that is competent and experienced in prosecuting class actions.

53.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Common questions of law and fact amongst Class members include, among other things:

(a)    Whether Defendant's daily rounds of so-called "penny auctions" are in fact lawful retail auctions or instead unlawful lotteries operated by Defendant in violation of Minnesota and/or federal law;

(b)    Whether Defendant has falsely or misleadingly advertised to consumers the results of prior auctions by misrepresenting the actual financial costs to prior "winners" of obtaining the advertised products in Defendant's "auctions";

(c)    Whether Defendant has engaged in a pattern and practice of misrepresenting the true retail values and regular prices of products it "auctions" off to consumers;

(d)     The extent to which Class members have sustained damages and the proper measure thereof; and

(e)     Whether the Class is entitled to injunctive and/or other equitable relief from Defendant's conduct.

54.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore, because the damages suffered by individual Class members are relatively small, the expense and burden of individual litigation make it practically impossible for Class members to redress the wrongs done to them on an individual basis.  There will be no difficulty in the management of this case as a class action.

**COUNT I**
**Violations of the Minnesota Consumer Fraud Act**
**Minn. Stat. § 325F.68, *et seq.***

55.     Plaintiff repeats and realleges each and every allegation above as if fully set forth in this paragraph.

56.     The "bids" and "bidpacks" offered by Defendant to consumers nationwide, as well as the consumer products auctioned and sold by Defendant to consumers nationwide, constitute "Merchandise" within the meaning of Minnesota Statutes § 325F.68 Subd. 2.

57.     Defendant DealDash, Inc. is a "Person" within the meaning of Minnesota Statutes § 325F.68 Subd. 3.

58.     Through its website, www.dealdash.com, Defendant represented to Plaintiff and each and every Class member that its online penny auctions constitute "fair and honest auctions," when in reality DealDash's penny auctions are unfair, fraudulent and illegal lotteries, the conduct of which are subject to penalties under §§ 609.75, *et seq.* of the Minnesota Criminal Code, among other statutes.

28

59.     Through its website and mobile device application(s), Defendant materially misrepresented to Plaintiff and the Class the prices paid by recent DealDash auction winners so as to deceive the Class into believing that DealDash auction winners may obtain valuable products at costs far lower than the actual costs paid by such winners.

60.     Through its website and other websites, such as Amazon.com and social media websites, Defendant materially misrepresented—and continues to materially misrepresent—its auctioned merchandise as being legitimate, high-end, brand name merchandise with extremely high retail "values," when in fact most of DealDash's auctioned merchandise consists of illegitimate, low-end merchandise with retail dollar values nowhere near the retail values that DealDash represents.

61.     Pursuant to Minnesota Statutes § 8.31, subd. 3a, Plaintiff and the Class have been injured by Defendant's past and ongoing violations of Minn. Stat. §§ 325F.68, *et seq.* in the form of monetary losses directly and proximately caused by Defendant's conduct.

## COUNT II
### Violations of the Minnesota False Statement in Advertisement Act
### Minn. Stat. § 325F.67

62.     Plaintiff repeats and realleges each and every allegation above as if fully set forth in this paragraph.

63.     Defendant DealDash, Inc. is a "person" and "corporation" within the meaning of Minnesota Statutes § 325F.67.  Defendant DealDash, Inc. acted at all relevant times with the intent to sell and dispose of merchandise in the form of DealDash "bids" and other consumer products such as those detailed herein, which Defendant offered directly to the public for sale and with the intent to increase public consumption thereof.

64.     Defendant has made, published disseminated and placed before the public in Minnesota through the internet and other media advertisements regarding DealDash bids and

29

"bidpacks" and other consumer products offered to the public for use, consumption, sales, and such advertisements have at all relevant times contained material assertions, representations and statements of fact that were and are materially untrue, deceptive, and misleading.

65.   Pursuant to Minnesota Statutes § 8.31, subd. 3a, Plaintiff and the Class have been deceived, misled and injured by Defendant's past and ongoing violations of Minn. Stat. §§ 325F.67 in the form of monetary losses directly and proximately caused by Defendant's conduct.

## COUNT III
### Violations of the Minnesota Unlawful Trade Practices Act
### Minn. Stat. § 325D.13

66.   Plaintiff repeats and realleges each and every allegation above as if fully set forth in this paragraph.

67.   Minnesota Statute §325D.13 prohibits misrepresenting the quality of goods, providing in pertinent part:

325D.13 QUALITY, MISREPRESENTED
No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise.

68.   Minn. Stat. §325D.15 provides private remedies for violations of this provision. Pursuant to Minn. Stat. §325D.15, Plaintiffs are entitled to compensatory damages for DealDash's violations of Minn. Stat. §325D.13.

69.   Defendant is a person under the definitions of Minn. Stat. §325D.10, and the underlying transaction is a sale of merchandise.

70.   As alleged above, DealDash has represented that the products being sold are high quality well known luxury brands.

71.   DealDash has misrepresented the quality of items it advertises for sale via its auctions.

**COUNT IV**
**Violations of the Minnesota Unlawful Trade Practices Act**
**Minn. Stat. § 325D.12**

72.    Plaintiff repeats and realleges each and every allegation above as if fully set forth

in this paragraph.

73.    Minnesota Statute §325D.12 prohibits misrepresenting the quality of goods,

providing in pertinent part:

**325D.12 RETAILERS NOT TO MISREPRESENT NATURE OF BUSINESS.**
(1) No person engaged in the sale of merchandise at retail shall, in connection
with such business, misrepresent the true nature of such business, either by use
of the words manufacturer, wholesaler, broker, or any derivative thereof or
synonym therefor, or otherwise.

