UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

---

GRANT PSTIKYAN,                                    Civil No. 17-1164 (JRT/FLN)

                    Plaintiff,

v.

DEALDASH, INC.,

                    Defendant.

---

**DEALDASH'S BRIEF SUPPORTING ITS MOTION TO DISMISS**

---

Plaintiff Grant Pstikyan lacks standing and fails to state a claim upon which relief can be granted.

First, Plaintiff, as a California resident, lacks standing to pursue claims against DealDash under Minnesota's consumer-protection laws. As this Court held in *Ferrari v. Best Buy Co.*, Civil No. 14-2956 (MJD/FLN), 2015 WL 2242128, at *10 (D. Minn. Mar. 12, 2015), a plaintiff residing outside Minnesota and alleging no injury in Minnesota may not bring claims under Minnesota's consumer-protection statutes. Nor does the choice-of-law provision in DealDash's Terms of Use cover Plaintiff's consumer-protection claims. And while Plaintiff purports to

represent a putative national class, the law is clear that the only standing that matters at this stage is that of the named Plaintiff.  Because he lacks standing, this case should be dismissed.

Second, even if Plaintiff did have standing, his complaint still fails to plead facts sufficient to satisfy *Twombly* and *Iqbal*'s "plausibility" standard, let alone Rule 9(b)'s heightened pleading requirements.  Assuming the facts alleged in the complaint, it is clear that DealDash's auctions are exactly that—auctions—and not the "illegal lotteries" that Plaintiff claims them to be.  According to Plaintiff's own allegations, DealDash auctions are won by the highest bidder, and "chance" (*e.g.*, a dice roll or card shuffle) does not determine the outcome.  While Plaintiff complains that DealDash does not disclose certain information to him about other auction participants, DealDash had no duty to disclose any more than would be required in any other form of auction (whether in person or online), nor does such alleged non-disclosure somehow transform an auction into a "lottery."  Furthermore, while Plaintiff asserts that DealDash misrepresents the price, quality, and source of auctioned merchandise, he does not—and cannot—assert that DealDash's descriptions of the auctioned products are inaccurate or untrue.

For each of these independent reasons, Plaintiff's complaint should be dismissed.

## I.    FACTS[1]

### A.    How DealDash Auctions Operate

DealDash is a Delaware company, with its corporate headquarters in Plymouth, Minnesota, that operates the auction website, www.dealdash.com. (Compl. ¶ 9.)   Before online shoppers can access DealDash auctions, they must create an account and agree to DealDash's Terms of Use and Privacy Policy. (Compl. ¶¶ 12, 51; Declaration of Paavo Pere ("Pere Declaration"), Exs. A, B ("Terms of Use").)[2]  The rules governing DealDash auctions are disclosed

---

[1] For purposes of this motion alone, DealDash assumes the truth of the complaint's allegations, as required under Rule 12(b)(6). DealDash expressly reserves the right to challenge Plaintiff's factual allegations should this motion be denied.

[2] The Pere Declaration, filed herewith, attaches copies of materials that are necessarily embraced by Plaintiff's Complaint.  "[D]ocuments necessarily embraced by the complaint are not matters outside the pleading." *Ashanti v. City of Golden Valley*, 666 F.3d 1148, 1151 (8th Cir. 2012) (citation omitted).  This includes documents whose contents are alleged in a complaint and whose authenticity is not questioned, but that were not attached to the pleading. *Id.* (quoting *Kushner v. Beverly Enters., Inc.*, 317 F.3d 820, 831 (8th Cir. 2003)).  "In a motion to dismiss, a court may consider 'matters incorporated by reference or integral to the claim, items subject to judicial notice, and matters of public record.'" *United States ex rel. Kraxberger v. Kan. City Power & Light Co.*, 756 F.3d

publicly to all website visitors, both in the Terms of Use and in easily accessible "How it Works" and "Help" webpages.  (*See generally* Terms of Use; Pere Declaration, Ex. C ("How it Works" page) and Ex. D ("Help" page).)

As with many traditional auctions, shoppers pay a fee to participate in DealDash auctions.  (Compl. ¶ 12.)[3]  At DealDash, this fee takes the form of "bids."  When a shopper places a bid in an auction, a bid is removed from his or her account.  (Compl. ¶ 16; Pere Declaration, Ex. F ("What is a Bid Pack" page).)  DealDash explains to shoppers that it is the cost of bidding that permits it to sell products at low auction prices.  (Pere Declaration, Ex. G ("Support" page) at "Too good to be true?" section under "FAQ.")  Shoppers purchase bids in bulk, by buying "bid packs," which can vary in terms of the number of bids in the pack and the unit price per bid.  (Compl. ¶ 12; Pere Declaration, Ex. H ("What's the Catch" page).)  DealDash bids can be purchased through the Buy It Now feature for 60 cents or on the Buy Bids page for much less when discount offers

_____

1075, 1083 (8th Cir. 2014) (citation omitted).  As Plaintiff refers explicitly to the Terms of Use and the DealDash website disclosures throughout his Complaint (*see, e.g.,* Compl. ¶¶ 25, 51), these materials are embraced by the pleadings.

[3] *See also* McAfee and McMillian, *Auctions and Bidding*, 25 J. Econ. Lit. 699, 702 (Jun. 1987); Klemperer, *Auction Theory: A Guide to the Literature*, 13 J. Econ. Surveys 227, 238 (1999) (discussing alternative designs of entry fees and reserve prices).

are active.  (Compl. ¶ 12.)  If, after trying out DealDash auctions, shoppers decide

that they do not like the experience for any reason, they are entitled to obtain a

complete refund for 100% of the first bid-pack purchase, with no questions

asked.  (Terms of Use at "No Questions Asked 100% Money Back Guarantee"

section.)

Every DealDash auction begins with a price of 1 cent and an "auction

clock" set to 10 seconds.  (Compl. ¶ 13;  "How it Works" page.)  With each bid,

the auction price increases by 1 cent and the clock resets.  (Compl. ¶¶ 13-15;

"How it Works" page .)  As with other traditional and online auctions, DealDash

shoppers have full control over whether and when to place a bid.  (Compl. ¶¶

13-16.)  The auction clock is akin to the traditional auctioneer announcing "Going

once, going twice, SOLD!"; when the time expires without a bid, the auction is

over.  DealDash does not use "reserve prices" (*i.e.*, minimum prices that an

auction must reach):  if only one shopper bids on an item, the auction will end at

an auction price of 1 cent, and the shopper will have the right to purchase the

item for that price.  (Compl. ¶ 14.)[4]  Unlike many traditional auction houses,

---

[4] *See* Axel Ockenfels, et al., *Online Auctions*, National Bureau of Economic
Research Working Paper Series at 15 (2006), available at:
http://www.nber.org/papers/w12785.pdf (last visited June 26, 2017).

DealDash does not charge a "buyer's premium": the auction result establishes the purchase price that the shopper will pay. (Pere Declaration, Ex. E ("Help" page video) at 00:20-01:26.)

In every DealDash auction, the shopper who places the highest bid always acquires the right to purchase the product at the auction price. (Compl. ¶ 16.) The outcome does not depend on whether a shopper has placed many bids, or only a solitary bid placed at the strategically correct time. (Compl. ¶ 16.) As with any traditional auction, neither the auctioneer (*i.e.*, DealDash) nor any participant knows when the auction will end; but before each auction begins, everyone knows that the highest bidder will obtain the right to acquire the product.[5] The auctions do not depend on chance, such as exists with a dice roll or randomly generated number. (Compl. ¶¶ 13-17.)

