## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

| | |
|---|---|
| GRANT PSTIKYAN, CAROLE BENNETT, and KEN FORD, Individually and on Behalf of All Others Similarly Situated | Case No.: 0:17-cv-01164-JRT-FLN |
| Plaintiffs, | **FIRST AMENDED CLASS ACTION COMPLAINT** |
| v. | |
| DEALDASH, INC., | **JURY TRIAL DEMANDED** |
| Defendant. | |

Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiffs Grant Pstikyan, Carole Bennett and Ken Ford bring this class action against Defendant DealDash, Inc. ("DealDash" or the "Company") on behalf of all persons who have purchased bids or merchandise through www.dealdash.com and/or DealDash's mobile device application(s). Plaintiffs make the following allegations based on the investigation of their counsel and based on personal knowledge as to themselves and their own acts. Plaintiffs and their counsel believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.     DealDash.com is a popular "penny auction" website that purports to offer consumers the chance to win expensive, brand name products for small fractions of their retail value. Consumers pay money in advance for a certain number of "bids," and then spend those bids in DealDash's daily penny auctions in the hope of winning valuable merchandise at steep discounts. DealDash's runs its online auctions twenty-four hours a day, seven days a week. DealDash continually advertises to consumers that they can save up to 90% or more off brand name merchandise ranging from electronics, to furniture, to art, to flatware, to clothing and accessories.

2.     Founded in 2009, DealDash has attracted millions of paying users throughout the United States, with American retirees forming the largest demographic of DealDash users. DealDash's substantive operations all reside overseas, yet the Company exclusively targets American consumers and ships its merchandise only into the continental United States. DealDash earns at least tens of millions of dollars per year in revenue, driven predominantly by consumers' "bid" purchases on www.DealDash.com and on DealDash's mobile app.

3.     The problem is that DealDash is a complete sham.  Rather than operating true retail "auctions," DealDash is running a series of unlawful lotteries on a daily basis.  Moreover, most of the "luxury" brand name products that DealDash flaunts to consumers are not true luxury brands at all; they are cheap, generic brands that do not sell in substantial volumes at their advertised values anywhere in the United States.  Yet DealDash represents its products as top-of-the-line, luxury brands that ordinarily command price tags in the hundreds or even thousands of dollars per item.  In fact, DealDash's brands do not and could not command such prices in any legitimate U.S. retail market, whether in stores or online.

4.     Most of DealDash's purported "auction" merchandise consists of brand names created only within the last one to three years by DealDash's twenty-four year-old founder and controlling owner: William Wolfram of Finland.  DealDash advertises its fake "brand name" products at outrageously high retail values—totally divorced from actual market values—to attract consumers into its "auctions" (read: lotteries) and deceive consumers into believing they are "bidding" (read: betting) on extraordinarily high-value products.  In fact, consumers are betting on products that are not worth even half their advertised values, and in some cases, not worth one tenth of the advertised value.  Most of DealDash's purportedly expensive, "brand name" products boast no substantial sales at or near their advertised values anywhere in the United States, except (maybe on occasion) via DealDash.  In sum, DealDash secretly creates and offers its own generic, unestablished brands and grossly misrepresents their true retail value to the public: all to induce consumers' paid entry into DealDash's unlawful lotteries.

5.     In addition, for each of DealDash's hundred-plus "penny auctions" per day, DealDash.com advertises recent "Winners" of each offered product from prior auctions, along with the (facially) low price that each recent "Winner" paid for that (purportedly) expensive

3

product. DealDash, however, declines to disclose to consumers how many paid bids those "Winners" spent to win each featured product. Even DealDash's lucky lottery "winners" often end up paying more money in bids and cash than what DealDash's products are actually worth. Meanwhile, DealDash auction losers—all but one participant in each auction—lose *all* of their prepaid bids and walk away with nothing. Thus, when a consumer loses a DealDash "auction," the House wins. When a consumer wins a DealDash "auction," the House still wins. Even "winning" consumers unwittingly lose.

6.     DealDash's penny auctions are unlawful lotteries in which U.S. consumers have lost and continue to lose at least millions of dollars in their fraud-induced pursuit of sham merchandise. Plaintiff and the Class hereby seek relief from Defendant's ongoing scheme.

## PARTIES

7.     Plaintiff Grant Pstikyan is a natural person domiciled in California. Between November 2016 and December 2016, Mr. Pstikyan purchased and lost thousands of dollars worth of bids on DealDash.com. He also lost money by spending both cash and paid bids in various penny auctions to acquire DealDash's falsely and misleadingly advertised merchandise.

8.     Plaintiff Carole Bennett is a natural person domiciled in Texas. Between January 2017 and June 2017, Ms. Bennett purchased and lost thousands of dollars worth of bids on DealDash.com. She also lost money by spending both cash and paid bids in various penny auctions to acquire DealDash's falsely and misleadingly advertised merchandise.

9.     Plaintiff Ken Ford is a natural person domiciled in Pennsylvania. Between December 2016 and July 2017, Mr. Ford purchased and lost thousands of dollars worth of bids on DealDash.com. He also lost money by spending both cash and paid bids in various penny auctions to acquire DealDash's falsely and misleadingly advertised merchandise.

10.     Defendant DealDash, Inc. is a Delaware corporation with its purported principal place of business located at 12805 Highway 55, Suite 205, in Plymouth, Minnesota.  DealDash, Inc. is a wholly owned subsidiary of a Finnish company, DealDash Oyj based in Helsinki, Finland.  The so-called "penny auction" website, www.dealdash.com, is owned and operated by or on behalf of Defendant DealDash, Inc.  DealDash also operates its penny auctions and interfaces with consumers through its mobile device applications.

## JURISDICTION AND VENUE

11.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5,000,000 and the overwhelming majority of Class members are citizens of States different from Defendant DealDash, Inc.  Pursuant to 28 U.S.C. § 1391(b), venue is proper because a substantial part of the events giving rise to Plaintiff's claims occurred in this district.

## SUBSTANTIVE ALLEGATIONS

"We started the company six years ago after having a really bad penny auction experience. I was looking for a Macbook and I found this website that auctioned off laptops. But it was no normal auction. It was a penny auction, so each time I bid, I was charged a small fee. And before I knew it, I had spent €50 with nothing to show for it.  I lost the auction.  I felt like an idiot."

-DealDash Founder and Controlling Owner, William Wolfram (2015)

12.     The consumer experience on DealDash.com begins as follows.  A consumer visits www.dealdash.com and views a webpage that looks like this:



Each box on DealDash's homepage represents a separate "auction" for the pictured product. Consumers can click on any box of their choice to enter that particular auction's webpage, which looks like this:



13.     Before consumers can actually participate (*i.e.,* "bid") in an auction, they must first create a personal DealDash account by entering, *inter alia*, their email address along with financial account information such as a credit or debit card number.  Next, consumers must purchase some number of "bids," which DealDash sells in bulk "bidpacks" that typically consist of anywhere from a few hundred to a few thousand bids each.  DealDash prices its bidpacks such that consumers pay between twelve and fifteen cents per bid.  The more bids a consumer buys, the more opportunities he or she will have to win an auction.

14.     Each individual "auction" begins at a fixed point in time. At the moment an auction begins, a 10-second clock, like the ones shown above, begins to count down.  During that 10-second countdown, any user with prepaid bids in their DealDash account can click a bright yellow "BID NOW" button to place the first bid.[1]  The placement of that first bid immediately makes that first-bidding user the "highest bidder" on the featured product: at a price of $0.01. The first bid also immediately resets the countdown clock back to 10 seconds.

15.     If nobody bids within the next 10 seconds, then that first bidder wins the auction, entitling them to purchase the featured product from DealDash for a price of $0.01.  If someone does bid within the next 10-second countdown, then this second bidder immediately becomes the "highest bidder" on the featured product: at a price of $0.02.   And the countdown clock immediately resets back to 10 seconds.

16.     If nobody bids within the next 10 seconds, then that second bidder wins the auction, entitling them to purchase the offered product from DealDash for a price of $0.02.  If someone does bid within the next 10-second countdown, then this third bidder (which may or may not be the same person as the opening bidder in the auction) immediately becomes the

---

[1] If nobody places a bid within the first 10 seconds of an auction, then the auction simply ends, and nothing happens.

7

"highest bidder" on the featured product, at a price of $0.03.   And the countdown clock immediately resets back to 10 seconds.

17.     This pattern continues, as each subsequent bid increases the potential purchase price of the product by one cent: hence, the term "penny auction."   Each subsequent bid placed by any user amounts to a valuable consideration that comes out of the user's DealDash account, with the monetary value of that spent bid being whatever the bidder paid for it: usually between twelve and fifteen cents.   DealDash auctions typically last for several hours, or even several days, with the penny-built "auction" prices sometimes going into the hundreds of dollars, depending upon the featured item.   At some point in time, however, the 10-second clock runs out, entitling the most recent bidder to purchase the featured item from DealDash at the latest, penny-built auction price.   Every other bidder simply loses the bids that they spent in the given auction, along with the money they paid DealDash for those bids, and walks away with nothing.

18.     As an example, if the 10-second clock runs out at a time when the featured item's price has ticked up to $100.00, this necessarily means that participating consumers spent a total of 10,000 bids in the auction, with the last bidder (whoever they are) winning the right to purchase the featured product from DealDash for an additional $100.00.   This winning bidder might have already spent less than a dollar's worth, or several hundred dollars' worth, of paid bids in the course of that auction.   But one thing is certain; collectively, consumers just spent over $1,000 worth of prepaid bids (likely between $1,200 and $1,500) in the auction, and everyone *except* the last bidder got nothing in return.

19.     When consumers place a paid bid in a DealDash auction, they have no way of knowing, or even reasonably guessing, whether they will be the last bidder, *i.e.,* the auction winner.   They place each and every bid hoping that *this* 10-second countdown will be the one

8

that runs out, but as a practical matter, they have almost no relevant facts with which to judge whether the clock is likely to run out.  This is universally true for several reasons.

20.     First, while DealDash's auction pages display the number of users who have participated so far in the given auction, a bidder has no information whatsoever about the number of bids the other users have in their DealDash accounts.

21.     Second, in practice, users cannot see or otherwise discern how many bids other participants have spent so far in the given auction, so there is no way to know how much "skin" other users already have in the game.  Perhaps if a competing participant had already lost 1,000 paid bids in this auction, that participant would be less likely to keep bidding than another participant who has only lost a few paid bids so far.  But participants have no way of discerning who, if anyone, has gotten in too deep for a particular auction, versus who has plenty of "dry powder" remaining.  Therefore, all competitors in any given auction are entirely unpredictable to each other (except to the extent that different bidders might collude, but DealDash deems any such collusion cheating and purports to strictly police such cheating).