(2) No person shall, in connection with the sale of merchandise at retail
misrepresent, directly or indirectly, that the price at which such merchandise is
sold is an approximately wholesale price, or is less than the usual retail price,
either by the use of any such expression, or of any expression having a similar
meaning, or otherwise misrepresent the true nature of such sale.

(3) No person shall, in connection with the sale of merchandise at retail, or in, or
in connection with the use of, samples, catalogs, or other forms of advertising
listing merchandise for sale at retail, display price tags or price quotations in any
form showing prices which are fictitiously in excess of the actual prices at which
such merchandise is regularly and customarily sold at retail by such person or by
the person issuing such samples, catalogs, or other forms of advertising.

74.    Minn. Stat. §325D.15 provides private remedies for violations of this provision.

Pursuant to Minn. Stat. § 325D.15, Plaintiffs are entitled to compensatory damages for

DealDash's violations of Minn. Stat. § 325D.12.

75.    Defendant is a person under the definitions of Minn. Stat. §325D.10, and the

underlying transaction is a sale of merchandise.

76.     As alleged above, DealDash has misrepresented the true nature of the businesses that supply many of its products. DealDash and its founder own the copyright and trademarks to myriad brands represented on its website. These brands are misrepresented as luxury brands.

77.     As alleged above, DealDash has knowingly represented that the price of the merchandise is less than the usual retail price.

78.     As alleged above, DealDash's auction pages show prices, which are fictitiously in excess of the actual prices at which such merchandise would be customarily sold at retail.

**COUNT V**
**Violations of the Minnesota Uniform Deceptive Trade Practices Act**
**Minn. Stat. § 325D.44**

79.     Plaintiff repeats and realleges each and every allegation above as if fully set forth in this paragraph.

80.     Plaintiff repeats and realleges each and every allegation above as if fully set forth in this paragraph.

81.     Minnesota Statute §325D.44 prohibits misrepresenting the quality of goods, providing in pertinent part:

**325D.44 DECEPTIVE TRADE PRACTICES.**
A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:
. . .
(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;
. . .
(4) uses deceptive representations or designations of geographic origin in connection with goods or services;
(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;
. . .
(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

32

. . .

(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

. . .

(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

82.    As alleged above, DealDash has attempted to pass off its brands as major international luxury brands that command prices well above the standard rates for what would be considered peer brands—if the house brands were in fact luxury brands.

83.    DealDash has attempted to misrepresent the status and quality of itsbrands listed in its auctions.

84.    DealDash routinely misleads consumers about the actual value of the products listed in its auctions.

**COUNT VI**
**Unjust Enrichment**

85.    Plaintiff repeats and realleges each and every allegation above as if fully set forth in this paragraph.

86.    Plaintiff purchased DealDash bids and bidpacks, and participated in illegal online lotteries based on Defendant's numerous, independently false and misleading misrepresentations and omissions as alleged herein.

87.    Defendant generated enormous profits from Plaintiff's and the Class's purchases and losses of cash and bids on www.dealdash.com and DealDash mobile device applications.

88.    Defendant has been knowingly, unlawfully and unjustly enriched at the direct expense of and detriment to Plaintiff and every member of the Class by collecting money to which Defendant was never entitled.

89.    It would be wrong to permit Defendant to enrich itself at the expense of Plaintiff and the Class, and Defendant should be required to disgorge this unjust enrichment.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring that Defendant is liable for the damages sustained by Plaintiff and the Class, pursuant to Minnesota Statutes § 8.31, subd. 3a;

B.    Permanently enjoining Defendant from operating its penny auctions in a manner that constitutes an unlawful lottery operation;

C.    Permanently enjoining Defendant from misrepresenting the actual costs paid for products by previous DealDash lottery winners;

D.    Permanently enjoining Defendant from grossly misrepresenting the "values," origins and/or regular prices of consumer products offered on DealDash.com and otherwise;

E.    Ordering Defendant to disgorge all profits obtained by the selling of "bids" and "bidpacks" to consumers for their participation in Defendant's unfair and unlawful scheme;

F.    Determining and certifying that this action is a proper class action, and certifying Plaintiff as Class Representative and Plaintiff's counsel as Class Counsel pursuant to Rule 23;

G.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs and expenses incurred in this action; and

H.    Awarding such other relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated: April 13, 2017          Respectfully submitted,

### GUSTAFSON GLUEK PLLC

By:  s/ Daniel C. Hedlund
   Daniel E. Gustafson (#202241)
   Daniel C. Hedlund (#258337)
   Eric S. Taubel (#392491)
   Canadian Pacific Plaza
   120 South 6th Street, Suite 2600
   Minneapolis, MN 55402
   Telephone: (612) 333-8844
   Facsimile: (612) 339-6622
   Email: dgustafson@gustafsongluek.com
     dhedlund@gustafsongluek.com
     etaubel@gustafsongluek.com

*Liaison Counsel for Plaintiff*

**FINKELSTEIN & KRINSK LLP**
Jeffrey R. Krinsk, Esq. (*pro hac vice* pending)
jrk@classactionlaw.com
David J. Harris, Jr., Esq. (*pro hac vice* pending)
djh@classactionlaw.com
Trenton R. Kashima, Esq. (*pro hac vice* pending)
trk@classactionlaw.com
550 West C Street, Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

*Lead Counsel for Plaintiff*

35