Much like traditional auction houses that permit absentee bidding[6], DealDash offers all shoppers the option of using the "Bid Buddy" feature, which

_____

("[T]raditional, live auction houses like Christie's and Sotheby's do not inform bidders whether any secret reserve price has yet been exceeded.").

[5] *See* McAfee and McMillan, *Auctions and Bidding*, 25 J. Econ. Lit. at 704-05.

[6] *See* Christie's "Buying at Christie's – Register & Bid" Page, http://www.christies.com/buying-services/buying-guide/register-and-bid/ ("If you plan to bid remotely with Christie's LIVE™ or submit an online absentee

allows the shopper to set up an automated program to make bids according to the shopper's pre-set specifications.  (Compl. ¶ 21; Pere Declaration, Ex. I ("How to Bid in an Auction" page).)  This feature relieves shoppers of the need to manually hit the "BID" button every time they want to place a bid; it can also be used by skilled shoppers to gain a strategic advantage.  ("How to Bid in an Auction" page; Terms of Use at "Bidding / BidBuddy" section.)  DealDash prominently discloses to customers the fact that most of its auctions are won by shoppers using the Bid Buddy function.  (Pere Declaration, Ex. J ("Tips and Tricks" page).)

As an auction unfolds, shoppers can gather information about the other auction participants by watching the bids and observing others' bidding behavior.  ("Tips and Tricks" page.)  Each auction page displays the last 9 bids placed in the auction and the identities of the shoppers making those bids, which other shoppers can track to inform their own bidding behavior.  Like traditional

---

bid…"); Christie's Absentee Bid Form, http://ww.christies.com/media-library/files/absenteebidform.ashx; *see also* Sotheby's Glossary, http://www.sothebys.com/en/Glossary.html#absentee-bid-anchor ("Absentee bids […] may be placed by filling out and submitting an Absentee Bid Form, or online.").

auctions or eBay, DealDash auctions involve an element of strategy in gauging

other participants and knowing when to bid.[7]

Shoppers may purchase merchandise either using the "Buy it Now"

feature or by placing the highest bid in the auction.  Indeed, at any point after an

auction begins, if a shopper no longer wishes to participate in the auction but still

wants to acquire the product, he or she may elect to use the "Buy It Now"

feature.  ("How to Bid in an Auction" page.)  Much like eBay's "Buy It Now"

option, shoppers who exercise this option pay DealDash the list price for the

product, and they also *receive back all of the bids that they expended in the auction*.

("How to Bid in an Auction" page; "Tips and Tricks" page; "What's the Catch"

page.)[8]  The "Buy It Now" feature is available to shoppers prior to, during, and

---

[7] *See generally* Axel Ockenfels and Alvin E. Roth, *Late and multiple bidding in second price Internet auctions: Theory and evidence concerning different rules for ending an auction*, 55 Games and Economic Behavior 297 (May 2006) (discussing how optimal bidding strategies differ between eBay and Amazon auctions due to different rules); *see also* Hugo Greenhalgh, *How to bid successfully at an auction*, Financial Times (Mar. 29, 2017), https://www.ft.com/content/ad55b40a-0f05-11e7-a88c-50ba212dce4d; Debbie Carlson, *How to buy at an auction*, Chicago Tribune (Mar. 20, 2017), http://www.chicagotribune.com/lifestyles/sc-cons-0323-auction-how-to-bid-20170320-story.html.

[8] *See also* Ockenfels, *Online Auctions* at 36 (explaining the benefits of "Buy-Now" features for impatient bidders); Anita Singh, *Christie's auction house copies eBay's 'buy it now' model*, The Telegraph (Oct. 30, 2014),

for seven days after the auction, allowing shoppers who did not win to still acquire the product and receive all of their bids back. ("What's the Catch" page; "How to Bid in an Auction" page.)  DealDash's "Buy It Now" feature ensures that shoppers always are able to acquire the product for the list price, without paying more, and without using any bids. ("What's the Catch" page.)

In addition to the comprehensive disclosure discussed above, DealDash cautions shoppers to be judicious about their bidding practices.  For example, DealDash highlights the fact that "[b]idding rapidly will only waste your bids and inflate the auction price" and encourages shoppers to "[b]id strategically, or book Bid Buddy to do it for you."  ("Tips and Tricks" page; *see also* Terms of Use at "Bidding" section.)  DealDash also reminds shoppers to keep their personal budgets in mind when participating in the auctions: "On a budget? Try bidding on less-expensive, less-popular items. There will likely be less competition." ("Tips and Tricks" page.)

To ensure that all shoppers are satisfied with the quality of the products that they have purchased, DealDash offers a no-questions-asked return policy.

---

http://www.telegraph.co.uk/culture/art/art-news/11197222/Christies-auction-house-copies-eBays-buy-it-now-model.html.

If, within 30 days after the shopper has received the product, the shopper decides

that he or she is not satisfied for any reason, the shopper may return the product

and obtain a refund simply by sending an e-mail to DealDash's customer-service

department. (Terms of Use at "Cancellation / Rescission" section.) DealDash

receives consistently high marks from customers through various online outlets.[9]

### B.    The Market for Products Offered on DealDash

DealDash's business model provides value to both merchandisers and

shoppers. DealDash offers a broad array of products at its auctions, at varying

retail price points. While some of the products offered on DealDash are luxury

goods with retail prices in the thousands of dollars, many other products at

auction are less expensive and widely available through other—usually higher-

priced—retail channels. DealDash's roster of brands includes more than 500

well-known brands, including Apple, Sony, Microsoft, Dell, ASUS, and

Cuisinart. Indeed, DealDash has executed agreements with major retailers such

---

[9] *See, e.g.,* @DealDash, *Reviews*, Facebook
https://www.facebook.com/pg/DealDash/reviews/ (nearly 3000 reviewers
collectively rating DealDash at 4.3 stars out of 5, and near 1.3M likes); DealDash
Reviews, Trustpilot, https://www.trustpilot.com/review/www.dealdash.com
(1700 reviewers collectively rating DealDash at 9.0 out of 10); DealDash App,
*Reviews*, Google Play,
https://play.google.com/store/apps/details?id=com.dealdash&hl=en (over 21,000
reviewers collectively rating DealDash at 4.2 stars out of 5).

as Walmart, Sears, and BestBuy, which use DealDash as an alternative

distribution channel to move inventory without discounting the retail pricing at

their own stores and websites.[10]

DealDash also offers brands from international companies that sell many

brands under one roof.  Among these brand consolidators is Galton Voysey

Limited (Galton Voysey), a Hong Kong-based corporation co-founded by

William Wolfram, one DealDash's founding members.[11]  (Compl. ¶ 39.)  While

DealDash and Galton Voysey share one person in common from their respective

founding teams, neither company owns any interest in the other and they have

no direct relationship to one another (*e.g.*, they have distinct corporate structures,

separate officers and employees, etc.).  (*See* DealDash's Rule 7.1 Disclosure (ECF

Docket No. 24).)