22.     Third, the advertised dollar value of an auctioned product might theoretically serve as a rational upper bound for bidding purposes.  But bidding on DealDash rarely (if ever) continues long enough for the penny-stacked offer price to rise anywhere near the advertised value of the feautured product.[2]  Thus, in substantially all DealDash auctions, the penny-stacked offer price is largely *immaterial* to the question of whether a subsequent bid will be placed (*i.e.,* immaterial to whether the current "highest bidder" will win the auction).  There is always a

---

[2] The one exception to this rule occurs when DealDash runs "free" promotional auctions, in which the last bidder gets the "auctioned" product for free regardless of how many bids are placed in the auction.  In these promotional auctions, the penny-stacked offer price can sometimes *exceed* the product's advertised value because that price is ultimately meaningless.  The final, winning bidder will pay nothing for the offered product beyond the prepaid bids that he or she spends in the auction.

9

substantial, advertised value to be potentially won by the next bidder in the form of a steep discount on the featured product. Unlike a traditional auction, there is always an incentive for *somebody* to spend just one more bid, regardless of the current penny-built bid price.

23. Fourth, DealDash offers participants in all of its penny auctions a special "Bid Buddy" feature, which the participant can (unbeknownst to other users) turn on and off at their own behest. The "Bid Buddy" function allows any user to turn on a fully automated bidding function in any given auction. The user inputs into Bid Buddy a fixed number of paid bids from his/her DealDash account, and Bid Buddy will automatically place those bids—one by one—in that auction whenever the countdown clock is about to run out. The user can then walk away from DealDash for hours, or even days, on end while Bid Buddy continues to play for him or her. But users cannot see who else in the auction has their Bid Buddy turned on or off, or how many bids any given user has placed (or could place) into their Bid Buddy or into the auction generally. Thus, no user can even know whether they are "bidding" against preprogrammed algorithms or against live human beings, or some combination thereof. Nor can bidders know whether other "live" participants in an auction are even sitting at their computers anymore; if other participants in one of these internet "auctions" happened to walk away from their computers or mobile phones for more than 10 seconds, no other users would know this.

24. Fifth, DealDash auctions routinely go on for many hours or even several days on end. Due to each bidder's complete lack of knowledge as to numerous variables (including but not limited to those above) that are determinative of when a DealDash auction will likely end, no amount of skill or strategy could inform an auction participant of the likelihood that the particular bid they are about to place will be the "winning" bid. In a game of poker, for instance, skilled players can calculate approximate probabilities of victory in a given hand based on their

knowledge of the cards in their hand, the cards in the deck, and the number of other players in the hand: **before** deciding whether to bet.  For DealDash players, it is literally impossible to make any such probability determinations before deciding whether to bet (*i.e.,* "bid") because they have no clue as to, *inter alia*: (1) who is at the proverbial table and who isn't; (2) whether other players at the table are merely watching the auction (*i.e.,* have folded) or are just waiting for their time to bet; (3) how many casino "chips" (*i.e.,* bids) other players have at their disposal to bet with; (4) whether the other players at the table are active human beings with human (*e.g.,* competitive) tendencies, or whether the other players at the table are disinterested "Bid Buddy" algorithms that will continue to spend some unknown number of bids for some indefinite period of time.  All of this (and more) is unknown to every single bidder every time they place an individual bid-bet on DealDash.  No one—not even DealDash itself—can say whether the likelihood of winning an auction with a particular bid is around 1%, 99%, or somewhere in between.

25.    This is how DealDash's founder and controlling owner, Mr. Wolfram, quickly "spent €50" and "felt like an idiot" after losing his first penny auction and having "nothing to show for it." *See* ¶13, *supra*.  This is likewise how Plaintiffs and other Class members end up the overwhelming majority of times they play in a DealDash auction, no matter their level of experience with DealDash or in other penny auctions.  Nevertheless, many U.S. consumers continue playing on DealDash in hopes of winning that one big "auction" that could make up for all of their financial losses.  Mr. Wolfram was exactly right when he spoke in 2015: this is "no normal auction." *Id.*

26.    In the end, while DealDash purports to be a "fair and honest" website conducting mere retail "auctions," DealDash is—in law and in fact—running hundreds of lotteries on a daily

basis, with each individual "penny auction" amounting to a separate lottery.  The United States Federal Trade Commission ("FTC") has informally stated that, "in many ways, a penny auction is more like a lottery than a traditional online auction."  *See* https://www.consumer.ftc.gov/articles/0037-online-penny-auctions (last visited Apr. 5, 2017). The FTC is correct, but does not go far enough in its assessment.

27.    In a traditional lottery, an increasing number of entries (here, "bids") typically does ***not*** reduce the offered prize or the value thereof.  On DealDash, however, the more entries that are submitted into each auction (in the form of paid "bids"), the smaller the ultimate winner's prize gets in terms of a purported discount on the featured product.

28.    In addition, consumers can play in as many different "auctions" (*i.e.,* lotteries) as they desire, simultaneously.  A single consumer could use Bid Buddy (or a fast clicking hand) to bid (*i.e.,* bet) in many different "auctions" all at once, losing every single auction along with all of their paid bids and walking away with nothing but empty pockets.

29.    DealDash itself has warned users of the gambling-like dangers of participating in its so-called "auctions." In a blog post linked to the DealDash homepage, www.dealdash.com, on December 3, 2016, DealDash stated the following in an article titled *Don't Get In Over Your Head on DealDash*:

> **Bidding on DealDash can be so exciting that it's easy to get caught up in the moment, and get in over your head. Here are some ways to keep yourself afloat.**
>
> DealDash doesn't want you to get in over your head. DealDash wants you to bid responsibly and enjoy playing in the auctions. However, sometimes bidding and winning are just so much fun that it's easy to get carried away. And once you get carried away and go over your bidding budget then you're unhappy. DealDash wants you to enjoy your shopping entertainment experience. Here are some suggestions from DealDash to keep you from getting in over your head.

The main way that you can keep yourself from getting in over your head is setting strict bidding limits for yourself for each auction, and sticking to them. If you say that you're only going to spend 100 bids on a particular auction, and you know that you have a very fierce competitive spirit and it's hard for you to stop bidding when you're in the moment, simply input your 100 bid budget into your BidBuddy and walk away. The BidBuddy is there for you to use however you like, from helping you bid while you are asleep or at work, or in this case to help you stick to your bidding budget.

***

These are just a few helpful guidelines for keeping your budget and bids in check while playing on DealDash. It's easy to get carried away, just try to follow my suggestions: remember to set a budget, use your BidBuddy, and keep calm. See you on DealDash everyone! ***Good luck*** and happy bidding. (emphasis added)[3]

30.    DealDash is not a mere twist on retail auction websites like eBay.  As Mr. Wolfram himself acknowledges, DealDash is "no normal auction."  DealDash is a continuous series of online lotteries specifically designed to fleece lucky and unlucky consumers alike.

**DealDash Deceptively Advertises the Prices Paid by Recent Winners**

31.    DealDash's inducement of consumers to purchase bids and start playing its penny auctions is driven substantially by its advertisements of recent "Winners" across the DealDash website and other consumer-facing media.   For example, right at the top of the DealDash homepage, the Company provides a "Winners" button for consumers to click on:

---

[3] *See* https://dealdashblog.com/2016/12/03/dont-get-in-over-your-head-on-dealdash/ (last visited April 13, 2017).



When consumers click on the "Winners" button, they are taken to another page that displays information like the following:



The number of "Winners" displayed is enormous, going far back in time, as the user can continuously scroll down the webpage to reveal more and more previous winners:



This "Winners" page shows, *inter alia*, the purported dollar value of each product won, along with the sharply discounted price purportedly paid by each recent winner.

32.    Similarly, within each individual auction's webpage, the Company displays the recent "Winners" of the product being auctioned:



Like the main "Winners" webpage, each individual auction's webpage displays the following information, among other data: (1) the purported price paid by each recent winner for the featured product; (2) each recent winner's username on DealDash.com; and (3) the purported value/retail price of the auctioned product.

33.     DealDash's recent "Winners" advertisements substantially, and often grossly, understate the true price paid by each "Winner" for the featured product.   For example, DealDash.com boasts a $50 "value" for the hat pictured above, and a purportedly low price of $7.57 paid by a winner named "Smith829."   But DealDash does not disclose ***how many paid bids*** Smith829 had to spend to win the right to purchase that hat for $7.57.   Given that this auction ended with a final "price" of $7.57, two or more consumers necessarily spent a combined seven hundred fifty-seven bids in this auction, with each bid typically costing twelve to fifteen cents.   This means consumers (collectively) spent between $90 and $113 in bids to win Smith829 (and only Smith829) the right to purchase that supposedly $50 hat from DealDash for $7.57. How many of those 757 bids did Smith829 have to spend to win this "auction," and then pay

DealDash another $7.57 for the hat?  Up to half of those bids—379—for which Smith829 would likely have paid twelve to fifteen cents each.

34.    But consumers are not given this material information.  Instead, DealDash leads consumers to believe that the only material prices paid by recent "Winners" are the final "auction" prices they paid for the featured product.  Far from costing Smith829 $7.57 to buy that hat, it actually cost Smith829 somewhere between $8 and $64 in paid bids and cash to acquire that purportedly $50 hat.  And worse, that is no $50 hat.

**DealDash the Brand Fraud**

35.    Plaintiff Grant Pstikyan lost most of the "auctions" he played on DealDash.com from November 2016 to December 2016, losing well into the thousands of dollars in the process. However, Mr. Pstikyan also won a few DealDash auctions.  For example, on December 7, 2016, Mr. Pstikyan won a DealDash auction for a handbag called the "Ivens Travel Bag in Nylon and Leather," purportedly from a high-end French brand called "Bolvaint - Paris."  The bag he won looks like this:



Plaintiff spent 5,494 prepaid bids at an average buy-in price of approximately 13 cents per bid, bringing his total "bid spend" in this auction to about $714. Then, upon winning this auction, Plaintiff won the right to, and did, purchase this "Bolvaint" travel bag from DealDash for $164.43. Thus, Plaintiff spent a total of approximately $878 on DealDash to win this bag. Plaintiff did so based on DealDash.com's representations that the true "value" and retail price for this bag was **$2,900.** If that valuation seems a bit rich, it is rich.