Galton Voysey principally develops and sells luxury brands, including

Bolvaint (Compl. ¶ 31), Kamikoto (Compl. ¶ 35(c)), and others.  As with other

---

[10] *See* Pere Declaration, Ex. K ("Orders & Shipping" page) ("We work with top suppliers such as Walmart and Sears, who ship the items directly to your door!").

[11] Mr. Wolfram has been recognized globally for his entrepreneurship. (Compl. ¶ 41; EY Entrepreneur of the Year, Ernst & Young, http://eoyhof.ey.com/#!/search (search for "Wolfram" in "Member Last Name" to see his 2013 Finland Entrepreneur Of The Year Award)).

luxury brands, the retail prices for these goods are high; indeed, high prices are

an inherent part of luxury goods.  "Luxury goods are expensive in part because

they are exclusive, and they are exclusive in part because they are expensive.

Luxury goods are not just somewhat more expensive than something delivering

comparable utility – they are vastly more expensive."  Ben Kleinman, *Luxury*

*Markets, Antitrust, and Intellectual Property: An Introduction*, 90 J. Pat. & Trademark

Off. Soc'y 742, 748 (Oct. 2008).  Like an increasing number of luxury brands

today, Galton Voysey uses social media, Amazon, and other electronic

distribution channels to reach its customers and sell its products.  (Compl., ¶ 38,

60).  Galton Voysey also uses DealDash as an alternative distribution channel for

its goods—and for the same reason other brand vendors do: to move overstock

merchandise without discounting its own retail pricing.

### C.    Plaintiff's Purchases through DealDash

Plaintiff is a California resident who purchased products through

DealDash auctions during November and December 2016.  (Compl. ¶ 8.)

Plaintiff alleges that he spent thousands of dollars on "falsely and misleadingly

advertised merchandise."  (*Id.*)  Nowhere in his complaint, however, does

Plaintiff allege that he sought to return the merchandise for a refund, or even

contacted DealDash to complain about the merchandise's quality or value.
Plaintiff's own Complaint acknowledges that his total financial outlays on
products, including both the cost of bids and the auction price, were
substantially less than the listed retail values; his only support for having
overpaid is the conclusory allegation that the products were "worth nowhere
near [the listed] price."  (Compl. ¶ 45.)  Nowhere does Plaintiff allege plausible
facts explaining why the goods he purchased should cost so much less than the
amounts he bid and paid for them.

## II.   LEGAL STANDARDS

Plaintiffs are required to plead facts that "raise a right to relief above the
speculative level," which requires more than labels, conclusions, or formulaic
recitation of the elements of a cause of action.  *Bell Atlantic Corp. v. Twombly*, 550
U.S. 544, 555, 127 S. Ct. 1955 (2007) (internal citations omitted).  "Threadbare
recitals of the elements of a cause of action, supported by mere conclusory
statements," are insufficient.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009) (further
explaining, "[O]nly a complaint that states a plausible claim for relief survives a
motion to dismiss.").

Plaintiff's consumer-protection claims are also governed by Rule 9(b)'s particularity requirement. *See King v. Reed, LLC*, No. 07-1908 (DWF/RLE), 2008 WL 80630, at *4 (D. Minn. Jan. 8, 2008). Under Rule 9(b), "[c]onclusory allegations that a defendant's conduct was fraudulent and deceptive are not sufficient." *Merry v. Prestige Capital Mkts., Ltd.*, 944 F. Supp. 2d 702, 707 (D. Minn. 2013). Instead, a plaintiff must set forth the "who, what, when, where, and how" of the alleged fraud. *King*, 2008 WL 80630, at *4.

## III.   ARGUMENT

### A.   As a California Resident, Plaintiff Lacks Standing to Sue Under Minnesota's Consumer-Protection Statutes.

For a named plaintiff to have standing to sue under Minnesota's consumer-protection statutes, he or she must either be a resident of Minnesota or have sustained an injury in Minnesota. *See Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. 13-2664 (ADM/SER), 2014 WL 943224 , at *11 (D. Minn. Mar. 11, 2014) ("Named plaintiffs lack standing to assert claims under the laws of the states in which they do not reside or in which they suffered no injury.") (citation omitted).

Here, Plaintiff has alleged no facts to support either basis for standing. Plaintiff lives in California. (Compl. ¶ 8.) Nowhere in his complaint does he

14

allege that he has ever set foot in Minnesota.  Nowhere does he allege that he

purchased a product designed in, manufactured in, or shipped from Minnesota.

Nowhere does he claim to have ever communicated with anyone physically

present in Minnesota.  And nowhere does Plaintiff attempt to describe any injury

that he sustained in Minnesota.  From the face of the complaint, Plaintiff's only

apparent connection to Minnesota is the fact that he used DealDash's website last

fall and DealDash's corporate headquarters happen to be located in Minnesota—

although Plaintiff acknowledges that "most of DealDash's substantive operations

reside overseas."  (Compl. ¶¶ 3, 9.)

Plaintiff's claims here are analogous to those in *Ferrari v. Best Buy Co.*, 2015

WL 2242128, where the plaintiff, Mr. Ferrari (a resident of Massachusetts),

brought a nationwide class action against a Minnesota-based company for

violations of Minnesota's Unfair Trade Practices Act, Consumer Fraud Act, and

Uniform Deceptive Trade Practices Act.  *Id.* at *4, 10.  In its decision on a motion

to dismiss, this Court reaffirmed that named plaintiffs lack standing to assert

claims under the laws of states in which they do not reside and have suffered no

injury.  *Id.* at *9. Because Mr. Ferrari alleged that he lived in Massachusetts,

purchased the product in Massachusetts, and relied on advertisements that he

saw in Massachusetts, this Court held that he failed to allege "any injury in Minnesota" and concluded that he "lack[ed] standing to bring his claims under Minnesota's consumer protection statutes." *Id.* at *10; *see also Black v. MoneyGram Payment Sys.*, No. 4:15-cv-01767-AGF, 2016 WL 3683003, at *8 (E.D. Mo. July 12, 2016) (holding that a Missouri plaintiff lacked standing to pursue a claim under the Minnesota Unfair Trade Practices Act).  Here, Plaintiff's Minnesota consumer-protection claims fail for the same reasons that Mr. Ferrari's did.

Nevertheless, Plaintiff seeks to apply Minnesota's consumer-protection statutes not only to his own purported claim against DealDash, but also to any potential claims of any person who has ever purchased bids or merchandise through DealDash, regardless of where in the United States any such person might reside.  (Compl. ¶¶ 49-51.)  This is despite the fact that Plaintiff recognizes that, like himself, "the overwhelming majority of [putative] Class members are citizens of States" other than Minnesota. (Compl. ¶ 10; *see also* Compl. ¶¶ 46, 50 (referring to "millions of consumers across the United States" and to DealDash consumers who are "geographically dispersed . . . throughout the United States").)