36.     One popular, higher-end brand for handbags in the United States is Kate Spade New York, founded in 1993 by well-known designer Kate Spade. Somewhat similar in size, style and materials to the above "Bolvaint" travel bag on DealDash.com, is the following bag from www.katespade.com:



Like the purportedly **$2,900** "Bolvaint" bag on DealDash, this Kate Spade New York bag is made of both Nylon and Leather, except with more leather and less nylon than the above

Bolvaint bag that Plaintiff won. The regular retail price from Kate Spade New York is $378, but currently on sale for $225.[4]

      37.    Another popular, higher-end designer of handbags is Michael Kors, which offers the following bag, somewhat similar in size and materials, except this bag is 100% leather:



The retail price for this all-leather bag from Michael Kors is merely $328.[5]

      38.    Seemingly, this "Bolvaint - Paris" brand featured on DealDash must be something special to command prices and valuations ***ten times higher*** than Kate Spade and Michael Kors for relatively similar products. But in fact, this mysterious Bolvaint brand is pretty much worth nothing. Aside from https://bolvaint.com, this "Bolvaint" company (if it is a company at all) has no substantial business operations or sales, much less substantial sales at DealDash's

---

    4    *See* https://www.katespade.com/products/smith-street-zanna/098689972855.html (last visited April 6, 2017).

    5    *See* https://www.michaelkors.com/rivington-large-studded-leather-tote/_/R-US_30S7SR7T3L?color=0001 (last visted April 6, 2017).

extraordinarily high prices.  Bolvaint has no publicly discernable offices of any meaningful size, no apparent contact phone number for customers (if there are any actual customers), no retail outlets or substantial purchases by other retailers.  There is nothing but internet offers and advertisements for various "Bolvaint" items on the likes of Amazon.com, social media, and in some internet-based "press releases" touting the prowess of this purported brand.

39.     In a May 9, 2017 article from *Consumer Reports'* consumerist.com (published in response to the initial complaint in this lawsuit), Consumer Reports notes that while bolvaint.com lists Bolvaint's mailing address "in Paris' uber-ritzy Place Vendome," some other business, a Patek Phillipe salon, "appears to be the actual tenant of the address listed on the Bolvaint website."   *See*   https://consumerist.com/2017/04/17/customer-accuses-dealdash-of-selling-cheap-generic-products-disguised-as-independent-luxury-brands   (last  visited  July  17, 2017).[6]

40.     Mr. Pstikyan's "Bolvaint" bag does not have a true "value" or retail price of $2,900, as DealDash represents to consumers, nor is it worth anywhere near the approximately $878 that Plaintiff spent on this bag as a DealDash "Winner."

41.     DealDash "auctions" off many other purportedly high-end brand names that, in fact, have no substantial offices, no substantial sales to U.S. consumers, no contact phone numbers, and no significant distribution channels outside of DealDash and its affiliates.  These include, but are far from limited to, products like the following on DealDash.com:

(a) "The Victor – Handmade Wall Clock" from a home decor brand called "The Barrel Shack," which DealDash.com states has a retail "value" of ***$810***:

---

[6] *See also* http://www.patek.com/en/retail-network/patek-philippe-salons (last visited July 17, 2017) (listing 10, place Vendome, 75001 Paris, France as the Paris address for a Patek Philippe salon).  *But see* https://bolvaint.com/pages/about-us (last visited July 17, 2017) (providing the same Paris address for Bolvaint).



(b) "Q-Tech Bluetooth Headphones" from an electronics brand called "Schultz," which DealDash.com says are worth *$510*:[7]



---

[7] As a comparison, bluetooth, noise-cancelling headphones from the iconic audio brand, Bose, sell for less than $400.

(c) The "Senshi Dual Knife Set with Wooden Display Stand" from a purportedly authentic, high-end Japanese brand called "Kamikoto," which DealDash.com says is worth *$1,375*:



(d) A "Heavy Duty Army Backpack" from an (apparently) high-end outdoor equipment supplier called "Wilson & Miller," which DealDash.com represents as having a *$170* value:



(e) Two pair of men's underwear from a purportedly expensive apparel brand, "verdict."[8] DealDash.com says these have a true "value" of ***$90***:



(f) The "Amber Dunes Tall Scented Candle" (ten inches tall) from a rather expensive household accessories brand called "New Haven."  DealDash represents to consumers that this candle has a "value" and retail price of ***$130***:

---

[8] This "verdict." brand is also the purported maker of that star-spangled, supposedly $50 hat shown in ¶32, *supra*.



New Haven - Amber Dunes Tall Scented Candle

42.     Each of the six brands shown in ¶41 above provides many products to be "auctioned" off on DealDash on a daily basis.

43.     DealDash represents to consumers that all products from the six brand names in ¶41 command extraordinarily high dollar "values" for what they are (*e.g.,* an $810 wall clock, $510 head phones, $1,375 for two kitchen knives, a $170 backpack, $90 for two pair of men's underwear, and $130 for a scented candle).  These brands' purported retail prices match or even surpass the prices of comparable products from some of the most well-known, high-end brand names in the world.

44.     But strangely, none of these six, ***seemingly disparate*** brand names—among several others that flood DealDash's daily "auctions"—have any substantial offices, phone numbers, distribution or U.S. retail sales channels outside of DealDash and its affiliates.  These "brand name" products are offered only on DealDash, on each brand's own barebones, similarly-

styled website, and sometimes via Amazon.com, social media or elsewhere on the internet.[9]  But these "brand name" products are not selling much (if at all) anywhere in the United States outside of DealDash, much less at the extremely high "values" or retail prices that DealDash ascribes to them.

45.     There is a reason for this.  The reason can be found in the records of the United States Patent and Trademark Office ("USPTO").   As it turns out, each of the seemingly disjointed, extraordinarily expensive brand names in ¶41 was trademarked in the United States—the only country where DealDash attempts to sell to consumers—within the last two years, by the same company.

(a) A company called Galton Voysey Limited, seemingly located in Hong Kong, applied for a trademark with the USPTO for "The Barrel Shack" home décor brand on July 1, 2015, and that trademark was registered on November 1, 2016.

(b) Galton Voysey Limited also applied for a trademark with the USPTO for the "Schultz" electronics brand, on February 3, 2016, and that trademark was registered on September 27, 2016.

(c) Galton Voysey Limited also applied for a trademark with the USPTO for the "Kamikoto" knife brand, on February 3, 2016, and that trademark was registered on March 7, 2017.

(d) Galton Voysey Limited also applied for a trademark with the USPTO for the "Wilson & Miller" outdoor equipment brand, on February 3, 2016, and that trademark remains pending.

(e) Galton Voysey Limited also applied for a trademark with the USPTO for the "verdict." apparel and accessories brand, on February 3, 2016, and that trademark remains pending.

(f) Galton Voysey Limited also applied for a trademark with the USPTO for the "New Haven" candle and home décor brand, on July 1, 2015, and that trademark was registered on December 27, 2016.

---

[9]   The  individual  websites  for  the  six  brand  names  provided  in  ¶41  are: https://www.newhavencollection.com, http://www.verdictlife.com, https://wilsonandmiller.com/, https://kamikoto.com/, http://schultzinnovation.com/, and https://thebarrelshack.com.

46.     Each USPTO trademark application referenced in ¶45 was signed by the purported "Chairman" of Galton Voysey Limited: none other than twenty-four year-old William Wolfram of Finland: the founder, longtime CEO, and still controlling (indirect) owner of lottery pusher DealDash, Inc.[10]

47.     DealDash's purportedly expensive, seemingly disparate high-end brand names do no legitimate retail business anywhere in the United States (and probably nowhere on Earth) because they are nothing but the cheap, recent inventions of DealDash and its principal(s). Consumers, however, are misled to believe that DealDash's products are exactly what they purport to be: some of the highest quality, most expensive, luxurious, independently owned brand names on the planet.  DealDash's brands are no such thing.

48.     Mr. Wolfram and his associates at DealDash have been using their own faux-luxury brands to fraudulently induce participation in their unlawful lottery games.  And they are using their unlawful lottery games in an attempt to manufacture independent U.S. consumer demand for their generic, unestablished brands, which have no real U.S. consumer demand to

---

[10] In response to Plaintiff Grant Pstikyan's initial complaint in this lawsuit (Dkt. 1), and likely in response to some media and other public attention on Galton Voysey Ltd. that has followed this lawsuit, Galton Voysey Ltd. has now seen fit to disclose on its website its connection to various brand "auctioned" off daily—for years now—on dealdash.com.  *See* https://galtonvoysey.com/about-us/ (last visited July 17, 2017) (listing "Kamikoto," "verdict.," "New Haven," "Bolvaint Paris,"  "wilson&miller," "The Barrel Shack," "Schultz" and "Ashlynn Avenue" as Galton Voysey's "Featured Brands").  Before this lawsuit, Galton Voysey never publicly disclosed its ownership of *any* of DealDash's seemingly disparate, faux-luxury brands. To this day, with the exception of "Ashlynn Avenue," Galton Voysey is only disclosing its ownership of those DealDash brands that Mr. Pstikyan specifically called out in his initial complaint (Dkt. 1).  Galton Voysey, however, is the source of approximately *twenty* other, purportedly valuable, seemingly disparate luxury brands (which in reality, have no substantial U.S. sales at their sky-high advertised "values").  Some or all of those twenty other phony brands are materially misrepresented and "auctioned" off daily and/or weekly on dealdash.com.  On information and belief, these other brands include, *inter alia*, the following super-high-priced DealDash brands: "Far East Collection" paintings, "Monolith" luggage, "Volsen" appliances, "Miranella" kitchenware, "Aava" cookware, and "Millstrand Co." clothing.

speak of at the advertised price points.   In a vacuum, DealDash is welcome to offer Mr. Wolfram's newly invented, generic merchandise for sale to the public at outrageous prices.   But DealDash is **not** welcome to induce consumers to purchase "bids" and play in its daily lotteries by representing that his products have "values" and retail prices that have no basis in economic reality; doing so is manifestly deceptive to the reasonable consumer.