Plaintiff points out that DealDash's Terms of Use include a choice-of-law provision that states that the agreement will be governed by Minnesota law. (Compl. ¶ 51.)[12]   DealDash acknowledges this Court's class-certification decision in *Khoday v. Symantec Corp.*, No. 11-180 (JRT/TNL), 2014 WL 1281600, at *18-21 (D. Minn. Mar. 31, 2014), which held that certain contractual choice-of-law provisions could justify application of Minnesota's Consumer Fraud Act to non-Minnesota residents' claims.   DealDash respectfully submits, however, that the Court instead follow its decision to dismiss the complaint in *Ferrari* for at least three reasons:

*First*, the contractual choice-of-law provision at issue here compels this result.   The provision in DealDash's Terms of Use states:   "*This agreement* will be governed by the laws of the United States and the State of Minnesota, without

---

[12] While Plaintiff alleges that the choice-of-law provision covers "any and all disputes" regarding shoppers' relationships with DealDash, Plaintiff's reading conflates the Terms of Use's choice-of-law provision and its forum-selection provision.   The relevant section of the Terms of Use reads as follows: "*This agreement* will be governed by the laws of the United States and the State of Minnesota, without reference to rules governing choice of laws.   Any *action* relating to this agreement must be brought in the federal or state courts located in Minneapolis, Minnesota, and you irrevocably consent to the jurisdiction of such courts."   (Terms of Use at "Applicable Law" section (all-capitalization removed and emphasis added).)

reference to rules governing choice of laws." (Terms of Use at "Applicable Law"

section (all-capitalization omitted and italics added).) In contrast, the Minnesota-

law provision at issue in *Khoday* stated that "any and all claims or disputes

*relating to the Services* shall be governed by the laws of the State of Minnesota."

*Khoday*, 2014 WL 1281600, at *19 (emphasis added) (citation omitted). By its

express terms, the scope of the choice-of-law provision to which DealDash and

Plaintiff agreed is, unlike in *Khoday*, limited to the four corners of their

contractual agreement. And Plaintiff has not asserted a breach-of-contract claim.

The choice-of-law provision here mirrors that in *Smith v. Genetic Depot,*

*Inc.*, No. 11-cv-273 (PJS/TNL), 2013 WL 627065 (D. Minn. Feb. 20, 2013), where

this Court held that a choice-of-law provision limited to "this agreement" did not

cover negligent and fraudulent-misrepresentation claims, because such claims

related to contract inducement rather than contract performance. *Id.* at *8-9; *see*

*also In re Sling Media Slingbox Adver. Litig.*, 202 F. Supp.3d 352, 358 (S.D.N.Y. 2016)

(holding that a choice-of-law provision stating that "this Agreement" would be

governed by California law did not apply to New York purchasers' consumer-

protection claims). The Minnesota choice-of-law provision in the Terms of Use

governs contract claims based on the parties' performance of that agreement; it is

inapplicable to Plaintiff's claims that DealDash violated Minnesota consumer-protection statutes by allegedly running illegal lotteries and inducing consumers to participate in its auctions through purported fraud.

*Second*, it would violate public policy to allow contracting parties to expand the reach of Minnesota's consumer-protection laws to the exclusion of other states' laws.  As the U.S. Supreme Court has explained, it is a fundamental principle of our federal system of government that each state has a sovereign interest in making "its own reasoned judgment about what conduct is permitted or proscribed within its borders."  *State Farm Mut. Auto Ins. Co. v. Campbell*, 538 U.S. 408, 422 (2003).  The Eighth Circuit has noted that "state consumer-protection laws vary considerably, and courts must respect these differences rather than apply one state's law to sales in other states with different rules."  *In re St. Jude*, 425 F.3d 1116, 1120-21 (8th Cir. 2005) (quoting *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002)).  Similarly, the Ninth Circuit has held, applying the law of California (Plaintiff's home jurisdiction), that "each class member's consumer protection claim should be governed by the consumer protection laws of the jurisdiction in which the transaction took place."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 591 (9th Cir.

2012) ("Consumer protection laws are a creature of the state in which they are

fashioned. They may impose or not impose liability depending on policy choices

made by state legislatures. . .").  In fact, applying a state's substantive law to a

non-resident's claim violates the Constitution unless the state has "a significant

contact or significant aggregation of contacts" with the circumstances giving rise

to the claim.  *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312 (1981).  Plaintiff alleges

no such contacts with Minnesota.

Applying Minnesota law to a nationwide class action brought by a non-

Minnesota resident would infringe on the other 49 states' sovereignty to make

their own policy determinations regarding consumer-protection issues.  *See*

*Mazza*, 666 F.3d at 592 ("Each of our states also has an interest in balancing the

range of products and prices offered to consumers with the legal protections

afforded to them."); *accord Bristol-Meyers Squibb v. Superior Court of California*, S.

Ct. No. 16-466, slip opinion at *6-7 (June 19, 2017) (noting that "the sovereignty of

each State" implies "a limitation on the sovereignty of all its sister States")

(internal quotation marks and citations omitted).[13]  For this reason, courts around

---

[13] *See also In re Cheerios Mktg. & Sales Prac. Litig.*, No. 09-cv-2413, MDL
Docket No. 2094, 2012 WL 3952069, at *10 (D.N.J. Sept. 10, 2012) (ruling that
applying Minnesota law to a nationwide class action would be improper given

the Eighth Circuit and the country recognize that consumer-protection claims are governed by the law of the state in which the consumer resides.  *See, e.g., True v. Conagra Foods, Inc.*, No. 07-00770-CV-W-DW, 2011 WL 176037, at *8 (W.D. Mo. Jan. 4, 2011) ("[I]n this putative class action, the law of the state where each member resides would be applicable in this action."); *Tyler v. Alltel Corp.*, 265 F.R.D. 415, 427 (E.D. Ark. 2010) (holding that "the law of each state where the consumer transaction occurred, or where the consumer lives, should govern that transaction"); *In re Grand Theft Auto Video Game Consumer Litig.*, 251 F.R.D. 139, 151-54 (S.D.N.Y. 2008)  (same outcome, applying Minnesota choice-of-law rules). And even if the Terms of Use's choice-of-law provision did cover consumer-protection claims, this cannot cure a plaintiff's lack of an injury sufficient to confer the standing necessary to pursue a claim.  *See In re Sony Gaming Networks & Customer Data Sec. Breach Litig.*, 903 F. Supp. 2d 942, 965-66 (S.D. Cal. 2012) (holding that contractual choice-of-law provision did not govern consumer-protection claims, and further dismissing such claims for failure to sufficiently allege injury).

---

other states' "interest in applying their own consumer protection law to their own citizens").

*Finally*, applying contractual choice-of-law provisions to consumer-protection claims is likely to frustrate, rather than advance, such laws' consumer-protection objectives.  Allowing contractual parties to "opt in" to a particular state's consumer-protection laws, to the exclusion of the consumer's home state's law, would incentivize a "race to the bottom" in standardized contracts drafted by consumer-facing organizations, whereby the drafter would be incentivized to select the state law with the least consumer-friendly laws.  *Cf. Khoday*, 2014 WL 1281600, at *20 (collecting cases where courts have refused to enforce choice of law provisions that would limit or deprive consumers of favorable remedies under their home state's laws); *Grand Theft Auto*, 251 F.R.D. at 153 (declining to apply Minnesota consumer-fraud law to a national class action because it is less consumer-friendly than some other jurisdictions).  While enforcing contractual choice-of-law provisions with respect to consumer-protection issues may bring a measure of uniformity, it would also come with the negative consequence of denying local residents the benefits of the consumer-protection statutes that their individual state legislatures have enacted.

For these reasons, because Plaintiff is a resident of California and has alleged no injury sustained in Minnesota, and because the Terms of Use's choice-

of-law provision does not cover consumer-protection claims, Plaintiff lacks

standing to pursue claims under Minnesota's consumer-protection statutes.  On

this basis alone, the Court should dismiss such claims with prejudice.