49.     In Title 16, Part 233 of the Code of Federal Regulations, the Federal Trade Commission ("FTC") has promulgated rules under the Federal Trade Commission Act entitled "Guides Against Deceptive Pricing."  Specifically, 16 C.F.R. § 233.2(a) provides as follows:

> Another commonly used form of bargain advertising is to offer goods at prices lower than those being charged by others for the same merchandise in the advertiser's trade area (the area in which he does business). This may be done either on a temporary or a permanent basis, but in either case ***the advertised higher price must be based upon fact, and not be fictitious or misleading.*** Whenever an advertiser represents that he is selling below the prices being charged in his area for a particular article, he should be reasonably certain that ***the higher price he advertises does not appreciably exceed the price at which substantial sales of the article are being made in the [geographic] area—that is, a sufficient number of sales so that a consumer would consider a reduction from the price to represent a genuine bargain or saving.***  Expressed another way, if a number of the principal retail outlets in the area are regularly selling Brand X fountain pens at $10, it is not dishonest for retailer Doe to advertise: "Brand X Pens, Price Elsewhere $10, Our Price $7.50".

The FTC has provided similar guidelines in 16 C.F.R. § 233.3, which provides:

> Many members of the purchasing public believe that a manufacturer's list price, or suggested retail price, is the price at which an article is generally sold. Therefore, if a reduction from this price is advertised, ***many people will believe that they are being offered a genuine bargain. To the extent that list or suggested retail prices do not in fact correspond to prices at which a substantial number of sales of the article in question are made, the advertisement of a reduction may mislead the consumer.***
>
> Typically, a list price is a price at which articles are sold, if not everywhere, then at least in the principal retail outlets which do not conduct their business on a discount basis. It will not be deemed fictitious if it is the price at which substantial ***(that is, not isolated or insignificant)*** sales are made in the advertiser's trade area (the [geographical] area in which he does business). ***Conversely, if the list price is significantly in excess of the highest price at which substantial sales in the trade***

> *area are made, there is a clear and serious danger of the consumer being misled*
> *by an advertised reduction from this price.*

16 C.F.R. §§ 233.3(a),(d) (emphasis added).

50.     The prices and retail values of all—or substantially all—Galton Voysey branded products advertised on DealDash.com are "fictitious," "misleading" and without any reasonable basis in economic reality.  Galton Voysey does not and cannot sell its newly created, grossly overpriced, generic brands in "substantial" volumes anywhere in the U.S.: at least not at prices *anywhere near* the valuations advertised on DealDash.com.  For most or all of Galton Voysey's (*i.e.,* DealDash's) newly branded products, there are simply no substantial sales to U.S. consumers at the purported values and prices advertised on DealDash.

**Contrary to Defendant's Responses to a (Now) Public Investigation, DealDash and Galton Voysey Do Not Operate at "Arms Length"**

51.     Following Plaintiff Pstikyan's initial complaint (Dkt. 1) in this case, a non-profit consumer watchdog group, Truth in Advertising (or "TINA"), took an in-depth look at DealDash, its business and its advertisements to U.S. consumers during recent years.  As part of its investigation, TINA reviewed and catalogued over 100 DealDash advertisements, including television commericals, online ads, social media posts, and representations on DealDash's website and mobile app.  After a months-long investigation, TINA concluded that DealDash, *inter alia*:

- "advertises incredible savings on auctioned items on without adequately disclosing the true out-of-pocket cost for obtaining the products;

- uses customer testimonials touting atypical savings on products [previously] won without clearly and conspicuously disclosing that DealDash customers typically lose money on auctions;

- promotes a perpetual sale on the purchase of bid packs; [and]

28

- fails to disclose its material connection to certain [Galton Voysey] products that are advertised and auctioned on DealDash.com."[11]

52.     TINA's in-house attorneys further concluded that "DealDash Operates an Illegal Gambling Site," and that ***"[t]he deceptive marketing practices highlighted above are used for the sole purpose of driving traffic to DealDash auctions, [which] constitute a form of gambling."*** [12]

53.     On May 25, 2017, approximately six weeks after Plaintiff Pstikyan initiated this action, an attorney for Truth in Advertising sent a letter to DealDash's current (presumed, but unconfirmed) CEO via email, demanding that DealDash cease the illegal practices described above by June 2, 2017: or else TINA would "notify appropriate state and federal authorities, including, but not limited to, the Federal Trade Commission and the Minnesota Attorney General's Office, that DealDash is engaged in deceptive and illegal practices."[13]

54.     On June 2, 2017, DealDash—through its counsel in this action—responded to TINA with a letter that summarily disputed (some of) TINA's accusations.  In particular, DealDash asserted to TINA that Galton Voysey "is a completely separate business."[14]  DealDash further asserted through its counsel that DealDash and Galton Voysey "work completely on an arms length basis with negotiations taking place with each other in a professional and arms

---

[11] *See* June 5, 2017 Complaint Letter from TINA to the Acting Director and Associate Director of the U.S.Federal Trade Commission, at 1-2 *available at* https://www.truthinadvertising.org/wp-content/uploads/2017/06/6_5_17-DealDash-complaint-to-FTC_Redacted.pdf.

[12] *Id.* at 15.

[13] *See* May 25, 2017 Letter from TINA to DealDash, *available at* https://www.truthinadvertising.org/wp-content/uploads/2017/05/5_25_17-ltr-from-TINA-to-DealDash_Redacted.pdf.

[14] *See* June 2, 2017 email and letter from defense counsel to TINA, *available at* https://www.truthinadvertising.org/wp-content/uploads/2017/06/6_2_17-DealDash-response-to-TINA.pdf.

length manner."[15]  DealDash painted a similar factual picture for this Court in DealDash's Brief Supporting its [Original] Motion to Dismiss (Dkt. 27), stating that DealDash and Galton Voysey "have no direct relationship to one another," and further, that "Galton Voysey . . . uses DealDash as an alternative distribution channel for its goods . . . for the same reason other brand vendors do: to move overstock merchandise without discounting its own retail pricing.  Dkt. 27 at 11-12.

55.    The true facts, however, are that DealDash's dealings with Galton Voysey are anything but "arms length," and Galton Voysey does not "use DealDash . . . for the same reason other brand vendors do."  *Id.*

56.    Specifically, beginning in early 2017—at the latest—DealDash has engaged in a systematic campaign to create the false and misleading appearance that U.S. consumers are actually buying Galton Voysey's brands at outrageous prices off of Amazon.com.  DealDash calls this deceptive campaign its "Buy It Now Get Cash Back" promotion.  First, DealDash sends one of its high-spending lottery customers an email from "cashback@dealdash.com," which contains text like the following (which is quoted from an email recently sent by DealDash to one of its existing customers):

> We want to thank you for being a valued member of DealDash and give you the opportunity to receive a Kamikoto knife set *for $0.01* through the *Buy It Now Get Cash Back* promotion.
>
> You may select the following:
>
> 1.    Kamikoto 7in. Santoku Chef Knife (out of stock)
> 2.    Kamikoto Kanpeki Knife Set
>
> **How it works?**
>
> 1. Simply purchase the item of choice using the link above. ***This will redirect you to Amazon where you can purchase the item directly from Kamikoto the original manufacturer*** [at a sky-high price of $1,295].

---

[15] *Id.*

2. After you place your order simply reply back with your Amazon order number and PayPal email address.

3. ***Once your [Amazon] order is confirmed and shipped we [DealDash] will send you the difference between $0.01 and the retail price of each item as cash back to your PayPal account (typically within 24 to 72 hours of placing your order).***

Please reply back with any questions! I look forward to hearing from you.

Best,
David

--
DealDash

(emphasis added)

57.    DealDash then follows through on the promised transaction.  The customer buys the item from Galton Voysey via Amazon.com, and DealDash pays the consumer back his or her full purchase price, minus one cent.

58.    The structure of this "Buy It Now Get Cash Back" transaction is such that the consumer pays Galton Voysey some outrageous price via Amazon.com for the given product. But DealDash itself quickly gives the consumer all of his or her money back out of DealDash's own funds.  Galton Voysey makes a "luxury" brand sale via Amazon.  The consumer gets a windfall in the form of merchanise (albeit some unknown, generic merchandise) for a mere penny.  ***DealDash, however, spends hundreds or thousands of dollars per transaction and gets nothing in return.***  These are no "arms length" transactions between DealDash and Galton Voysey.  DealDash is purchasing Galton Voysey products for consumers and not getting anything in return.   In the end, DealDash is directly paying U.S. consumers to purchase outrageously priced merchandise from Galton Voysey, in order to create the false appearance of legitimate Galton Voysey retail sales that, in fact, ***do not exist.***

59.     Indeed, there is nothing "arms length" about these transactions, as DealDash represented to TINA on June 2, 2017.  Nor is Galton Voysey a "completely separate business" from DealDash, regardless of what their complex, transcontinental corporate structures (*i.e.,* legal fictions) might suggest.   Nor does Galton Voysey "use[] DealDash as an alternative distribution channel for its goods . . . for the same reason other brand vendors do." *See* Dkt. 27 at 11-12.  Instead, there is a very "direct relationship" between DealDash and Galton Voysey, and that direct relationship is one in which DealDash is secretly bankrolling Galton Voysey—both directly and indirectly—for the primary purpose of creating a false appearance that DealDash's newly invented lottery prizes are extremely valuable items.   In fact, they are unestablished, absurdly high-priced generic products that U.S. consumers have never been buying at full price in substantial amounts.

60.     Sometimes, DealDash's uses its outsized profits—fleeced off the backs of DealDash's daily lottery losers—to purchase more items from Galton Voysey *for itself* to "auction" off to consumers.  DealDash doesn't mind paying (if it actually does) Gatlon Voysey's outrageous prices for two reasons.  *First*, at the end of the day, when DealDash "auctions" Galton Voysey branded products off to Americans, DealDash is going to make more than enough money selling bids to the lottery losers to justify paying Galton Voysey's purported prices.  For example, if DealDash pays Galton Voysey $1,000 for a "Bolvaint" wrist watch, and can sustain a penny auction for that (purportedly) $1,000 watch long enough for the penny-stacked offer price to tick up to just $100, that means consumers are going to spend ***10,000 paid bids*** at a price of 12 to 15 cents per bid, landing DealDash approximately $1,200 to $1,500 in revenue.  That's a decent profit margin of 20-50%.  If, however, DealDash can have that $1,000 watch "bid" all the way up to $200 (far more than it's worth, but still an apparent 80% discount

in the eyes of DealDash players), suddenly, DealDash has now made $2,400 to $3,000 in revenue by paying Galton Voysey $1,000 for a watch probably worth under $100 in a legitimate U.S. consumer market (if such a market even existed).  **Second**, Mr. Wolfram owns both companies, so DealDash losses plus Galton Voysey gains are essentially a wash to him.