### B.      Plaintiff Fails to State a Claim for Violations of the Minnesota Consumer Fraud Act (Count I).

To state a claim for violation of the Minnesota Consumer Fraud Act (Minn.

Stat. § 325F.68, *et seq.*) (the "MCFA"), Plaintiff must plead plausible facts

supporting four elements:  (1) a misrepresentation or false statement sufficient to

violate the statute; (2) an intent for the public to rely thereon; (3) the cause of

action is asserted for the benefit of the public; and (4) the defendant's violation

caused the plaintiff to suffer damages.  Minn. Stat. § 325F.68, *et seq.*; *see also*

*Certified Question United States Dist. Court Order v. Philip Morris*, 621 N.W.2d 2, 12

(Minn. 2001).  Private actions for MCFA violations require that the plaintiff have

been injured by a violation (Minn. Stat. § 8.31, subd. 3a) and a "causal nexus"

between the plaintiff's injuries and the defendant's allegedly wrongful conduct.

*Wiegand v. Walser Auto. Grps. Inc.*, 683 N.W.2d 807, 811 (Minn. 2004).

The gravamen of Plaintiff's complaint is two-fold: First, Plaintiff complains

that DealDash is operating illegal lotteries that are supposedly subject to

penalties under Minnesota Criminal Code sections 609.75, *et seq.*  (Compl. ¶ 58.)

Second, Plaintiff alleges that DealDash does not fully disclose the terms of its auctions, and that DealDash misrepresents the prices paid by recent winners and the quality and value of auctioned products.  (Compl. ¶¶ 59-60.)

Plaintiff's allegations are insufficient to state a claim under the MCFA— particularly with respect to the first element of misrepresentation or false statement—for at least three reasons.  First, DealDash does not operate an illegal lottery, and Plaintiff's conclusory pleading fails to satisfy *Twombly/Iqbal* or Rule 9(b) pleading standards.  Second, DealDash fully discloses its auctions' terms. (*See* Facts, *supra* at 3-10 (How DealDash Auctions Operate).)  Third, Plaintiff's complaint lacks facts plausibly alleging that DealDash misrepresents the price and quality of its merchandise.  For all of these reasons, Count I (MCFA) fails.

### 1.   DealDash Does Not Operate an Illegal Lottery.

As a threshold matter, there is no private right of action for alleged violations of Minn. Stat. § 609.75 and the related statutes concerning lotteries, gambling, and betting.  *See Krueger v. Zeman Constr. Co.*, 781 N.W.2d 858, 863 (Minn. 2010); *H.J. Inc. v. Northwestern Bell Corp.*, 420 N.W.2d 673, 675 (Minn. Ct. App. 1988).  Accordingly, Plaintiff's claims cannot stand to the extent they are based directly on a purported violation of the Minnesota criminal code.

Even if dressed up as violations of the MCFA, Plaintiff's accusation that DealDash is somehow operating an illegal lottery is directly undercut by the Minnesota lottery statutes' language.  Under those statutes, the role of "chance" is critical:  "A lottery is a plan which provides for the distribution of money, property or other reward or benefit ***to persons <u>selected by chance</u>*** from among participants some or all of whom have given a consideration for the chance of being selected."  Minn. Stat. § 609.75, subd. 1(a) (emphasis added).  Similarly, "[a] bet is a bargain whereby the parties mutually agree to a gain or loss by one to the other of specified money, property or benefit ***<u>dependent upon chance</u>*** although the chance is accompanied by some element of skill."  Minn. Stat. § 609.75, subd. 2 (emphasis added).  Finally, "[a] gambling device is a contrivance the purpose of which is that for a consideration a player is afforded an opportunity to obtain something of value, other than free plays, automatically from the machine or otherwise, ***the award of which is <u>determined principally by chance</u>***, whether or not the contrivance is actually played."  Minn. Stat. § 609.75, subd. 4 (emphasis added).  Minnesota case law confirms that a "lottery" requires three elements:  "(1) a prize or reward is offered, (2) ***<u>chance determines who is awarded the prize</u>***, and (3) participants pay consideration for the chance to win

the prize." *Minn. Souvenir Milkcaps LLC v. State*, 687 N.W.2d 400, 403 (Minn. Ct. App. 2004) (emphasis added).[14]

Under these standards, DealDash auctions' outcomes are not "determined principally by chance" and thus do not constitute a lottery, much less any form of betting or gambling.  As with other auctions, the highest bidder is 100% entitled to the item.  DealDash allows participants to continue bidding if they are outbid.  Each time a new bid is placed, bidders have thereby absolutely secured their place to acquire the item at the bid point, in direct contrast to "random draw" lotteries where winners are selected by chance.  And the "Buy It Now" feature allows shoppers to purchase a given item at any time and receive all their bids back.  Shoppers therefore have full control over (1) *whether* they wish to place another bid (or another 1,000 bids), (2) *when* they place their bid(s), and (3) whether they wish to "Buy It Now" and bypass the auction altogether

---

[14] *See also* Op. Minn. Atty. Gen. 733-H (July 10, 1947) (noting that the award of prizes based on chance is an essential component of a "lottery"); Op. Minn. Atty. Gen. 510-B-9 (Apr. 10, 1951) (same); Op. Minn. Atty. Gen. 510-B (Oct. 17, 1947) (contest not a "lottery" because prizes were not awarded based on chance); Op. Minn. Atty. Gen. 510-B (Nov. 25, 1949) (same); Op. Minn. Atty. Gen. 510-B (Feb. 15, 1949) (same).

midstream.  When a shopper's bid is the highest one, he or she is 100% assured of winning the auction.

Plaintiff's complaint confuses *chance* with *uncertainty*.  Granted, DealDash shoppers do not know every aspect of every other auction participant's resources and strategy.  But this is true in every auction, whether it be eBay or Sotheby's or DealDash.  The fact that one bidder may not know the other bidders' strategies— or that bidders pay for the opportunity to bid[15]—does not change the fundamental fact that shoppers ultimately retain control over whether they win or lose the auction.[16]  Thus, DealDash auctions do not constitute illegal lotteries, as their outcome does not principally depend (if at all) on chance.

-------------------

[15] *See* Terms of Use at "Bidding/BidBuddy" and "How the Auctions Work" sections.

[16]  While DealDash has not located any decisions directly on point, complaints against other penny auction sites have been dismissed on a variety of grounds.  *See, e.g., Manning v. Creative Headquarters, LLC*, No. 11-CV-2203, 2012 U.S. Dist. LEXIS 191219 (N.D. Ill. March 30, 2012) (granting motion to dismiss putative class action on grounds that the auction operators were not "winners" against whom gambling consideration may be recovered because the entry and bidding fees were paid regardless of an auction's outcome) (not available on Westlaw); *Bryant v. QuiBids, LLC*, No. 11-CV-1013, 2012 WL 394154 (N.D. Ill. Feb. 3, 2012) (dismissing gambling-based claims against penny auction website on personal jurisdiction grounds).

### 2.   DealDash Fully Discloses the Terms of its Auctions to Shoppers.

Plaintiff's complaint fails to plead any actionable intentional misrepresentations because DealDash's website features extensive—and inarguably truthful—disclosures about the manner in which the auctions operate.