61.     Other times, DealDash uses its daily lottery profits **to pay consumers to buy Galton Voysey's products** at outrageous prices, thus creating the false and misleading appearance of a real "luxury" consumer market for Galton Voysey's unknown, generic brands: a market that simply does not exist in the United States.  This false and misleading appearance then drives more consumers to participate—and lose money—in DealDash's lotteries as they hopefully pursue the chance to win steep, deceptively advertised discounts off what appears to be highly valuable and expensive merchandise.

62.     The purpose and effect of DealDash's "Buy It Now Get Cash Back" transactions is to **further** deceive the consumer who seeks to conduct some due diligence regarding DealDash's expensive, purportedly disparate luxury brands.  There are at least ten such brands featured on DealDash, and likely more than twenty such brands.  Each time DealDash pays one of its high-spending customers to buy a Galton Voysey-branded product on Amazon.com, DealDash asks that customer to post a review of the product on Amazon.  When the customer does so, Amazon.com then posts that customer review to its website, and confirms within its own database that the "reviewer" **has in fact** purchased the product via Amazon.com.  So Amazon.com not only displays the "customer review," it also displays the customer's review on Amazon as being the product of a "Verified Purchase."  The reality, however, is that **DealDash** paid the consumer to make his or her "Verified Purchase."

63.     For example, if an actual or potential DealDash user sees a $3,400 "Bolvaint –
Paris" travel bag being auctioned off on DealDash.com, they might do some due diligence online
before deciding whether to spend their hard-earned or borrowed money on a chance to win this
purportedly valuable bag (which they've never heard of).  If a consumer "googles" the phrase
"Bolvaint travel bag," one of the first search results that comes up is a link to this Amazon.com
webpage:



64.     When a consumer then clicks on Amazon's "2 customer reviews" for this
purportedly $3,400 "Bolvaint" handbag, the consumer will then be brought to the following
webpage on Amazon.com:



65.     Amazon then displays both reviews as "Verified Purchases," which means that Amazon itself has confirmed within its own database records that the purported reviewer of the product has purchased the reviewed product via Amazon.  This not only lends credibility to the glowing customer review (requested by DealDash upon paying the consumer), it also creates the false and misleading impression that U.S. consumers are actually buying this "Bolvaint" handbag for $3,400, when in fact, DealDash is simply using U.S. consumers as conduits through which DealDash itself secretly purchases Galton Voysey products (for the consumer) at absurdly high prices.  With at least a few "Verified Purchases" and glowing reviews via a respected retailer like Amazon, actual and potential DealDash players have at least *some* factual basis on which to justify "bidding" for such unknown, but purportedly valuable products on DealDash.

66.     DealDash's "Buy It Now Get Cash Back" transactions create sizable, uncompensated financial losses for DealDash, and bogus retail sales for Galton Voysey (i.e.,

William Wolfram) at sky-high prices. The only "compensation" to DealDash in these undisclosed transactions comes from Amazon, which unwittingly continues to act as a deceptive promoter of DealDash's pet lottery prizes: prizes that Galton Voysey cheaply manufacturers somewhere in East Asia, using predominantly DealDash lottery losers' money. Just as DealDash is "no normal auction," and Galton Voysey is "no normal" retail supplier. The two companies operate in tandem for the particular purpose of fleecing U.S. consumers—and only U.S. consumers—out of many millions of dollars from overseas.

### DealDash's Perrenial Bidpack "Sales" Are Also Deceptive to the Reasonable Consumer

67.     The FTC has also promulgated interpretive rules against deceptive *former* price comparisons.

> One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious—for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction—the "bargain" being advertised is a false one; **the purchaser is not receiving the unusual value he expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.**

> ***

> Other illustrations of fictitious price comparisons could be given. An advertiser might use a price at which he never offered the article at all; he might feature a price which was not used in the regular course of business, *or which was not used in the recent past but at some remote period in the past, without making disclosure of that fact*; he might use a price that was not openly offered to the public, or that was not maintained for a reasonable length of time, but was immediately reduced.

16 C.F.R. §§ 233.1(a),(d) (emphasis added).

68.     Throughout at least 2016 and the first half of 2017 (approximately), DealDash has advertised on its website that the regular prices of its bidpacks amount to 60 cents per bid, but that it offers limited time "sales," purportedly allowing consumers to purchase bids at sharply reduced prices between 12 and 15 cents per bid.  *See, e.g.*, ¶31, *supra* (first website image). DealDash routinely made the same advertisements to consumers via direct email.  This practice leads the reasonable consumer to believe that he or she is receiving an unusual value, in the form of a sharp discount of 75%-80% off of DealDash's regular bidpack pricing.

69.     The true facts, however, are that DealDash has been consistently and continuously offering its bidpacks for "sale" at far less than 60 cents per bid—usually less than 20 cents per bid—for years.  Contrary to DealDash's representations, the advertised bid "sale" never "ends soon."  *See, e.g.*, ¶31, *supra*.  DealDash has not been charging its players anywhere near 60 cents per bid since before 2015 (at latest).  Thus, the enormous, tremporay "bargain" that DealDash purports to offer consumers on their bidpack purchases "is a false one."  16 C.F.R. §§ 233.1(a). DealDash's large purported "discounts" on bidpacks are, in fact, perpetual "sales" that provide consumers with no unusual value whatsoever.  Consumers believe they are getting a special deal, but they are really just paying DealDash's regular, longstanding bid prices.

**Economic Injuries to Plaintiffs and the Class**

70.     Between November 2016 and December 2016, Plaintiff Grant Pstikyan spent $5,923 purchasing 44,250 bids on www.dealdash.com to participate in DealDash's penny auctions, with such bid purchases being premised on DealDash's fictitious 75%-80% off bidpack "sales."  In that time frame, Mr. Pstikyan lost tens of thousands of bids, for which he paid thousands of dollars, in at least thirty different "auctions."  Like the overwhelming majority of Class members, Plaintiff lost most of the DealDash auctions in which he participated, thus losing

the money spent on his bids and obtaining nothing.  Plaintiff participated in and lost his money in

DealDash's auctions because he believed that he was, in fact, participating in proper retail

auctions rather than the entirely fraudulent lottery scheme that is DealDash.  Plaintiff also

participated in and lost DealDash auctions because he believed he was bidding on high "value,"

brand name, luxury merchandise: rather than a bunch of generic, low-value products recently

invented by DealDash's (indirect) controlling owner and his associates.

71.     Moreover, even when Plaintiff "won" some of his DealDash auctions, he still

suffered substantial economic losses.    These losses include (but are not necessarily limited to):

(a) his December 2016 payment of approximately $879 in bids and cash to win a "Bolvaint" bag worth nowhere near $879 (*i.e.,* neither DealDash nor Galton Voysey has substantial sales at or above that price in the United States), but which DealDash represented as worth $2,900;

(b) his December 2016 payment of approximately $107 in bids and cash to win three "Kamikoto" kitchen knives worth nowhere near $107, but which DealDash represented as worth $1,295;

(c) his December 2016 payment of approximately $151 in bids and cash to win a "New Haven" bathroom scale worth nowhere near $151, but which DealDash represented as worth $229;

(d) his December 2016 payment of approximately $541 in bids in a "free" promotional auction[16], to win another "Bolvaint" bag worth nowhere near $541, but which DealDash represented as worth $2,500;

(e) his December 2016 payment of approximately $281 in bids in a "free" promotional auction, to win a "handmade" sculpture from "The Barrel Shack" worth nowhere near $281, but which DealDash represented as worth $1,530;

(f) his November 2016 and December 2016 payments of hundreds of dollars in bids and cash to win several purported oil paintings from DealDash's bogus "Far East Collection," worth nowhere near the hundreds of dollars that Plaintiff spent, but which DealDash represented as being worth thousands of dollars.

---

[16] *See* ¶22, n.2, *supra.*

72.     Likewise, between January 2017 and June 2017, Plaintiff Carole Bennett purchased and lost DealDash bids in over 600 losing auctions, losing thousands of dollars in the process and obtaining nothing.

73.     Moreover, even as Ms. Bennett "won" approximately 100 of her DealDash auctions, she still suffered substantial economic losses.     These losses include (but are not necessarily limited to):

(a) her April 2017 payment of over $130 in bids and cash to win a "New Haven" floor lamp worth far less than $130, but which DealDash represented as worth $370;

(b) her April 2017 payment of over $120 in bids and cash to win a second "New Haven" table lamp worth far less than $120, but which DealDash represented as worth $235;

(c) her April 2017 payment of over $120 in bids and cash for a run-of-the-mill pet bed from "The Barrel Shack" worth far less than $120, but which DealDash represented as worth over $250;

(d) her April 2017 payment of over $110 in bids and cash to win a set of "Miranella" cermanic knives worth nowhere near that price, but which DealDash represented as worth $146;[17]

(e) her February 2017 payment of over $185 in bids and cash to win a 20-inch piece of hard-shell luggage from "Monolith,"[18] worth far less than $185, but which DealDash represented as worth $599;

---

[17] The first time that Ms. Bennett's husband attempted to use one of these ceramic knives, one of them broke apart in his hand.  On information and belief, "Miranella" is yet another recently created, worthless "brand" owned by Galton Voysey, but Plaintiffs have yet to confirm this with documentary evidence.  Miranella's website, however, looks and reads a lot like the websites of the other "brands" owned by Galton Voysey.  *Compare* https://miranella.com, *with* n.9, *supra* (last visited July 20, 2017).

[18] On information and belief, "Monolith" is another recently created, worthless "brand" owned by Galton Voysey, but Plaintiffs have yet to confirm this with documentary evidence. Monolith's website, however, looks and reads much like the bare bones websites of other "brands" owned by Galton Voysey.  *Compare* https://monolithblack.com, *with* n.9, *supra* (last visited July 20, 2017).

(f) her February 2017 payment of over \$38 in bids and cash to win a "Wilson & Miller" flashlight worth substantially less than \$38, but which DealDash represented as worth \$65; and

(g) her February 2017 payment of over \$114 in bids to win (in a "free" promotional auction) a "Wilson & Miller" Heavy Duty Army Backpack worth substantially less than \$114, but which DealDash represented as worth \$170.

74.     Similarly, between December 2016 and July 2017, Plaintiff Ken Ford purchased and lost DealDash bids in over 3,000 losing auctions, losing thousands of dollars in the process and obtaining nothing.