Simply alleging in conclusory fashion that a company misrepresents its business to the public is insufficient to survive a motion to dismiss.  In *Baker v. Best Buy Stores, LP*, 812 N.W.2d 177 (Minn. Ct. App. 2012), for example, the Court of Appeals affirmed dismissal of a Consumer Fraud Act claim in which the plaintiff alleged that even though statements in a contract were "technically true," the service contract was written in "a manner that is misleading."  *Id.* at 183.   The court concluded (1) that the contract was not ambiguous; (2) there was no breach of the contract; and (3), as a result, there was no intentional misrepresentation that would support a claim under the MCFA.  Here, as in *Baker*, DealDash's exhaustive disclosures in the Terms of Use, as well as the "How it Works", "How to Bid on an Auction", "Tips and Tricks", and "What is a Bid Pack" pages (*See* Pere Declaration, Exs. A, B, C, F, and J), among others,

directly contradict Plaintiff's claim that DealDash misrepresented the nature of its auctions.

Furthermore, if Plaintiff contends that DealDash omitted certain information (*e.g.*, the number of bids that other shoppers retain in their accounts, the number of bids other shoppers have already spent, whether other shoppers are sitting in front of their computers and manually bidding or using DealDash's Bid Buddy service, and the upper bounds of pricing (Compl. ¶¶ 18-21)), Plaintiff identifies no duty on DealDash's part to disclose such information.  Nor can it. Certain unknown elements are simply inherent in the concept of an auction— whether it is conducted primarily online, as on eBay, or through a more traditional auction house like Christies.  No traditional auction house discloses other bidders' financial capabilities, nor do they publish the specific number of times a particular buyer has submitted a bid on a particular item.  In contrast, on the DealDash website, strategic shoppers who actively monitor an auction's progress can see exactly how many times other auction participants have submitted bids on a particular item.

Plaintiff also complains that DealDash fails to disclose how many prepaid bids the advertised winners had to spend to acquire each featured product.

(Compl. ¶ 29.)  Simple math, however, enables every customer to calculate the maximum cost of an earlier auction.  For example, because all auctions start at $0.00 and pricing increases by one cent per bid, it is clear that an item selling for $20.92 was the subject of 2,092 bids.  (*See, e.g.,* Compl. ¶ 16.)  Bidders can easily see that the *maximum* they would ever have to submit would be *half*—or 1,046—of the bids (*i.e.,* the winner was always the person who counterbid any other person's increase of $0.01, until winning).  Of course, the winner of a particular auction might have won the product by bidding only 50 times, or 10 times, or even only once.  Accordingly, a prospective bidder can readily determine both the maximum and minimum any purchase would have cost.  (Compl. ¶ 16.)

The information that Plaintiff claims was "misrepresented" is either available on DealDash's website or calculable with simple math.  Plaintiff is unable to point to any actionable failure by DealDash to disclose relevant information to shoppers who participate in its auctions.

### 3. DealDash Does Not Misrepresent the Quality or Price of its Merchandise to Shoppers.

Plaintiff next complains that some of the brands offered on DealDash are not the "luxury" goods that they purport to be, and that DealDash lists these items with a "value" that is substantially higher than what they are worth.

(Compl. ¶ 34.)  Notably, however, Plaintiff does not allege that the products DealDash offers are of low quality, nor that DealDash's descriptions of the goods being sold are actually false.  This failure is fatal.

As a threshold matter, one buyer's subjective opinions of a brand's "value" are simply that—opinions.  Plaintiff's comparisons of one brand of handbag to another (Compl. ¶¶ 31-34) constitute nothing more than Plaintiff's opinion; indeed, Plaintiff offers no explanation why a "Kate Spade" or "Michael Kors" handbag should be any more comparable to a Bolvaint bag than, for example, one offered for sale at ten times the price by a Paris designer.[17]  This element of subjectivity rings particularly true for the luxury-goods market, where individual opinions about prestige and value are particularly pronounced. DealDash, as an alternative channel for luxury goods, simply accounts for these subjective perceptions by providing factually accurate descriptions in each of its auction listings regarding the goods being sold.

Plaintiff alleges in conclusory fashion that DealDash does not "regularly and customarily" receive the posted "value price" for its items (Compl. ¶ 38), but

_____

[17] Plaintiff points to nothing in the Bolvaint bag that bespeaks poor quality or craftsmanship.

provides no factual basis for this conclusion.  Indeed, the reverse is true:

DealDash openly displays the "value price" of every item by allowing shoppers

to buy at the "Buy It Now" price—an option that shoppers can select (and also

get all their bids back).  Even a cursory review of a typical DealDash page will

show that numerous well-known (and less well-known) products are available

for sale (via the "Buy It Now" feature) at standard retail prices found at

department stores and online.

Plaintiff also complains that DealDash purportedly sells brands "largely"

developed or owned by Galton Voysey, a retail conglomerate co-founded (years

later) by Mr. Wolfram, one of DealDash's founding members.  (Compl. ¶¶ 5, 31-

43.)  In so doing, however, Plaintiff necessarily acknowledges the

incontrovertible fact that DealDash also sells products from unaffiliated brands—

like Apple, Sony, Microsoft, Dell, ASUS, Cuisinart, and others—whose prices

and market value are well known to all.  To the extent Plaintiff's argument is

premised on the notion that Galton Voysey is not itself well-known, there are

many companies around the world that create, sell, and promote whole suites of

well-known and lesser-known products.  For example, Diageo is a British

multinational alcoholic-beverages company that does not itself have a household

name, but owns and markets famous brands including Smirnoff, Johnnie Walker, Baileys, Guinness—and also less well-known brands like Bundaberg, Lagavulin, and Grand Old Parr.[18]  Likewise, LVMH is a French luxury-goods conglomerate largely unknown to the general public—but that nevertheless owns and markets well-known brands such as Louis Vuitton, Marc Jacobs, and Dior, and also sells the lesser-known Kenzo and Krug.[19]

The fact that Galton Voysey and DealDash share a common founder does not offer plausible support for Plaintiff's conclusion that Galton Voysey's external market is "illegitimate."  (Compl. ¶¶ 5, 35, 38, 41.)  Both companies have separate corporate structures and separate duties to their separate shareholders. (*See* DealDash's Rule 7.1 Disclosure (ECF Docket No. 24).)  Galton Voysey's various brands sell high-quality, well-regarded products that are marketed to customers via social media, Amazon, DealDash, and elsewhere.  Indeed, nothing in Plaintiff's Complaint suggests otherwise.

Finally, Plaintiff fails to plead the existence of a causal nexus between his alleged damages and DealDash's conduct.  If a customer is dissatisfied with the

---

[18] Diageo, "Our Brands" Page, http://www.diageo.com/en-us/ourbrands/Pages/StrategicBrands.aspx.

[19] LVMH, "Houses" Page, https://www.lvmh.com/houses/.

quality or any other aspect of an item, he or she may return it to DealDash (in

unused condition) for a full refund of the purchase price, with no questions

asked.  Of course, Plaintiff never alleges that he sought to contact DealDash's

customer service line to complain about any aspect of his purchases—much less

about the merchandise's quality.  Moreover, the bulk of Plaintiff's disclosure-

based allegations in the Complaint are contradicted by the extensive content of

the disclosures on the website, as well as the bidder information available on

each auction page.  As a result, Plaintiff has alleged no actionable damages

caused by DealDash's conduct.