75.     Moreover, even as Mr. Ford "won" approximately 160 of his DealDash auctions, he still suffered substantial economic losses.     These losses include (but are not necessarily limited to):

(a) his July 2017 payment of over \$245 in bids and cash to win a "Bolvaint" necktie worth nowhere near \$245, but which DealDash represented as worth \$280;

(b) his June 2017 payment of over \$220 in bids and cash for a wall clock from "The Barrel Shack" worth far less than \$220, but which DealDash represented as worth \$540;

(c) his June 2017 payment of over \$50 in bids and cash to win a "Wilson & Miller" flashlight worth substantially less than \$50, but which DealDash represented as worth \$65;

(d) his April 2017 payment of over \$280 in bids to win (in a "free" promotional auction) a pair of "Kamikoto" kitchen knives worth far less than \$280, but which DealDash represented as worth \$1,375; and

(e) his March 2017 payment of over \$400 in bids and cash to win one "Kamikoto" Chef's knife worth nowhere near \$400, but which DealDash represented as worth \$675.

76.     Like Plaintiffs, millions of consumers across the United States have lost substantial sums of money—at least tens of millions of dollars—purchasing and losing bids in DealDash's daily lotteries, and walking away from those lotteries with nothing.     Moreover, Plaintiffs and the putative Class purchased their tens of millions of dollars (per year) in

"bidpacks" based in large part on the false premise that they were receiving 75%-80% discounts off of DealDash's regular bid pricing, when in fact, they were simply paying DealDash's regular bid prices, which had been continuously offered to the public for years.

77.     Numerous consumers like Plaintiffs have also suffered sizable economic losses by purchasing and spending bids to *win* DealDash's daily lotteries, and then spending additional cash to acquire their products at purportedly steep discounts that are entirely false, misleading and imaginary.

78.     Plaintiffs—like substantially all DealDash customers—would not have purchased bids from DealDash or entered any of DealDash's purported retail "auctions" had they known the fact that they were entering an illegal and fraudulent lottery scheme.  Moreover, Plaintiff and other "winning" DealDash users would not have purchased bids, played in DealDash's illegal lotteries, and spent *additional* cash to acquire purportedly high-"value," brand name merchandise, had they known that they were betting on and buying low-value, generic merchandise that is only of DealDash, by DealDash, and for DealDash and its principal(s), and for which there exists no legitimate U.S. consumer market.

79.     At bottom, DealDash lures consumers onto its website with phony bid sales and phony discounts on phony luxury products, and then proceeds to fleece them in its lotteries and thank them for their business.

**TINA and Hundreds of U.S. Consumers Formally Complain to Federal and State Agencies**

80.     After receiving DealDash's June 2, 2017 Response Letter, TINA's in-house attorneys replied to DealDash and its counsel that they found DealDash's response to be both deficient and insufficient.  Accordingly, on June 5, 2017, TINA submitted two formal, 30-page Complaint Letters to federal and state law enforcement authorities: one Complaint Letter to the

U.S. Federal Trade Commission, and the other to Attorney General Offices for the States of Minnesota, New York, Pennsylvania, Massachusetts, Connecticut, and the District of Columbia. *See generally* June 5, 2017 Complaint Letter from TINA to the FTC, *available at* https://www.truthinadvertising.org/wp-content/uploads/2017/06/6_5_17-DealDash-complaint-to-FTC_Redacted.pdf; June 5, 2017 Complaint Letter from TINA to Attorneys General, *available at* https://www.truthinadvertising.org/wp-content/uploads/2017/06/6_5_17-DealDash-complaint-to-State-AGs.pdf.   The Complaint Letters both request that the agencies investigate and take appropriate enforcement action against DealDash's "illegal gambling operation" and its ongoing false advertisements to consumers. *Id.*

81.    As part of its investigation, TINA also submitted requests for information regarding DealDash to the Federal Trade Commission under the Freedom of Information Act ("FOIA").   The government's FOIA responses show that in recent years, over 600 individual consumers have complained about being scammed in various ways on DealDash.com. *See* Consumer Complaints to the FTC Regarding DealDash, *available at* https://www.truthinadvertising.org/wp-content/uploads/2017/06/Deal-Dash-FTC-complaints.pdf (showing 99 single-spaced pages worth of consumer complaints to the FTC).   It remains to be seen whether federal or state authorities will take any enforcement action.

## CLASS ALLEGATIONS

82.    Plaintiffs bring this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") on behalf of all persons who have purchased bids or merchandise through www.dealdash.com and/or DealDash's mobile device application(s) (the "Class").   Excluded from the Class are Defendant, officers and directors of Defendant at all relevant times, members of such individuals' immediate families and their legal representatives, heirs, successors or assigns, as applicable, and any entity in which any Defendant has or had a controlling interest.

83.     Class members are so numerous and geographically dispersed that joinder of all members is impracticable.  DealDash has at least hundreds of thousands of distinct customers located throughout the United States who have purchased bids and/or merchandise from DealDash in recent years.  Moreover, members of the Class are not only ascertainable, but readily identifiable through comprehensive database records maintained by Defendant and/or its affiliates.  Most if not all Class members can be directly notified of this action via the e-mail addresses they provided Defendant upon creating their respective DealDash account(s), and may otherwise be notified by forms of publication notice that are customary in consumer class actions such as this.  While the exact number of Class members is currently unknown to Plaintiff, Plaintiff estimates that the number of Class members is at least in the hundreds of thousands.

84.     Plaintiffs' claims are typical of other Class members' claims, as all Class members have suffered the same harm as a result of the same illegal course of conduct by Defendant.  In addition, Plaintiffs' and other Class members' claims for relief arise under precisely the same legal theories.  At all relevant times, Defendant required that all of its customers agree to its Terms of Use before purchasing bids or products from its website, www.dealdash.com.  Defendant's Terms of Use, and all other documents incorporated therein by reference, apply to and exhaust the terms of every Class members' "buying of or bidding on goods or other services offered by DealDash on [www.dealdash.com]" pursuant to the express language of Defendant's Terms of Use.  DealDash's Terms of Use are expressly governed by Minnesota law, regardless of choice of law principals.  Minnesota law properly applies to each and every Class member's claims as alleged herein, in part because all such claims exclusively concern and arise out of Class members' "buying of or bidding on goods or other services offered by DealDash" pursuant to DealDash's Terms of Use on its website.  All Class member

43

injuries may be similarly remedied by an award of damages and injunctive relief as requested herein.

85.     Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel that is competent and experienced in prosecuting class actions.

86.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Common questions of law and fact amongst Class members include, among other things:

(a)     Whether Defendant's daily "penny auctions" are lawful retail auctions or unlawful lotteries operated by Defendant in violation of Minnesota and/or federal law;

(b)     Whether Defendant has falsely or misleadingly advertised to consumers the results of prior auctions by misrepresenting the actual financial costs to prior "winners" of obtaining the advertised products in Defendant's "auctions";

(c)     Whether Defendant has engaged in a pattern and practice of misrepresenting the true nature, source, retail values and prices of products it "auctions" off to consumers;

(d)     Whether Defendant has engaged in perpetual bid "sales" that falsely mislead consumers to believe they are receiving an unusual bargain when purchasing DealDash's bidpacks;

(e)     The extent to which Class members have sustained damages and the proper measure thereof; and

(f)     Whether the Class is entitled to injunctive and/or other equitable relief from Defendant's conduct.

87.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable.  Furthermore, because the damages suffered by individual Class members are relatively small, the expense and burden of individual litigation make it practically impossible for Class members to redress the wrongs done to them on an individual basis.   There will be no difficulty in the management of this case as a class action.

88.     Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Grant Pstikyan also seeks to represent a California Subclass of all California residents who purchased bids or merchandise through www.dealdash.com and/or DealDash's mobile device application(s) (the "Class").   For substantially the same reasons described in the preceding paragraphs, the California Subclass independently satisfies Fed. R. Civ. P. 23.

89.     Plaintiff Carole Bennett seeks to represent a Texas Subclass of all Texas residents who purchased bids or merchandise through www.dealdash.com and/or DealDash's mobile device application(s) (the "Class").   For substantially the same reasons described in the preceding paragraphs, the Texas Subclass independently satisfies Fed. R. Civ. P. 23.

90.     Plaintiff Ken Ford Bennett seeks to represent a Pennsyvania Subclass of all Pennsylvania residents who purchased bids or merchandise through www.dealdash.com and/or DealDash's mobile device application(s) (the "Class").   For substantially the same reasons described in the preceding paragraphs, the Pennsylvania Subclass independently satisfies Fed. R. Civ. P. 23.

**COUNT I**
**Violations of the Minnesota Consumer Fraud Act**
**Minn. Stat. § 325F.68,** *et seq.*
**(On Behalf of All Plaintiffs and Class Members)**

91.     Plaintiff repeats and realleges each and every allegation above as if fully set forth in this paragraph.

92.     The "bids" and "bidpacks" offered by Defendant to consumers nationwide, as well as the consumer products auctioned and sold by Defendant to consumers nationwide, constitute "Merchandise" within the meaning of Minnesota Statutes § 325F.68 Subd. 2.

93.     Defendant DealDash, Inc. is a "Person" within the meaning of Minnesota Statutes § 325F.68 Subd. 3.

94.     Through its website, www.dealdash.com, Defendant represented to Plaintiff and each and every Class member that its online penny auctions constitute "fair and honest auctions," when in reality DealDash's penny auctions are unfair, fraudulent and illegal lotteries, the conduct of which are subject to penalties under §§ 609.75, *et seq.* of the Minnesota Criminal Code, among other statutes.

95.     Through its website and mobile device application(s), Defendant materially misrepresented to Plaintiff and the Class the prices paid by recent DealDash auction winners so as to deceive the Class into believing that DealDash auction winners may obtain valuable products at costs far lower than the actual costs paid by such winners.

96.     Through its website and other websites, such as Amazon.com and social media websites, Defendant materially misrepresented—and continues to materially misrepresent—its auctioned merchandise as being legitimate, high-end, brand name merchandise with extremely high retail "values," when in fact most of DealDash's auctioned merchandise consists of illegitimate, low-end merchandise with retail dollar values nowhere near the retail values that DealDash represents.

97.     Pursuant to Minnesota Statutes § 8.31, subd. 3a, Plaintiff and the Class have been injured by Defendant's past and ongoing violations of Minn. Stat. §§ 325F.68, *et seq.* in the form of monetary losses directly and proximately caused by Defendant's conduct.

## COUNT II
### Violations of the Minnesota False Statement in Advertisement Act
### Minn. Stat. § 325F.67
### (On Behalf of All Plaintiffs and Class Members)

98.     Plaintiff repeats and realleges each and every allegation above as if fully set forth in this paragraph.

99.     Defendant DealDash, Inc. is a "person" and "corporation" within the meaning of Minnesota Statutes § 325F.67.  Defendant DealDash, Inc. acted at all relevant times with the intent to sell and dispose of merchandise in the form of DealDash "bids" and other consumer products such as those detailed herein, which Defendant offered directly to the public for sale and with the intent to increase public consumption thereof.