     For all of these reasons, Count I (MCFA) fails.

    **C.**     **Plaintiff Fails to State a Claim for Violations of the Minnesota Unlawful Trade Practices Act (Counts III & IV) or the Minnesota Deceptive Trade Practices Act (Count V).**

     Plaintiff alleges that DealDash violated the Minnesota Unlawful Trade

Practices Act (Minn. Stat. §§ 325D.12 and 325D.13) (the "MUTPA") and the

Minnesota Deceptive Trade Practices Act (Minn. Stat. § 325D.44) (the "MDTPA")

by misrepresenting the quality of goods and their corresponding retail values.

(Compl. ¶¶ 71, 76-78, 82-84.)  For the same reasons that Plaintiff fails to state a

violation of the MCFA, he also fails to state a violation of these statutes because

(a) Plaintiff does not allege facts plausibly supporting that DealDash inaccurately describes its merchandise or misrepresents its retail value, and (b) because Plaintiff is incapable of alleging the necessary element of a risk of future harm.

MUTPA claims require a showing that the defendant made one or more material misrepresentations about the merchandise at issue.  Under Section 325D.13, that misrepresentation must concern the "true quality, ingredients or origin of […] merchandise."  Similarly, Section 325D.12's various subsections require a showing that the defendant has either "misrepresent[ed] the true nature" of a business "engaged in the sale of merchandise at retail" (Minn. Stat. § 325D.12(1)), misrepresented "that the price at which [its] merchandise is sold […] is less than the usual retail price" (Minn. Stat. § 325D.12(2)), or "display[ed] price tags […] showing prices which are fictitiously in excess of the actual prices at which such merchandise is regularly and customarily sold" (Minn. Stat. § 325D.12(3)).

As discussed in detail above, Plaintiff has not plausibly alleged (and cannot allege) that DealDash misrepresented the nature, quality, or retail value of the merchandise sold on its website.  Rather, DealDash fairly describes the

quality of its merchandise and fairly represents its retail value.  As a result, Counts III and IV (MUTPA) cannot stand.

Similarly, pleading a Minnesota Deceptive Trade Practices Act violation requires facts showing that (1) DealDash made a misleading statement; (2) the statement actually deceived, or had a tendency to deceive, a substantial segment of Defendant's audience; (3) such deception is likely to influence buying decisions; and (4) Plaintiff has been or is likely to be injured as a direct result of DealDash's activities.  *See* Minn. Stat. § 325D.44.

In addition to his inability to properly allege any misleading statement or deception, Plaintiff's complaint contains no facts supporting the critical element of potential for future harm.  Private litigants cannot pursue injunctive relief under the MUTPA or MDTPA without showing the potential for "future harm." *Gardner v. First Am. Title Ins. Co.*, 296 F. Supp. 2d 1011, 1020 (D. Minn. 2003).  In *Gardner*, for example, the Court dismissed an MDTPA claim on summary judgment where there was no likelihood of future harm.  *Id.*  Likewise, in *Hunter v. Ford Motor Co.*, Civil No. 08-4980 (PJS/JSM), 2010 WL 3385225 (D. Minn. July 28, 2010), the plaintiff asserted that Ford had engaged in deceptive trade practices by misleading her into believing that she was buying merchandise at

prices substantially below market pricing, and that she was purchasing merchandise of a particular quality. *Id.* at \*4-6. The Court dismissed the MDTPA claim, noting that the plaintiff "has provided this Court with no evidence that she is at risk of any future harm from defendants." *Id.* at \*14.

Similarly here, Plaintiff is already on notice of DealDash's alleged practices and can no longer say that he will be deceived. *See Tuttle v. Lorillard Tobacco Co.*, Civil File No. 99-1550 (PAM/JGL), 2001 WL 821831, at \*5 (D. Minn. July 5, 2001) (reasoning that the plaintiff alleging DTPA violations, by virtue of his knowledge, "can no longer be harmed by continued violations"). Plaintiff does not allege that even attempted to return any of the goods that he now claims were lacking in quality. As a result, it is clear that he has not been harmed in this regard, and that he cannot meet the clear pleading requirements set forth in the relevant statutes.

For all of these reasons, the Court should dismiss Counts III, IV, and V (MUTPA and MDPTA).

## D. Plaintiff Fails to State a Claim for Violations of the Minnesota False Statement in Advertisement Act (Count II).

Next, Plaintiff claims that DealDash wrongfully placed misleading ads for bids and bid packs, as well as various consumer products. (Compl. ¶ 64.) In

37

order to state a claim for violation of the Minnesota False Statement in

Advertisement Act (Minn. Stat. § 325F.67) (the "MFSAA"), Plaintiff must

plausibly allege (1) a misrepresentation sufficient to violate the statute, *Khoday*,

858 F. Supp. 2d at 1016; (2) that the alleged statements were "made, published,

disseminated, circulated, or placed before the public" in Minnesota, *Parkhill v.*

*Minn. Mut. Life Ins. Co.*, 995 F. Supp. 983, 997 (D. Minn 1998); (3) that Plaintiff, as

a private litigant, suffered harm as a result of DealDash's supposed false

statements in advertising under Minn. Stat. § 8.31, subd. 3a; and (4) that his cause

of action benefits the public, *Ly v. Nystrom*, 615 N.W.2d 302, 314 (Minn. 2000).  *See*

*also* Minn. Stat. 325F.67.  Plaintiff's complaint fails to allege facts supporting the

first and second elements.

As a threshold matter, DealDash's representations are not

"advertisements" under the MFSAA.  The statute's plain language does not

encompass information regarding past auction winners that is published on a

website and automatically updated by software to reflect more recent winners.

This informational list is not the subject of human authorship, and instead

reflects information that is drawn directly from DealDash's auction database.

Beyond Plaintiff's bare characterization of DealDash's representations as "advertisements," Plaintiff has entirely failed to plead facts supporting the conclusion that DealDash's "advertisements" are "false" under the MFSAA.  To be sure, even if the statements on DealDash's website could properly be characterized as "advertisements," the statements are not false.  Plaintiff, therefore, cannot plead the existence of any misrepresentation by DealDash.  As described in detail above, DealDash fairly describes the quality and "value" of its merchandise.

Finally, Plaintiff, as a resident of California who does not allege that any of the statements at issue were made to him in Minnesota, cannot recover under the MFSAA.  In *Parkhill*, 995 F. Supp. at 997, this court dismissed claims based on allegedly false statements originating in Minnesota but made to plaintiff while he was living in Florida.  The court concluded that "[w]hile plaintiff attempts to broaden the scope of the Advertising Act to encompass defendant's statements, the statute's plain language requires that any statements be made in Minnesota" and that "plaintiff's allegations relate only to statements made to him in Florida." *Id.*  On a motion to dismiss, this issue is considered vis-à-vis the named plaintiff. *See, e.g., Browe v. Evenflo Co.*, Civ. No. 14-4690 ADM/JJK, 2015 WL 3915868, at *4

n.1 (D. Minn. June 25, 2015) ("For purposes of this motion [to dismiss], only

Browe's claims, and not those of any potential class member, are considered.").

Accordingly, Count II (MFSAA) should be dismissed.