100.     Defendant has made, published disseminated and placed before the public in Minnesota through the internet and other media advertisements regarding DealDash bids and "bidpacks" and other consumer products offered to the public for use, consumption, sales, and such advertisements have at all relevant times contained material assertions, representations and statements of fact that were and are materially untrue, deceptive, and misleading.

101.     Pursuant to Minnesota Statutes § 8.31, subd. 3a, Plaintiff and the Class have been deceived, misled and injured by Defendant's past and ongoing violations of Minn. Stat. §§ 325F.67 in the form of monetary losses directly and proximately caused by Defendant's conduct.

**COUNT III**
**Violations of the Minnesota Unlawful Trade Practices Act**
**Minn. Stat. § 325D.13**
**(On Behalf of All Plaintiffs and Class Members)**

102.     Plaintiff repeats and realleges each and every allegation above as if fully set forth in this paragraph.

103.     Minnesota Statute §325D.13 prohibits misrepresenting the quality of goods, providing in pertinent part:

325D.13 QUALITY, MISREPRESENTED
No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise.

104.    Minn. Stat. §325D.15 provides private remedies for violations of this provision. Pursuant to Minn. Stat. §325D.15, Plaintiffs are entitled to compensatory damages for DealDash's violations of Minn. Stat. §325D.13.

105.    Defendant is a person under the definitions of Minn. Stat. §325D.10, and the underlying transaction is a sale of merchandise.

106.    As alleged above, DealDash has represented that the products being sold are high quality well known luxury brands.

107.    DealDash has misrepresented the quality of items it advertises for sale via its auctions.

### COUNT IV
### Violations of the Minnesota Unlawful Trade Practices Act
### Minn. Stat. § 325D.12
### (On Behalf of All Plaintiffs and Class Members)

108.    Plaintiff repeats and realleges each and every allegation above as if fully set forth in this paragraph.

109.    Minnesota Statute §325D.12 prohibits misrepresenting the quality of goods, providing in pertinent part:

**325D.12 RETAILERS NOT TO MISREPRESENT NATURE OF BUSINESS.**
(1) No person engaged in the sale of merchandise at retail shall, in connection with such business, misrepresent the true nature of such business, either by use of the words manufacturer, wholesaler, broker, or any derivative thereof or synonym therefor, or otherwise.

(2) No person shall, in connection with the sale of merchandise at retail misrepresent, directly or indirectly, that the price at which such merchandise is sold is an approximately wholesale price, or is less than the usual retail price, either by the use of any such expression, or of any expression having a similar meaning, or otherwise misrepresent the true nature of such sale.

(3) No person shall, in connection with the sale of merchandise at retail, or in, or in connection with the use of, samples, catalogs, or other forms of advertising listing merchandise for sale at retail, display price tags or price quotations in any form showing prices which are fictitiously in excess of the actual prices at which

such merchandise is regularly and customarily sold at retail by such person or by
the person issuing such samples, catalogs, or other forms of advertising.

110.    Minn. Stat. §325D.15 provides private remedies for violations of this provision.
Pursuant to Minn. Stat. § 325D.15, Plaintiffs are entitled to compensatory damages for
DealDash's violations of Minn. Stat. § 325D.12.

111.    Defendant is a person under the definitions of Minn. Stat. §325D.10, and the
underlying transaction is a sale of merchandise.

112.    As alleged above, DealDash has misrepresented the true nature of the businesses
that supply many of its products. DealDash and its founder own the copyright and trademarks to
myriad brands represented on its website. These brands are misrepresented as luxury brands.

113.    As alleged above, DealDash has knowingly represented that the price of the
merchandise is less than the usual retail price.

114.    As alleged above, DealDash's auction pages show prices, which are fictitiously in
excess of the actual prices at which such merchandise would be customarily sold at retail.

**COUNT V**
**Violations of the Minnesota Uniform Deceptive Trade Practices Act**
**Minn. Stat. § 325D.44**
**(On Behalf of All Plaintiffs and Class Members)**

115.    Plaintiff repeats and realleges each and every allegation above as if fully set forth
in this paragraph.

116.    Plaintiff repeats and realleges each and every allegation above as if fully set forth
in this paragraph.

117.    Minnesota Statute §325D.44 prohibits misrepresenting the quality of goods,
providing in pertinent part:

**325D.44 DECEPTIVE TRADE PRACTICES.**

A person engages in a deceptive trade practice when, in the course of business, vocation, or occupation, the person:

. . .

(2) causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;

. . .

(4) uses deceptive representations or designations of geographic origin in connection with goods or services;

(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;

. . .

(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

. . .

(11) makes false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;

. . .

(13) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

118.    As alleged above, DealDash has attempted to pass off its brands as major international luxury brands that command prices well above the standard rates for what would be considered peer brands—if the house brands were in fact luxury brands. DealDash has attempted to misrepresent the status and quality of itsbrands listed in its auctions.

119.    DealDash routinely misleads consumers about the actual value of the products listed in its auctions.

**COUNT VI**
**Unjust Enrichment**
**(On Behalf of All Plaintiffs and Class Members)**

120.    Plaintiff repeats and realleges each and every allegation above as if fully set forth in this paragraph.

121.    Plaintiff purchased DealDash bids and bidpacks, and participated in illegal online lotteries based on Defendant's numerous, independently false and misleading misrepresentations and omissions as alleged herein.

122.    Defendant generated enormous profits from Plaintiff's and the Class's purchases and losses of cash and bids on www.dealdash.com and DealDash mobile device applications.

123.    Defendant has been knowingly, unlawfully and unjustly enriched at the direct expense of and detriment to Plaintiff and every member of the Class by collecting money to which Defendant was never entitled.

124.    It would be wrong to permit Defendant to enrich itself at the expense of Plaintiff and the Class, and Defendant should be required to disgorge this unjust enrichment.

**COUNT VII**
**Violation of CAL. BUS. & PROF. CODE §§ 17500, *et seq.***
**Untrue, Misleading and Deceptive Advertising**
**(On Behalf of Plaintiff Pstikyan and California Subclass Members)**

125.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

126.    As fully set forth above in this Complaint, at all material times, Defendant engaged in a scheme of, *inter alia*: (a) operating daily lotteries in violation of the laws of Minnesota, California and numerous other states, as well as in violation of 18 U.S.C. § 1955, while deceptively misrepresenting to consumers that DealDash was operating "fair and honest auctions"; (b) misrepresenting the quality, origin, retail prices and retail values of the goods "auctioned" off in its lotteries; (c) misrepresenting the true costs paid by prior DealDash winners to obtain featured products; and (d) promoting false and misleading discounts and continuous, multiyear "sales" on its bidpacks.  Defendant engaged in such scheme by way of, *inter alia*, commercial marketing, internet advertising, internet content, product packaging and labelling,

and numerous other promotional materials.

127.   Defendant's advertisements and other inducements come within the definition of advertising as contained in CAL. BUS. PROF. CODE §§ 17500, *et seq.*, in that such promotional materials were intended as inducements to purchase Defendant's products and are statements disseminated by Defendant throughout California to Plaintiff and other California Subclass Members.

128.   Defendant knew, or in the exercise of reasonable care should have known, that the statements regarding its products and services were false, misleading and/or deceptive.

129.   Consumers, including Plaintiff and California Subclass Members, necessarily and reasonably relied on Defendant's statements regarding its products and operations as described herein. Consumers, including Plaintiff and members of the California Subclass were among the intended targets of such representations.

130.   The above acts of Defendant, in disseminating said misleading and deceptive statements throughout the State of California and nationwide to consumers, including Plaintiffs and members of the Class and the California Subclass, were and are likely to deceive reasonable consumers by obfuscating the true nature and value of Defendant's goods, and thus were violations of CAL. BUS. PROF. CODE §§ 17500, *et seq.*

131.   Plaintiffs and California Subclass members were harmed and suffered injury as a result of Defendant's violations of the CAL. BUS. PROF. CODE §§ 17500, *et seq.* Defendant has been unjustly enriched at the expense of Plaintiffs and the members of the California Subclass.

132.   Accordingly, Plaintiff and members of the California Subclass seek injunctive relief prohibiting Defendant from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from

Defendant's wrongful conduct to the fullest extent permitted by law.  Lottery entries cannot legally be advertised, distributed or sold. Thus, DealDash bids and bidpacks have no economic value and are worthless as a matter of law, and purchasers of DealDash bids or bidpacks are entitled to a refund of the purchase price of the same.

**COUNT VIII**
**Violation of CAL. BUS. & PROF. CODE §§ 17200, *et seq.***
**Unlawful Business Acts and Practices**
**(On Behalf of Plaintiff Pstikyan and California Subclass Members)**

133.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

134.    The business practices alleged above are unlawful under 18 U.S.C. § 1955, the lottery laws of the States of Minnesota, California and numerous other States, as well as Business and Professional Code §§ 17500, *et seq*., and California Civil Code § 1770(a), which forbid Defendant's unlawful, untrue, fraudulent, deceptive, and/or misleading marketing and advertisements described fully herein.

135.    As a result of Defendant's above unlawful, unfair and fraudulent acts and practices, Plaintiff, on behalf of himself and all others similarly situated, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendant from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendant's wrongful conduct to the fullest extent permitted by law.  Lottery entries cannot legally be advertised, distributed or sold. Thus, DealDash bids and bidpacks have no economic value and are worthless as a matter of law, and purchasers of DealDash bids or bidpacks are entitled to a refund of the purchase price of the same.

**COUNT IX**
**Violation of CAL. BUS. & PROF. CODE §§ 17200, *et seq.***
**Unfair Business Acts and Practices**
**(On Behalf of Plaintiff Pstikyan and California Subclass Members)**

136.   Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

137.   Plaintiff and other members of the Class and the California Subclass who purchased Defendant's products suffered a substantial injury by virtue of buying products that misrepresented and/or omitted their true nature and value as alleged herein. Had Plaintiff and members of the California Sub-Class known that Defendant's materials, advertisements and other inducements misrepresented and/or omitted the true nature and value of DealDash's products and discounts as alleged herein, they would not have purchased said products.

138.   Defendant's actions alleged herein violate the laws and public policies of California and the federal government, as set out in preceding paragraphs of this Complaint.