###### E.    Plaintiff Fails to State a Claim for Unjust Enrichment (Count VI).

Lastly, Plaintiff purports to bring a common-law claim for unjust

enrichment, presumably also under Minnesota law.  (Compl. ¶¶ 85-89.)[20]  The

elements of an unjust-enrichment claim are "(1) a benefit conferred; (2) the

defendant's appreciation and knowing acceptance of the benefit; and (3) the

defendant's acceptance and retention of the benefit under such circumstances

that it would be inequitable for him to retain it without paying for it."  *Dahl v.*

*R.J. Reynolds Tobacco Co.*, 742 N.W.2d 186, 195 (Minn. Ct. App. 2007).  Such a

claim exists only under circumstances where the defendant knowingly received

or obtained something of value for which the defendant should pay "in equity

and good conscience."  *Klass v. Twin City Fed. Sav. & Loan Ass'n.*, 291 Minn. 68,

---

[20] As with the consumer-protection claims, choice-of-law principles dictate that each putative class member's purported unjust-enrichment claim would be governed by the law of each class member's home state. *See Rapp v. Green Tree Serv'g, LLC,* 302 F.R.D. 505, 519 (D. Minn. 2014) ("As countless courts have found, the states' different approaches to, or elements of, unjust enrichment are significant.") (quotation marks and citations omitted).

190 N.W.2d 493, 494-95 (Minn. 1971).  To be actionable, the defendant's actions

must amount to illegal or unlawful conduct.  *See Caldas v. Affordable Granite &*

*Stone, Inc.*, 820 N.W.2d 826, 838 (Minn. 2012).

Here, Plaintiff alleges that DealDash was unjustly enriched by his

purchase of bid packs and participation in purported "illegal online lotteries."

(Compl. ¶ 86.)  As Plaintiff's unjust-enrichment claim rests on the same factual

allegations as his consumer-protection claims, it fails for similar reasons.

As a threshold matter, the Minnesota Supreme Court has limited unjust

enrichment to claims premised on an implied or quasi-contract; the doctrine is

inapplicable in situations where there exists a valid contract between the parties.

*Caldas*, 820 N.W.2d at 838-39; *see also United States Fire Ins. Co. v. Minnesota State*

*Zoological Bd.*, 307 N.W.2d 490, 497 (Minn. 1981) ("[E]quitable relief cannot be

granted where the rights of the parties are governed by a valid contract.").[21]

Here, before shoppers can purchase bids or access a DealDash auction, they are

required to agree to DealDash's Terms of Use—that is, agree to a binding

contract with DealDash.  (Compl. ¶¶ 12, 51.)

---

[21] *See also Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 742 F.3d 845,
854 (8th Cir. 2014) (affirming dismissal due to the existence of contracts between
the parties).

Although Rule 8(d)(2) permits parties to plead separate counts in the alternative, Plaintiff has not done that here, where there is no separate claim for breach of contract.  In fact, Plaintiff's unjust-enrichment claim appears to be premised on the allegation that DealDash has been unjustly enriched by entering into purchase contracts with class members under "unjust" conditions.  (Compl. ¶ 86.)  Where a plaintiff pleads the applicability of enforceable contracts to the transactions at issue, an unjust-enrichment claim cannot stand.  *See Strategic Energy Concepts, LLC v. Otoka Energy, LLC*, No. 16-463 (MJD/BRT), 2016 WL 7627040, at *13 (D. Minn. Nov. 18, 2016); *see also Olympus Ins. Co. v. Aon Benfield*, No. 11-CV-2607 (PJS/AJB), 2012 WL 1072334, at *8 (D. Minn. Mar. 30, 2012).

Furthermore, as explained above, Plaintiff does not allege that he has conferred any benefit on DealDash that has not been matched by consideration in the form of as-described products.  *See Zinter v. University of Minnesota*, 799 N.W.2d 243, 247 (Minn. Ct. App. 2011) (plaintiff failed to state an unjust-enrichment claim where university provided the consideration for which plaintiff paid).  Given the fact that DealDash provided him with the products for which he bid, Plaintiff appears to be suggesting that DealDash has been unduly enriched because he would not have purchased bids and merchandise had he

known that Galton Voysey shared a co-founder with DealDash.  (Compl. ¶ 48.)

Such a proposition does not meet *Iqbal*'s plausibility standard.

This court has rejected similar suggestions by other plaintiffs.  In *Carlsen v.*

*GameStop, Inc.*, 112 F. Supp. 3d 855 (D. Minn. 2015), for example, a class of

magazine subscribers alleged that the defendant had been unjustly enriched

because it had misrepresented the fact that it would not share subscribers'

personally identifiable information with third parties.  *Id.* at 858-59. The named

plaintiff alleged that his unjust-enrichment claim was supported by his allegation

that he "would not have shopped" with the defendant had he known how the

defendant would treat his personal data.  The court rejected this argument

because the plaintiff "did receive the full value of his purchase," regardless of

whether some privacy information was incorrect or misleading.  *Id.* at 865.

Similarly here, Plaintiff does not complain about the value of the products that

he actually received; he only speculates that he would not have shopped with

DealDash had he known about the limited connections that exist between

DealDash and Galton Voysey.  When a defendant provides the plaintiff with the

performance bargained for, there can be no failure of consideration.  *Olympus Ins.*

*Co.*, 2012 WL 1072334, at *8.

Finally, to the extent Plaintiff's unjust-enrichment claim is premised on his own "participat[ion] in illegal online lotteries" (Complaint at ¶ 86), Plaintiff has unclean hands and therefore cannot recover in equity.  *See Nagle v. Randall*, 115 Minn. 235, 238, 132 N.W. 266 (1911) (no common law right to recover losses in illegal gambling transactions); *Franklin v. Stoddart*, 34 Minn. 247, 248, 25 N.W. 400 (1885) (same).

Thus, as with the consumer-protection claims, Plaintiff fails to state an actionable claim for unjust enrichment (Count VI).

## IV.    CONCLUSION

For all of the foregoing reasons, DealDash respectfully requests that the Court grant its motion to dismiss.

Date:   June 30, 2017.

GREENE ESPEL PLLP

s/ Robert J. Gilbertson
Robert J. Gilbertson, Reg. No. 22361X
Sybil L. Dunlop, Reg. No. 390186
222 S. Ninth Street, Suite 2200
Minneapolis, MN  55402
BGilbertson@GreeneEspel.com
SDunlop@GreeneEspel.com
Tel:  (612) 373-0830
Fax:  (612) 373-0929

FOLEY & LARDNER LLP

Michael J. Tuteur (admitted *pro hac vice*)
Beth I. Z. Boland (admitted *pro hac vice*)
111 Huntington Avenue
Boston, MA 02199-7610
mtuteur@foley.com
bboland@foley.com
Tel: 617.342.4000
Fax: 617.342.4001

John J. Atallah (admitted *pro hac vice*)
555 South Flower Street
Los Angeles, CA 90071-2411
jatallah@foley.com
Tel: 213.972.4834
Fax: 213.486.0065

Aaron R. Wegrzyn (admitted *pro hac vice*)
777 East Wisconsin Avenue
Milwaukee, Wisconsin  53202-5306
awegrzyn@foley.com
Tel: 414.319.7028
Fax: 414.297.4900

*Attorneys for Defendant DealDash, Inc.*