139.   There is no benefit to consumers or competition by allowing Defendant to deceptively market, advertise, and sell its products as alleged herein.

140.   Plaintiffs and Class and the California Subclass members who purchased Defendant's products had no way of reasonably knowing that these products were deceptively marketed, advertised, packaged and labeled. Thus, Class and the California Subclass members could not have reasonably avoided the injury they suffered.

141.   The gravity of the harm suffered by Plaintiff and California Subclass members who purchased Defendant's products outweighs any legitimate justification, motive or reason for marketing, advertising, packaging and selling the products in a deceptive and misleading manner. Accordingly, Defendant's actions are immoral, unethical, unscrupulous and offend the established public policies as set out in federal and state law and is substantially injurious to

Plaintiff and members of the California Subclass.

142.    The above acts of Defendant, in disseminating said misleading and deceptive statements throughout the State of California and nationwide to consumers, including Plaintiffs and members of the Class and the and the California Subclass, were and are likely to deceive reasonable consumers by obfuscating the true nature and value of Defendant's products, and thus were violations of CAL. BUS. PROF. CODE §§ 17500, *et seq.*

143.    As a result of Defendant's above unlawful, unfair and fraudulent acts and practices, Plaintiff, on behalf of himself and all others similarly situated, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendant from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendant's wrongful conduct to the fullest extent permitted by law. Lottery entries cannot legally be advertised, distributed or sold. Thus, DealDash bids and bidpacks have no economic value and are worthless as a matter of law, and purchasers of DealDash bids or bidpacks are entitled to a refund of the purchase price of the same.

### COUNT X
### Violation of CAL. BUS. & PROF. CODE §§ 17200, *et seq.*
### Fraudulent Business Acts and Practices
### (On Behalf of Plaintiff Pstikyan and the California Subclass)

144.    Plaintiffs hereby incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

145.    Such acts of Defendant as described above constitute a fraudulent business practice under Cal. Bus. & Prof. Code §§ 17200, *et seq.*

146.    As fully set forth above in this Complaint, at all material times, Defendant engaged in a scheme of, *inter alia*: (a) operating daily lotteries in violation of the laws of

Minnesota, California and numerous other states, as well as in violation of 18 U.S.C. § 1955, while deceptively misrepresenting to consumers that DealDash was operating "fair and honest auctions"; (b) misrepresenting the quality, origin, retail prices and retail values of the goods "auctioned" off in its lotteries; (c) misrepresenting the true costs paid by prior DealDash winners to obtain featured products; and (d) promoting false and misleading discounts and continuous, multiyear "sales" on its bidpacks.  Defendant engaged in such scheme by way of, *inter alia*, commercial marketing, internet advertising, internet content, product packaging and labelling, and numerous other promotional materials.

147.    Defendant's misleading marketing, advertising, and sales as alleged herein are likely to, and do, deceive reasonable consumers. Indeed, Plaintiffs were deceived about the nature and value of DealDash's products and operations Defendant's misleading and deceptive practices caused Plaintiffs to purchase Defendant's products and/or pay more than they would have otherwise had they know the true nature of the products.

148.    As a result of Defendant's above unlawful, unfair and fraudulent acts and practices, Plaintiffs, on behalf of themselves and all others similarly situated, and as appropriate, on behalf of the general public, seeks injunctive relief prohibiting Defendant from continuing these wrongful practices, and such other equitable relief, including full restitution of all improper revenues and ill-gotten profits derived from Defendant's wrongful conduct to the fullest extent permitted by law. Lottery entries cannot legally be advertised, distributed or sold. Thus, DealDash bids and bidpacks have no economic value and are worthless as a matter of law, and purchasers of DealDash bids or bidpacks are entitled to a refund of the purchase price of the same.

**COUNT XI**
**Violations of V.T.C. Bus. & C. §§ 1741, *et seq.***
**Texas Deceptive Trade Practices Act ("DTPA")**
**(On Behalf of Plaintiff Carole Bennett and Texas Subclass Members)**

149.   Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint.

150.   The transactions and occurrences set forth above constitute violations of the Texas Deceptive Trade Practices—Consumer Protection Act ("DTPA"), Bus. & C. §§ 1741, *et seq.*, on the part of Defendant.  Specifically, DealDash's actions as fully set forth herein violate § 17.46(a) numerous provisions of § 17.46(b) of the Texas Business & Commerce Code, including, *e.g.*, §§ 17.46(b)(2), (3), (5), (7) and (24).  DealDash has violated such provisions as alleged fully herein by, *inter alia*: (a) operating daily lotteries in violation of the laws of Minnesota, California and numerous other states, as well as in violation of 18 U.S.C. § 1955, while deceptively misrepresenting to consumers that DealDash was operating "fair and honest auctions"; (b) misrepresenting the quality, origin, retail prices and retail values of the goods "auctioned" off in its lotteries; (c) misrepresenting the true costs paid by prior DealDash winners to obtain featured products; and (d) promoting false and misleading discounts and continuous, multiyear "sales" on its bidpacks.  Defendant engaged in such scheme by way of, *inter alia*, commercial marketing, internet advertising, internet content, product packaging and labelling, and numerous other promotional materials.

151.   As a direct consequence of Defendant's acts and omissions as alleged herein, Plaintiff and Texas Subclass members suffered economic damages are are entitled to recover the same as well as reasonable attorneys' fees and costs pursuant to §§ 17.50(a)(1) and (3) and 17.50(b).

**COUNT XII**
**Violation of 73 P.S. 201-1, *et seq.***
**Pennsylvania Unfair Trade Practices and Consumer Protection Law**
**(On Behalf of Plaintiff Ken Ford and Pennsylvania Subclass Members)**

152.    Plaintiff hereby incorporates by reference all allegations contained in the preceding paragraphs of this Complaint.

153.    Defendant has violated, and continues to violate Pennsylvania's Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. 201-1, *et seq.*, the Federal Trade Commission Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce," 15 U.S.C. § 45(a)(1), and false advertisements, 15 U.S.C. § 52(a)

154.    Plaintiff and Defendant are "persons" within the meaning of the UTPCPL.

155.    The products purchased by Plaintiff and the Class are "goods…primarily for personal, family or household purposes." 73 P.S. § 201-9.2.

156.    The UTPCPL declares as unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of clause (4) of section 21 of this act." 73 P.S. § 201-3.

157.    Under clause (4), unfair methods of competition and unfair or deceptive acts or practices are defined as "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions." 73 P.S. § 201-2(4)(xi).  Clause (4) also defines as unlawful "[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding." 73 P.S. § 201-2(4)(xxi).

158.    Defendant has violated such provisions as alleged fully herein by, *inter alia*: (a) operating daily lotteries in violation of the laws of Minnesota, California and numerous other states, as well as in violation of 18 U.S.C. § 1955, while deceptively misrepresenting to consumers that DealDash was operating "fair and honest auctions"; (b) misrepresenting the

quality, origin, retail prices and retail values of the goods "auctioned" off in its lotteries; (c) misrepresenting the true costs paid by prior DealDash winners to obtain featured products; and (d) promoting false and misleading discounts and continuous, multiyear "sales" on its bidpacks. Defendant engaged in such scheme by way of, *inter alia*, commercial marketing, internet advertising, internet content, product packaging and labelling, and numerous other promotional materials.

159.    Defendant also violated the UTPCPL because its scheme was deceptive in that it created the likelihood that consumers would be confused and deceived into believing that they were participating in lawful retail auctions rather than unlawful lotteries, that they were bidding on and purchasing high-value, independently owned, luxury brand name products at substantial discounts, when in fact, they were not.  Indeed, the products being bid on and purchased by Plaintiffs and the Class members were actually being sold at, and often far above, their true market prices, yet Plaintiffs and the Class purchased Defendant's products believing that the products were substantially discounted from the prices at which they were regularly sold.

160.    Plaintiffs have suffered ascertainable economic losses as a direct result of Defendant's conduct because they purchased and lost DealDash bids and purchased and lost DealDash products they otherwise would not have purchased but for Defendants' fraudulent and deceptive scheme. Accordingly, Plaintiffs and the class are entitled to recover damages and/or other additional relief as this court deems just or proper. Additionally, Plaintiffs are entitled to their costs and reasonable attorney fees.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray for judgment as follows:

A.    Declaring that Defendant is liable for the damages sustained by Plaintiffs and the Class;

B.    Permanently enjoining Defendant from operating its penny auctions in a manner that constitutes unlawful lottery operations;

C.    Permanently enjoining Defendant from misrepresenting the actual costs paid for products by previous DealDash lottery winners;

D.    Permanently enjoining Defendant from misrepresenting the "values," origins and/or retail prices of consumer products offered on DealDash.com;

E.    Ordering Defendant to disgorge all profits obtained by the selling of "bids" and "bidpacks" to consumers for their participation in Defendant's unfair and unlawful scheme;

F.    Determining and certifying that this action is a proper class action, and certifying Plaintiffs as Class Representatives and Finkelstein & Krinsk LLP as Class Counsel pursuant to Fed. R. Civ. P. 23;

G.    Awarding Plaintiffs and the Class pre-judgment and post-judgment interest as well as reasonable attorneys' fees, costs and expenses incurred in this action; and

H.    Awarding such other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiffs hereby demand a trial by jury.

Dated: July 21, 2017                     Respectfully submitted,

                                         FINKELSTEIN & KRINSK LLP


                                         By: ___s/ David J. Harris, Jr._____ ___
                                             David J. Harris, Jr. (*pro hac vice*)


                                         Jeffrey R. Krinsk, Esq. (*pro hac vice*)
                                         jrk@classactionlaw.com
                                         Trenton R. Kashima, Esq. (*pro hac vice*)
                                         trk@classactionlaw.com
                                         550 West C Street, Suite 1760
                                         San Diego, California 92101
                                         Telephone: (619) 238-1333
                                         Facsimile:  (619) 238-5425

                                         *Lead Counsel for Plaintiffs and the Putative Class*


                                         GUSTAFSON GLUEK PLLC
                                         Daniel E. Gustafson (#202241)
                                         Daniel C. Hedlund (#258337)
                                         Eric S. Taubel (#392491)
                                         Canadian Pacific Plaza
                                         120 South 6th Street, Suite 2600
                                         Minneapolis, MN 55402
                                         Telephone: (612) 333-8844
                                         Facsimile: (612) 339-6622
                                         Email: dgustafson@gustafsongluek.com
                                                dhedlund@gustafsongluek.com
                                                etaubel@gustafsongluek.com

                                         *Liaison Counsel for Plaintiffs and the Putative Class*