# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

—————————————

| | |
|---|---|
| GRANT PSTIKYAN, CAROLE BENNETT, and KEN FORD,  Individually and on Behalf of All Others Similarly Situated<br><br>Plaintiffs,<br><br>v.<br><br>DEALDASH, INC.<br><br>Defendant. | Case No. 0:17-cv-01164-JRT-FLN<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT DEALDASH, INC.'S MOTION TO DISMISS FIRST AMENDED CLASS ACTION COMPLAINT** |

1

## I.    INTRODUCTION AND SUMMARY OF ISSUES

Plaintiffs Grant Pstikyan, Carole Bennett and Ken Ford bring this class action to redress certain economic injuries they suffered from their dealings with Defendant DealDash, Inc. ("Defendant" or "DealDash").  DealDash is a Minnesota company that purports to run a "fair and honest auction" website, where consumers can "bid" on a wide variety of retail merchandise.  ¶94.[1]  DealDash advertises that consumers can save 90% or more off the prices of brand name products ranging from electronics, to furniture, to clothing and accessories (and much more) by bidding in DealDash's "auctions." ¶1.  The crux of Plaintiffs' Complaint is fourfold.

First, Plaintiffs allege that DealDash's fair and honest "penny auctions" are fraudulent lotteries that DealDash operates in violation of federal and state law.  ¶¶6, 12-30.  The alleged structure of DealDash's penny auctions is such that participants must pay DealDash for their chances to win prizes at steep discounts.  *Id.*  Those three elements — consideration, for a chance, to win a prize — mark the essence of an unlawful lottery in Minnesota and across the United States.  In fact, the U.S. Federal Trade Commission ("FTC") has recognized that a penny auction, like the ones offered by DealDash, is "more like a lottery than a traditional online auction." ¶26.  And to date, the only federal court to address allegations that "penny auctions" were illegal "lotteries" sustained those allegations.  *Mendelsohn v. BidCactus, LLC*, No. 3:11-CV-1500 (JCH), 2012 WL 1059702 (D. Conn. Mar. 28, 2012) (denying motion to dismiss claims alleging

---

[1] Citations herein to "¶__" or "¶¶__-__" refer to numbered paragraphs in Plaintiffs' First Amended Class Action Complaint (Dkt. 34) ("FAC" or "Complaint").

that an online penny auction company conducted illegal lotteries). DealDash, however, perists in its illegal lottery operations, while telling consumers that they are participating in "fair and honest auctions." ¶94. Plaintiffs and millions of other U.S. consumers have purchased and lost paid bids in DealDash's daily internet lotteries as a result. ¶76.

Second, Plaintiffs allege that DealDash has materially misrepresented the origins, retail values and prices of products that DealDash puts up for "auction" on its website. ¶¶35-66. DealDash auctions off tens if not hundreds of consumer products every day, with most of those products displaying sky-high retail values, and purporting to be manufactured by numerous high-end, independent companies. *Id.* These seemingly independent, luxury brand names and sky-high retail prices induced Plaintiffs and millions of other U.S. consumers to spend money "bidding" (read: "betting") in DealDash's penny auctions; they believed they could win high-value, luxury products from established brand names at steep discounts. *Id.*; *see also* ¶¶70-79. The truth, however, is that these twenty-plus brands are not independent or established at all. They are only recently created, not by independent companies, but by a foreign start-up company owned and controlled by DealDash's controlling owner. *Id.* And the retail prices that DealDash assigns to its deceptively branded products are entirely fictitious. *Id.* Not only has DealDash's "Brand Fraud" caused Plaintiffs and the Class to spend money losing DealDash auctions they would not have otherwise entered, its Brand Fraud has also caused auction "winners" like Plaintiffs to suffer economic losses by spending paid bids and cash to acquire grossly overpriced items. *Id.* Plaintiffs thought that they were (and most of the Class still thinks that they are) "winning" independent, luxury-

3

branded products at steep discounts, when Plaintiffs were actually buying deceptively branded, cheaply made *DealDash* products at enormous premiums.

Third, DealDash deceptively advertised to Plaintiffs and the Class the prices paid by recent winners of DealDash's penny auctions. ¶¶31-34.  Specifically, on its homepage and within each penny auction webpage, DealDash prominently displayed the "prices" at which the featured product had been "sold" to recent winners on DealDash: by displaying *only* the final "auction" prices paid by the winners, and nothing about the amount of bids or money those winners had to pay to win these auctions.  *Id.*  Accordingly, consumers are left with the impression that they can win DealDash auctions at costs comprised predominantly of the final auction price, when the reverse is true: the real cost to DealDash winners is always much higher, often several multiples higher, than the final auction price that DealDash displays.  This deception induces consumers to enter DealDash's penny auctions, hoping that they too can win the featured product for a low price, when in fact, such low prices are practically impossible to achieve.[2]

Fourth, DealDash deceptively advertised temporary discounts on all of its bidpacks, representing that DealDash's normal price was sixty cents per bid, but that consumers could obtain bids at unusually low prices between twelve and fifteen cents per bid. ¶¶67-69. This led consumers to believe they were getting an abnormal value when purchasing DealDash's bidpacks when, in reality, they are only paying DealDash's

---

[2] It appears from www.dealdash.com that after Plaintiffs' lawsuit, DealDash has now ceased this deceptive practice (at least temporarily), and now displays both the number of "Bids placed" by recent winners, as well as the "Est. total cost" paid by each recent winner.

4

regular prices over the last few years.  The FTC has specifically identified this type of pricing scheme as a "fictitious price comparison" that causes a consumer to "not receiv[e] the unusual value he expects."  ¶67.  Plaintiffs and the Class bought DealDash bidpacks for between twelve and fifteen cents per bid based on the false premise that they were receiving major, limited-time discounts.  Plaintiffs were not receiving any "unusual value" or "genuine bargain" at all.  ¶¶49, 67; 16 C.F.R. §§ 233.1(a),(d) and 233.2(a).[3]

For all four of the above reasons, Plaintiffs allege economic injuries in the form of thousands of dollars in lost paid bids and cash paid to DealDash.

In response, DealDash submits a scattershot-hybrid between an answer and a motion to dismiss.  Much of its Motion to Dismiss (Dkt. 40) ("Motion") seeks to erase or revise the Complaint's factual allegations, but DealDash's efforts to contradict and discredit the Complaint's facts are improper and should be disregarded by the Court at this stage.  Beyond that, Defendant's attacks on the Complaint's legal sufficiency are primarily fourfold as well, as they argue that: (1) Plaintiffs lack standing to assert claims under Minnesota law; (2) DealDash's "penny auctions" cannot be "lotteries" because they are not games of random "chance"; (3) as a matter of law, none of DealDash's advertisements are deceptive to consumers; and (4) Plaintiffs fail to allege causation, individual reliance or injuries.  As explained in detail below, the Court should reject all four of these arguments.

---

[3] It appears from www.dealdash.com that after Plaintiffs' lawsuit, DealDash has also ceased this deceptive practice (at least temporarily), and no longer displays sixty cents as being DealDash's regular price per bid.

## II.    LEGAL STANDARDS ON A RULE 12(b)(6) MOTION TO DISMISS

### A. The Court should accept Plaintiffs' factual allegations as true and construe them in the manner most favorable to Plaintiffs.

To state a claim, a complaint must include a short and plain statement showing that the pleader is entitled to relief.  FED. R. CIV. P. 8(a)(2).  This standard encourages brevity and is not intended to impose a great burden upon plaintiffs.  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007); *Dura Pharm., Inc. v. Boudo*, 544 U.S. 336, 347 (2005).  A plaintiff need only provide a defendant with "fair notice of what the plaintiff's claim is and the grounds upon which it rests."  *Dura*, 544 U.S. at 346; *Tellabs*, 551 U.S. at 319.  While mere legal conclusions are insufficient to state a claim for relief, all factual allegations in a complaint must be presumed true and viewed in a light most favorable to the plaintiff.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007); *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009); *Tellabs*, 551 U.S. at 322; *see also Riley v. St. Louis County of Mo.*, 153 F.3d 627, 629-30 (8th Cir. 1998) ("[W]e accept the complaint's factual allegations as true and construe the complaint in the light most favorable to the plaintiff.").  "*Twombly* and *Iqbal* did not change this fundamental tenet of Rule 12(b)(6) practice." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009).

### B. The Court should disregard Defendant's improper counterallegations.

Along with its Motion to Dismiss, DealDash files numerous, extraneous materials to contradict the Complaint's factual allegations, including a curious declaration from someone named Paavo Pere — hailing from Helsinki, Finland — who does not even

6

claim to be affiliated with Defendant DealDash, Inc.  *See generally* Dkt. 43.  Instead, Pere says he is the "Head of Product Insights" at Defendant's Finnish parent company, "DealDash Oyj," without explaining the parent company's role (if any) in owning or operating www.dealdash.com, and without asserting any factual basis whatsoever for his "personal knowledge" of DealDash, Inc.'s domestic operations.  *Id.* As "Exhibits" to his declaration, Pere attaches several, admittedly ***revised*** versions of webpages from DealDash.com, most of which were only published (admittedly) in the months ***after*** this lawsuit was first filed in April 2017.  In its brief, DealDash then spends nearly ten pages of argument rewriting the Complaint's allegations based largely upon these extraneous, recently invented materials.

Defendant contends that its own version of newly invented counter-facts is somehow "embraced by" Plaintiffs' Complaint,[4] but nothing could be further from the truth.  Most of DealDash's purported recitation of the Complaint's allegations actually contradicts, or is in clear tension with, the Complaint's allegations.  By way of example only, DealDash counteralleges that its penny auctions "involve an element of strategy in gauging other participants and knowing when to bid."  *See* Motion at 7.  But the Complaint alleges in detail that "no amount of skill or strategy could inform an auction participant of the likelihood that the particular bid they are about to place will be the 'winning' bid"; the Complaint further avers that "[n]o one — not even DealDash itself — can say whether the likelihood of winning an auction with a particular bid is around 1%,

---

[4] Motion at n.3.

99%, or somewhere in between." ¶24; *see generally* ¶¶12-30. Similarly, DealDash counteralleges that penny-auction participants "who actively monitor an auction's progress can see exactly how many times others have bid on a particular item." *See* Motion at 17. But the Complaint alleges that, "in practice, users cannot see or otherwise discern how many bids other participants have spent so far in the given auction." ¶21. DealDash's counterallegations even lack internal consistency in certain instances. On the one hand, they say that DealDash's penny-auction "outcome[s] d[o] not depend on whether a shopper placed many bids or only a solitary bid at the strategically-correct time"; on the other hand, DealDash counteralleges "that most of [DealDash's] auctions are won by shoppers using the Bid Buddy function," *i.e.,* shoppers who ***auto-bid*** for indefinite periods of time. *Compare* Motion at 6, *with* ¶23 (explaining that the Bid Buddy function continuously bids "for hours, or even days, on end.").

Contending with all of DealDash's false and improper counterallegations here would nearly consume the allotted briefing space. Accordingly, Plaintiffs reserve their rights to thoroughly contend with each and every one of DealDash's counterallegations at the appropriate stage of litigation. At this pleading stage, however, Plaintiffs respectfully request that the Court disregard all of DealDash's factual counterallegations, especially to the extent that those counterallegations are in tension with, or extraneous to, the Complaint's factual allegations. *See, e.g., Riley*, 153 F.3d at 629 ("When reviewing a

Rule 12(b)(6) dismissal for failure to state a claim, we look only to the facts alleged in the complaint and construe those facts in the light most favorable to the plaintiff.").[5]

## III.   LEGAL ARGUMENTS

### A. The Court should reject DealDash's clearly erroneous "standing" argument.

#### 1.   Defendant has not raised any true "standing" problem.

DealDash argues that a plaintiff "must either be a resident of Minnesota or have sustained an injury in Minnesota" in order to "have standing under Minnesota's consumer protection statutes." *See* Motion at 24-25 (citing *Ferrari v. Best Buy Co.*, Civil No. 14-2956 (MJD/FLN), 2015 WL 2242128, at *10 (D. Minn. Mar. 12, 2015), and *Insulate SB, Inc. v. Advanced Finishing Sys., Inc.*, No. 13-2664 (ADM/SER), 2014 WL 943224, at *11 (D. Minn. Mar. 11, 2014)).  Both unreported decisions in *Ferrari* and *Insulate SB* dismissed their respective plaintiffs' claims on the premise that plaintiffs lacked ***Article III*** standing to assert Minnesota consumer protection claims.  *See Insulate SB*, 2014 WL 943224, at *10; *Ferrari*, 2015 WL 2242128, at *9-10.  Article III, however, has nothing

---

[5] In addition, the mere fact that Plaintiffs' Complaint displays, quotes or otherwise references portions of the DealDash website does not mean that the Complaint "embraces" the entire DealDash website as true or accepts Pere's declaration as true. Motion at n.3.  Quite the opposite: substantially the entire website itself is an alleged fraud, and was first alleged to be a fraud back in April 2017.  *See generally* Dkt. 1; Dkt. 34.  And the Court cannot properly take judicial notice of the misleading website snippets proffered by Pere, because what DealDash's website publicly displayed at particular points in time during the Class Period is most certainly: (1) "subject to reasonable dispute"; and (2) not established by "sources whos accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Plaintiffs intend to reasonably dispute and question the accuracy of Pere's factual representations about the contents of DealDash's website at various points in time.

to do with the legal issue at hand: namely, whether Plaintiffs may exercise their Minnesota-granted, private rights of action under Minnesota's consumer protection statutes.  Both *Ferrari* and *Insulate SB* are inapposite to the extent that they frame the issue as one of Article III "standing."

Indeed, the Supreme Court has clarified the difference between Article III standing (a ***jurisdictional***, threshold issue concerning the constitutional separation of powers between the three branches of federal government) and statutory "standing" where a statute confers a private right of action (this is ***not*** a jurisdictional or otherwise constitutional issue).  Whether Plaintiffs have a cognizable injury for which a legislature has provided a private right of action is simply a question of statutory interpretation and application, not a constitutional question.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1386-88 (2014).  The question of statutory "standing" — as opposed to Article III, jurisdictional standing — is simply whether a plaintiff "falls within the class of plaintiffs whom [the legislature] has authorized to sue."  *Id.* at 1387-88; *see also id.* at n.4 ("We have on occasion referred to this inquiry as 'statutory standing' and treated it as effectively jurisdictional. [citations] That label is an improvement . . . , since it correctly places the ***focus on the statute***.  But it, too, is misleading, since 'the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.,* the court's statutory or constitutional power to adjudicate the case.'") (citations omitted).[6]   Similarly, the Eighth Circuit recently

---

[6] All emphasis is added herein unless otherwise stated.

reminded courts that "it is crucial . . . not to conflate Article III's requirement of injury in fact with a plaintiff's potential causes of action." *See Kuhns v. Scottrade, Inc.*, --- F.3d ---, 2017 WL 3584046, at *3 (8th Cir. 2017).

Here, DealDash does not and cannot seriously dispute that Plaintiffs have Article III standing, nor does DealDash dispute Plaintiffs' other bases for asserting this Court's subject matter jurisdiction over their claims, or personal jurisdiction over the parties. Therefore, insofar as Article III is concerned, this Court has the constitutional power to — and indeed, must — adjudicate Plaintiffs' Minnesota consumer protection claims on the merits. Rather than a jurisdictional "standing" question implicating the Court's judicial power, the threshold question presented here is a mere merits question: whether Plaintiffs Pstikyan, Bennett and Ford are within the "class of plaintiffs whom [the legislature] has authorized to sue." *See Lexmark Int'l*, 134 S.Ct. at 1388-89 (explaining the so-called "zone-of-interests" test that originated under common law, and unanimously holding that the test ***"applies to all statutorily created causes of action"***).

Plaintiffs have most certainly beem authorized by Minnesota's legislature to sue, and this Court and other Minnesota courts have long held as much.

### 2. Minnesota's legislature has expressly conferred a private, non-exclusive right of action upon Plaintiffs Pstikyan, Bennett and Ford, and DealDash does not dispute this.

This Court will surely recall its own herculean efforts last decade in the case that was *In re St. Jude Medical Inc. Silzone Heart Valves Products Liability Litigation*. In *St. Jude*, plaintiffs sought to certify a nationwide class under Minnesota's consumer protection statutes, alleging damages arising from defective prosthetic heart valves. On

motions by the plaintiffs, this Court originally issued three orders that collectively had the result of certifying two classes, one of which was a nationwide class of claims under Minnesota consumer protection statutes. *In re St. Jude Med., Inc.,* No. 01–1396, 2004 WL 1630786 (D.Minn. July 15, 2004); *In re St. Jude Med., Inc.,* No. 01–1396, 2004 WL 45504 (D.Minn. Jan. 5, 2004); *In re St. Jude Med., Inc.,* No. 01–1396, 2003 WL 1589527 (D.Minn. Mar. 27, 2003) (collectively, "*St. Jude I*"). In *St. Jude I*, the Court certified a nationwide class of Minnesota consumer protection claims based, in part, upon the plain statutory "standing" language of Minn. Stat. §§ 8.31, subd. 3a and 325D.45, subd. 1:

> Plaintiffs' claims under provisions of Minnesota's consumer protection statute, Minn.Stat. §§ 325F.67 and 325F.69, find support in another provision of Minnesota law that permits *"any person"* injured by a violation of these statutes to bring suit. Minn.Stat. § 8.31, subd. 3a. As the Minnesota Supreme Court held in *Group Health Plan, Inc. v. Philip Morris Inc.,* 621 N.W.2d 2 (Minn.2001), *none of these statutes contain any language restricting who may sue for violation of the consumer protection laws*. *Id.* at 8. *** In the present case, it is clear that plaintiffs meet these definitions of "any person" or "a person," and may therefore bring suit under Minnesota law. The fact that individual plaintiffs hail from other states is immaterial. Plaintiffs seek relief under particular Minnesota statutes. In the absence of evidence that plaintiffs do not have [statutory] standing to sue-and St. Jude provides none-the Court finds no reason to deny plaintiffs their chosen claim of action. (footnotes omitted)

*St. Jude I*, 2003 WL 1589527, at *18 (*reversed on other grounds*, 425 F.3d 1116 (8th Cir. 2005) (hereinafter, "*St. Jude II*"). In reversing and remanding *St. Jude I*, the Eighth Circuit took no issue with this Court's plain reading of Minnesota statutes (statutory "standing"), nor did it take issue with the plaintiffs' Article III standing (constitutional,

jurisdictional "standing").   *See generally St. Jude II*.   Both constitutional and statutory **standing** requirements were plainly satisfied.[7]

This Court, in *St. Jude I*, is not the only court to have found that Minn. Stat. §§ 8.31, subd. 3a, affirmatively grants private rights of action to injured, out-of-state plaintiffs.   Indeed, even after *St. Jude II*, in a reported decision, Judge Montgomery properly certified a nationwide class asserting claims under Minnesota's Consumer Fraud Act ("MPCFA").   *See Mooney v. Allianz Life Ins. Co. of North America*, 244 F.R.D. 531 (D. Minn. 2007).   In doing so, Judge Montgomery expressly recognized that: "[b]y allowing 'any person' to sue under the MPCFA, the Minnesota legislature has evinced a strong policy of providing recedress for fraudulent business practices that occur within Minnesota's borders, regardless of where a consumer's injury occurs."   *Id.* at 537. Relying primarily upon *St. Jude II*'s constitutional dicta — not statutory "standing" arguments — the *Mooney* defendants petitioned the Eighth Circuit to review Judge Montgomery's decision under Fed. R. Civ. P. 23(f), but the Eighth Circuit denied the petition.   *Mooney*, like *St. Jude I*, remains good law in this District on the question of out-

---

[7] The Eighth Circuit, however, ultimately reversed *St. Jude I* on other constitutional grounds, concluding that the Court had not conducted a sufficient "conflict-of-laws" analysis under (somehow) the Due Process and Full Faith and Credit Clauses of the Constitution.   *Id.* at 1120 ("Here, we cannot determine whether the district court's choice of law was arbitrary or unfair [for constitutional purposes], because the court did not analyze the contacts between Minnesota and each plaintiff class member's claims.").   As Plaintiffs will demonstrate herein, *St. Jude II* is not a precedent that binds this Court's Minnesota "standing" analysis in this case.   Plaintiffs will further show that *St. Jude II* is not a defensible — much less binding — constitutional precedent under settled Eighth Circuit and Supreme Court standards.

of-state plaintiffs' constitutional and statutory "standing" under Minnesota's consumer protection statutes.

To summarize the analysis above, this Court should *first* hold that Plaintiffs have Article III standing (and otherwise satisfy itself of its subject matter and personal jurisdiction over the claims and parties here). *Second*, the Court should hold — as this Court and other courts within Minnesota have repeatedly held — that as a matter of statutory interpretation (*i.e.,* the long-standing "zone-of-interests" test), Minnesota's legislature *has* afforded Plaintiffs Pstikyan, Bennett and Ford a private, statutory right of action under the legal standards recently clarified in *Lexmark Int'l. Lexmark Int'l, Inc.*, 134 S.Ct. at 1386-90. At that point, the Court will have established Plaintiffs' constitutional and statutory *standing* to assert their own (not this Court's, not any state's) private rights of action under Minnesota's consumer protection statutes. The Court should thus deny DealDash's Fed. R. Civ. P. 12(b)(6) Motion to the fullest extent that it is grounded in DealDash's erroneous formulation of "standing."[8]

---

[8] DealDash's erroneous Minnesota "standing" argument also attacks Plaintiffs' interpretation of DealDash's Terms of Use, but that "standing" argument is a constitutional non-starter for another, independent reason. Plaintiffs' Minnesota consumer protection claims assert private, *statutory* rights of action. The creation of private, statutory rights of action is an exercise of the State's sovereign power: nothing more, nothing less. Such statutory rights of action come only *from* the sovereign, and such statutory rights of action are possessed only *by* those persons who "fal[l] within the class of plaintiffs whom [the legislature] has authorized to sue." *Lexmark Int'l, Inc.*, 134 S.Ct. at 1387-89. Private parties cannot possibly write themselves into public statutes by private contract, creating *for themselves* statutory rights of action that no legislature has expressly or impliedly granted them. If Minnesota's legislature has not granted Plaintiffs a private, statutory right of action, then Plaintiffs have no private, statutory right of action under Minnesota law: period. Furthermore, while some statutory rights of action may be

Onward, once both "standing" issues are disposed of, the operative question then becomes whether there exists some *other* constitutional or statutory prohibition against Plaintiffs Pstikyan, Bennett and Ford asserting their own private, statutory rights of action, expressly granted to them by the State of Minnesota.  There is decidedly no such prohibition.

### 3. Under settled Eighth Circuit and Supreme Court standards, *St. Jude II*'s undecided constitutional <u>assumptions</u> are not good law, let alone binding precedent here.

"As a general proposition, when an issue is not squarely addressed in prior case law, we are not bound by precedent through *stare decisis*."  *Wetherill v. Geren*, 616 F.3d 789, n.8 (8th Cir. 2010); *see also Cooper Industries, Inc. v. Aviall Services, Inc.*, 543 U.S. 157, 170 (2004) ("Questions which merely lurk in the record, neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents.") (internal quotes omitted).

In *St. Jude II*, the Eighth Circuit's purportedly constitutional "conflict-of-laws" analysis was based on the undecided and uncited assumption that a "constitutional injury *to out-of-state plaintiffs* in applying Minnesota law" can somehow occur when those out-of-state plaintiffs choose to assert their own private, statutory rights of action under

---

waivable (as opposed to creatable) by private contract (consider, for instance, private arbitration clauses), DealDash does *not* argue that its Terms of Use contractually waive Plaintiffs' Minnesota-granted rights of action.  And DealDash's Terms of Use obviously say nothing of the sort.  Therefore, here, Plaintiffs' private, statutory rights of action in Minnesota can neither be created nor destroyed by DealDash's Terms of Use.  Such Terms of Use, however, may otherwise be relevant to the constitutional questions at hand, as Plaintiffs will show *infra*.

Minnesota law. *St. Jude II*, 425 F.3d at 1120; *id.* ("Regardless, protection of ***out-of-state parties'*** constitutional rights requires an inquiry into their claims' contacts with Minnesota and their individual state laws before concluding Minnesota law may apply."). Those uncited and unconsidered assumptions were not, and are not, good law.

The United States Supreme Court has expressly and repeatedly "held that a [private] cause of action is a species of property protected by the Fourteenth Amendment's Due Process Clause." *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428-29 (1982). "This conclusion is hardly a novel one." *Id.* "The Court has traditionally held that the Due Process Clauses *[plural]* protect civil litigants who seek recourse in the courts, either as defendants hoping to protect their property ***or as plaintiffs attempting to redress grievances***." *Id.* Far from requiring private ***plaintiffs*** to clear some imaginary "Due Process hurdle," before asserting their own statutory rights of action, properly granted to them by a sovereign state, Due Process truly requires federal and state ***governments*** to clear a meaningful "Due Process hurdle" before denying private plaintiffs their statutory rights of action, which are decidedly "a species of property." *Id.*; *see also Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972) ("Property interests, of course, ***are not created by the Constitution***. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source ***such as state law***—rules or understanding that secure certain benefits and that support claims of entitlement to those benefits."); *accord St. Jude I*.

*St. Jude II*'s presumed, but never decided, "Due Process hurdle" set against private plaintiffs appears to further assume — *sub silentio* — the never-decided premise that private plaintiffs cannot constitutionally assert two distinct, statutorily created rights of action, expressly granted to them by two distinct, sovereign states at the same time. Even assuming *arguendo* this was true (it is not even arguably true), it would be the constitutional perogative of private plaintiffs — not courts or governments — to choose which of their constitutionally protected, property-rights of action to forfeit. *See, e.g., Mooney v. Allianz Life Ins. Co. of North* America, 244 F.R.D. 531, 537 (D. Minn. 2007) (citing *Downing v. Abercrombie & Fitch*, 265 F.3d 994 (9th Cir. 2001), which dismissed as "pure fancy" the notion that "a state would seek to restrict its citizens from recovery that others could obtain under another state's law"); *In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 486-487 (D. Minn. 2015) (citing *Mooney* approvingly, and not even bothering to engage in any "choice" of law analysis with respect to the plaintiffs' statutory rights of action because which private right to exercise is not a court's or government's "choice" to make).

Class action plaintiffs — both named and absent — make such personal choices all the time in securities class actions, in which they forfeit their own (often more favorable) individual rights of action under state securities statutes for the privilege of asserting their implied rights of action under federal securities statutes. Yet securities class members are only forced to choose between their private, independent statutory rights of action because Congress has expressly prohibited class actions (not individual actions) arising under ***state*** securities statutes. *See* 15 U.S.C. § 77p(b) ("No covered class

action based upon the statutory or common law of any State or subdivision thereof may be maintained . . . .").  Otherwise, private securities class members, like private Plaintiffs here, could constitutionally assert two distinct, private rights of action granted to them by two different sovereigns at the same time.  This has repeatedly, and constitutionally, occurred in cases where two different states' securities statutes applied to the very same transaction and injury.  For example:

> Suppose a North Carolina resident brought an action against a defendant alleging fraud under state securities laws.  The "offer to sell" the security was "made" in North Carolina and the security was bought in Colorado. Because jurisdictional requirements have been satisfied, the securities laws of both Colorado and North Carolina would apply. North Carolina is interested in protecting its defrauded citizen and Colorado is interested in eliminating a base of fraudulent operations located within its borders. Each state's interest is vindicated by permitting the plaintiff to pursue multiple theories, as long as he is limited to a single recovery based upon a finding of liability.

> The situation created when two state securities [statutes] apply to a transaction *should be viewed more as an election of remedies, rather than a potential conflict of laws problem*.  This characterization serves several public policy goals. First, the decision obviates the need to enter the labyrinth of ever-shifting conflict of laws jurisprudence. Second, the decision comports with legislative directives to apply state securities statutes in prescribed situations.Third, the "territorial nexus" requirement eliminates any threat of forum shopping. Finally, the decision provides a logical and coherent analysis which will provide both issuers and purchasers of securities notice of which state(s) law is applicable to a given transaction.

*Simms Inv. Co. v. E.F. Hutton & Co., Inc.*, 699 F.Supp. 543, 545-46 (M.D.N.C. 1988);

*see also Lintz v. Carey Manor Ltd.*, 613 F. Supp. 543, 551 (W.D. Va. 1985) ("There is

nothing inconsistent in trying a securities case on multiple theories, and determining

liability under each statute that is applicable, so long as the plaintiff is prevented from multiple *recoveries*.").

Nobody's private, personal legal action or inaction is stopping any state from enforcing its own consumer protection laws against DealDash. *See Ly v. Nystrom*, 615 N.W.2d 302, 308 (Minn. 2000) ("By 1981, every state in the United States had statutes providing for consumer protection enforcement—commonly, as in Minnesota, the state attorney general—with broad enforcement authority."). The executive branches of the several States seem to be stopping themselves from enforcing their own laws against DealDash to date, but this is not Plaintiffs' fault, nor is it Plaintiffs' problem here. There is not even a potential constitutional "conflict" between the laws of Minnesota and Plaintiffs' home States just because Plaintiffs exercise their own distinct, private rights under distinct states' statutes, while the states themselves decline to exercise their own distinct, public rights under those same statutes. *Cf. Spokeo, Inc. v. Robbins*, 136 S.Ct. 1540, 1553 (2016) (Thomas, J., concurring) (discussing the difference between private rights and public rights, and recognizing that "[a] plaintiff seeking to vindicate a statutorily created private right need not allege actual harm beyond the invasion of *that* private right").

*St. Jude II*'s never-decided constitutional assumptions appear to have been based upon *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 312-13 (1981) and *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797 (1985), two Supreme Court cases that required judicial "choices" of law *only because of the nature of the private rights at issue*. In *Hague*, a plaintiff sought "declaratory relief construing the above indicated [insurance] policy": in other

words, "interpreting a private contract." *Hague v. Allstate Ins. Co.*, 289 N.W.2d 43, 45 (Minn. 1978). A court cannot simultaneously construe one contract two different ways; the contract is an indivisible, legal entity unto itself. Therefore, the Minnesota and federal Supreme Courts in *Hague* had to choose which State's ***contract*** law (so-called "substantive law") to apply in construing that singular agreement. That was the only reason why independent States' "substantive" laws were even potentially in constitutional "conflict" to begin with: ***there was only one private right*** to be adjudicated, so only one State's substantive law could ***possibly*** apply to adjudicate that singular right.

Here, with respect to each Plaintiff, two independent, substantive laws apply and correspond to two independent, private rights of action. Thus, there is no constitutional need —or even opportunity — for a judicial "choice" (read: "exclusion") of either state's substantive law. The Court can (indeed, must) construe two different statutory schemes two different ways at the same time, giving full effect to both. This is what the real (not *St. Jude II*'s imaginary) "Full Faith and Credit" Clause requires. *See* U.S. Const., Art. IV § 1 ("Full faith and credit shall be given in each state to the ***public*** acts, records, and judicial proceedings of every other state."); *Carroll v. Lanza*, 349 U.S. 408, 411 (1955) ("A statute is a 'public act' within the meaning of the Full Faith and Credit Clause."); accord *id.* at 415 (Frankfurter, J., dissenting) ("[Our] cases prove that where the statute of either the forum State or the outside State is not found to be [expressly] exclusive regarding remedies or rights elsewhere, ***the statute need not be afforded exclusive effect***."). That is the law, and it always has been the law. It was simply a mistaken, undecided assumption by the *St. Jude II* court to think that this Court was constitutionally

required (or even permitted) to choose between private, non-exclusive, statutory rights of action on behalf of those *St. Jude* plaintiffs.

Likewise, *Shutts* was a decision in which "Kansas courts [had] **applied Kansas contract and Kansas equity law** to every claim in this [nationwide class] case." *Id.* at 815. As in *Hague*, the contracts at issue could not be construed two different ways, nor could Kansas courts judge in equity that a defendant was "unjustly enriched" and not "unjustly enriched" at the same time. It was only the singular nature of the private right at issue that required any constitutional "choice" (read: "exclusion") of state substantive law to begin with. Courts cannot simultaneously adjudicate the same private right two different ways, and this legal reality alone created a potential constitutional "conflict" of law between states.

No such constitutional "conflict" even potentially exists between Minnesota and Plaintiffs' home States here. To illustrate, DealDash has allegedly violated California statutes, and the State of California has expressly granted Plaintiff Pstikyan a private, **non-exclusive**, statutory right of action: independent of the common law or any other state's laws. At the same time, DealDash has allegedly violated Minnesota statutes, and the State of Minnesota has granted Plaintiff Pstikyan a distinct, private, **non-exclusive**, statutory right of action: independent of the common law or any other state's laws. Ultimately, this Court can simultaneously enter a judgment in Plaintiff Pstikyan's favor on his private, Minnesota MPCFA right of action, and a judgment in DealDash's favor on Plaintiff Pstikyan's private, California UCL (Unfair Competition Law) right of action: or perhaps vice versa, or perhaps for Plaintiff on both claims, or perhaps against Plaintiff on

both claims.  Any of these outcomes is logically and legally possible, and the Court clearly has both subject matter jurisdiction and personal jurisdiction over all of the claims and parties before it.  Therefore, constitutionally speaking, the Court can and must adjudicate all of these distinct, private rights on the merits.  There is simply no constitutional "conflict" (as opposed to mere legal "difference") between states' laws here.  Consequently, there is no need or even opportunity for any judicial "choice" between distinct private rights or corresponding, applicable "substantive" laws.

Plaintiffs Pstikyan, Bennett and Ford are *not* "implicitly conceding" any of their own distinct, private, non-exclusive, statutory rights of action.  Motion at 25.  Indeed, none of Plaintiffs' home-State consumer protection statutes purport to "give an exclusive remedy," so Plaintiffs' home States have no constitutional interest whatsoever in whether Plaintiffs' choose to exercise their private, statutory rights granted to them by the State of Minnesota.  *See Carroll*, 349 U.S. at 411-12; *accord id.* at 415.

Nevertheless, if the Court forces Plaintiffs to pick just one non-exclusive, private right of action, then Plaintiffs would — as a matter of Due Process — respectfully request the opportunity to choose for themselves which of their own constitutionally protected, private property-rights of action to exercise or forfeit.  Absent class members can then make that very same choice *for themselves* as a matter of Due Process, the way they always do: after proper notice and an opportunity to be heard, or to opt out of the Class and bring their own individual claims.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985) ("[W]e hold that a forum State may exercise jurisdiction over the claim of an absent class-action plaintiff, even though that plaintiff may not possess

the minimum contacts with the forum which would support personal jurisdiction over a defendant.").  Indeed, "[a]ny plaintiff may consent to jurisdiction."  *Id.*

*St. Jude II*'s uncited, unconsidered and never-decided constitutional assumptions "oppose[] basic constitutional law and [are] error." *St. Jude II*, 425 F.3d at 1121.  Those false assumptions are not only clearly erroneous on multiple constitutional grounds; they also fail to satisfy the settled criteria for binding precedents, outside of the original *St. Jude* action itself.  More than a decade later, this Court should take up its mantle and address the **real** "Due Process" and "Full Faith and Credit Clauses" insofar as they pertain to distinct, non-exclusive, private, statutory rights of action simultaneously provided to the same person by two different states.  This is necessary to guard the "Full Faith and Credit" of Minnesota's and every other sovereign states' statutes, and to guard the true "Due Process" rights of private citizens nationwide.

In truth, the Due Process and Full Faith and Credit Clauses of the Constitution decidedly require that Plaintiffs' Minnesota consumer protection claims be sustained, not dismissed on erroneous "standing" grounds.

4. **Even if** *St. Jude II*'s **erroneous constitutional assumptions are binding on the Court here, Plaintiffs' claims under Minnesota law satisfy** *St. Jude II's* **presumed limitations on private, non-exclusive, statutory rights of action.**

On remand, *St. Jude II* required the Court to engage in a wrongly premised, two-part analysis:

> First, the Court must address whether Minnesota has sufficient contacts with each plaintiff's claims so that application of Minnesota law satisfies the constitutional requirements of the Due Process Clause and Full Faith and Credit Clause. Second, if Minnesota has sufficient contacts to satisfy

23

> the constitutional requirements, the Court must apply Minnesota's conflicts of law rules to determine whether application of Minnesota law is preferable over the law of other states with sufficient contacts.

*In re St. Jude Medical, Inc.*, No. MDL No. 01-1396 (JRT/FLN), 2006 WL 2943154, at *2 (D. Minn. Oct. 13, 2006) ("*St. Jude III*"). First, in conducting that analysis, this Court rightly recognized that "[i]n many situations, there will be several constitutionally permissible choices of [state] law." *Id.* at *3. The Court went on to find that Minnesota law properly applied to out-of-state plaintiffs' consumer protection claims. *Id.* at *4. As the Court stated, the forum state must have a "significant contact or significant aggregation of contacts to the claims asserted by each [plaintiff], contacts creating state interests, in order to ensure that the choice of [forum] law is not arbitrary or unfair." *Id.* at *3 (citing *Shutts*, 472 U.S. at 818, and *Hague*, 449 U.S. 302). "When considering fairness in this context, an important element is the expectation of the parties." *Mooney*, 244 F.R.D. at 535 (citing *Shutts*, 472 U.S. at 822).[9]

Here, unlike in *Hague* or *Shutts*, Minnesota's "significant contact . . . to the claims asserted by each [P]laintiff" is that Minnesota's legislature expressly provided for them by statute. This much is settled law. And as Judge Montgomery rightly recognized in *Mooney*, Minnesota's nationwide, private, statutory rights of action "evice[] a strong [State] policy of providing redress for fraudulent business practices that occur within

---

[9] While the Eighth Circuit later reversed and remanded this Court's order in *St. Jude III*, it did nothing to disturb the Court's core holding that Minnesota statutes properly applied to every consumer's claim nationwide. *See In re St. Jude Medical, Inc.*, 522 F.3d 836, 841 (8th Cir. 2008) ("*St. Jude IV*") ("[W]e find it unnecessary to consider the merits of the district court's choice-of-law analysis or the constitutionality of applying Minnesota law . . . .").

Minnesota's borders, regardless of where a consumer's injury occurs." *Mooney*, 244 F.R.D. at 537.   These long-standing legislative provisions alone render Plaintiffs' **voluntary** exercise of their State-granted, private rights anything but "arbitrary" or "unfair" to any party.

Moreover, DealDash's principle place of business (indeed, its only place of business in the U.S.) is in Minnesota, and Plaintiffs' consumer protection claims arise entirely out of fraudulent conduct and transactions occurring on and through DealDash's website, www.dealdash.com.   "As Judge Mongomery aptly observed [in *Mooney*] with respect to another large Minnesota-based company, [Defendant] can not claim surprise by application of Minnesota law to conduct emanating from Minnesota." *In re Target Corp. Customer Data Sec. Breach Litig.*, 309 F.R.D. 482, 486-87 (D. Minn. 2015); *accord Szabo v. Bridgeport Machines, Inc.*, 249 F.3d 672, 674 (7th Cir. 2001) ("Were these representations made with [the defendant's] approval (or knowledge)?   If so, then Connecticut law might apply across the board (as the district court concluded), but if not then the applicable law likely would be supplied by the state in which the statements were made.").[10]

---

[10] As in *Hague* and *Shutts*, the Seventh Circuit was forced into a "choice" between substantive laws in *Szabo* only because of the singular, indivisible nature of the **private rights** asserted: breach-or-warranty and tort claims.   Two different substantive laws cannot apply to one private right, but two different substantive laws can well apply to two different private rights: just as they do when courts routinely adjudicate federal and state statutory claims by the same plaintiff, at the same time, to redress the same injury, without facing constitutional preemption problems.

"And applying Minnesota [statutory rights of action] undoubtedly comports with putative [out-of-state] Plaintiffs' expectations: when dealing with a Minnesota corporation such as [Defendant], it is possible and in fact likely that Minnesota law will apply to those dealings." *In re Target Corp.*, 309 F.R.D. at 486-87.  This holds particular true where — as here — all parties have ***expressly agreed*** that the State of Minnesota would be the forum for any and all claims between them, and further agreed that Minnesota "substantive law" governs the parties' dealings as set forth in DealDash's own Terms of Use.   Such overt factual, statutory and agreed upon contacts between Minnesota, the parties, and their dealings are more than "sufficient to allow application of Minnesota law to the [statutory] claims of non-Minnesota class members without offending either the Due Process Clause or the Full Faith and Credit Clause."  *Id.*

At bottom, under any constitutional analysis, the Court should decline to dismiss Plaintiffs' Minnesota consumer protection claims on constitutional grounds.  On to the merits.

### B. Plaintiffs sufficiently plead that DealDash operates illegal lotteries while purporting to operate lawful retail "auctions."

DealDash is a Minnesota company operating online penny auctions throughout Minnesota and the United States, through www.dealdash.com and its mobile device applications.  ¶¶10-30.   Conducting a lottery in this State is a gross misdemeanor.  Minn. Stat. § 609.76, subd. 1(1),(3).  Conducting a lottery in violation of any state law is also a

26

federal crime. *See* 18 U.S.C. § 1955 (prohibition of illegal gambling businesses provides that "'gambling' includes but is not limited to . . . conducting lotteries").[11]

The Minnesota Criminal Code defines a "lottery" as "a plan which provides for the distribution of money, property or other reward or benefit to persons selected by chance from among participants some or all of whom have given a consideration for the chance of being selected." Minn. Stat. § 609.75, subd. 1(a). Moreover, "acts in this state in furtherance of a lottery conducted outside of this state are included notwithstanding its validity where conducted." Minn. Stat. § 609.75, subd. 1(c) (emphasis added). "An 'injured person' may bring a civil action to recover damages sustained for violations of the criminal code." *Wexler v. Brother Entertainment Group, Inc.*, 457 N.W.2d 218, 223

---

[11] This Court need not sustain Plaintiffs' Minnesota consumer protection claims in order apply Minnesota lottery law (*i.e.,* "substantive law") to Plaintiffs' home-State consumer protection claims. This is because, to the extent DealDash is conducting lotteries that are illegal in DealDash's home State, DealDash is also conducting lotteries that are illegal throughout the United States under 18 U.S.C. § 1955. For avoidance of doubt, Plaintiffs' "lottery" theory is itself fourfold. ***First***, all three Plaintiffs assert the private "cause of action under Minn. Stat. § 611A.05" recognized by the Minnesota Court of Appeal in *Wexler v. Brother Entertainment Group, Inc.*, 457 N.W.2d 218, 223 (Minn. App. 1990) (an illegal lottery case). ***Second***, Plaintiff Pstikyan also asserts his "lottery" claims under the unlawful prong of the California UCL, independent of any false or misleading statements made by DealDash, since DealDash's lotteries are illegal in DealDash's home State and as a matter of federal law. ***Third***, to the extent the Court sustains Plaintiffs' private rights of action under Minnesota consumer protection statutes, Plaintiffs assert that DealDash misrepresented its penny auctions as "fair and honest auctions," when in truth, DealDash's penny auctions were illegal lotteries under both state and federal law. ***Fourth***, under their home States' consumer protection statutes, Plaintiffs' assert that DealDash misrepresented its penny auctions as "fair and honest auctions," when in truth, its penny auctions were illegal lotteries under federal law by virtue of being illegal in DealDash's home State (as well as many other States, whose substantially identical lottery laws will not be analyzed here). For all of these reasons, Plaintiffs herein analyze their "lottery" allegations primarily under Minnesota lottery laws and 18 U.S.C. § 1955.

(Minn. App. 1990) (recognizing "a cause of action under Minn. Stat. § 611A.05" in the context of illegal lotteries).

Plaintiffs' Complaint alleges that DealDash's daily penny auctions are illegal lotteries in disguise. "Under Minnesota law, a lottery exists if (1) a prize or reward is offered, (2) chance determines who is awarded the prize, and (3) participants pay consideration for the chance to win the prize." *Stepnes v. Ritschel*, 771 F. Supp. 2d 1019, n. 6 (D. Minn. 2011), *aff'd* 663 F.3d 952, 962 (8th Cir. 2011).[12] Here, DealDash does not dispute that its (purportedly) steep discounts on its (purportedly) expensive merchandise constitute a "prize" for purposes of state lottery law, nor does DealDash dispute that each paid "bid" placed by a DealDash customer constitutes a valuable "consideration." Hence, the only question presented here is whether Plaintiffs plausibly allege the fact-dependent lottery element of "***chance***."

Defendant's only non-lottery argument is that "chance" necessarily means pure "randomness" under the law, and therefore, DealDash's penny auctions cannot be lotteries because the winners are not selected at random. Defendant is mistaken. The lottery element of "chance" does ***not*** require that random number drawings, dice throwings, or card shufflings be used to determine who wins a prize or reward. Nor is the element of "chance" an isolated, formulaic inquiry that turns on the presence or absence

---

[12] As Defendant recognizes, all of Plaintiffs' home states (along with many other states) define an illegal "lottery" by the same three elements that Minnesota does. *See* Motion at 14.

of pure "randomness."   Instead, the lottery element of chance is a relative, fact-specific inquiry.

"A game is considered one of chance if chance predominates over skill in determining the game's winner." *Stepnes*, 771 F. Supp. 2d at n.10; *see also Wexler v. Brothers Entertainment Group, Inc.*, 457 N.W.2d 218, 223 (Minn. App. 1990) (finding that "factors of chance . . . thwart[ed] the elements of skill" in a competitive trivia contest, which constituted an illegal lottery).   For instance, chance predominates over skill where "there could be no fixed and definite fact or quantity upon which to base a mathematical calculation or demonstration." *Stepnes*, 771 F. Supp. 2d at n.10; *see also Mendelsohn v. BidCactus, LLC*, No. 3:11-CV-1500 (JCH), 2012 WL 1059702 (D. Conn. Mar. 28, 2012) (denying motion to dismiss claims alleging that an online penny auction company conducted illegal lotteries, because the plaintiff could well show "that chance predominates over a consumer's use of bidding skills").

In *Stepnes*, a Minnesota man invited members of the public to pay $20 for an opportunity to estimate the total number of nuts, bolts and screws (collectively, "fasteners") contained in a large antique chest. *Stepnes*, 771 F. Supp. 2d at 1025-26.  The participant estimating the number closest to the actual number of fasteners in the chest, without going over, would win and obtain a house or a cash prize. *Id.*  The contest's website provided a photo of the chest filled with fasteners, provided the dimensions of the chest, and stated to contestants: "[y]ou must use your skills of analysis and mathematics to determine the number of items in [this] chest." *Id.* at 1027.  The *Stepnes* court found this purported guessing game to be an illegal lottery because "several factors

dictated that chance predominated over skill in determining the number of fasteners in the chest." *Id.* at n.10. In particular, "[w]ithout knowing the size and shape of the non-viewable fasteners, the ratio of fastener types contained in the chest, or the undisclosed fact that a cardboard box and plastic sheet were also inside the chest, a contestant would have no fixed and definite fact or quantity upon which to base a mathematical calculation or demonstration." *Id.* In sum, contestants' personal skills or lack thereof were largely irrelevant to who would ultimately win. *Id.* Therefore, the *Stepnes* court deemed this purported estimation game a "lottery" under Minnesota law.

The Eighth Circuit expressly affirmed the *Stepnes* court's analysis, finding:

> [A]s the district court correctly noted, the fasteners in the chest were not of uniform size and type. Consequently, it would have been nearly impossible to use mathematical skill to calculate the number of fasteners in the chest. A reasonably cautious person could thus conclude that guessing the number of fasteners in the chest was an illegal lottery.

*Stepnes v. Ritschel*, 663 F.3d 952, 962 (8th Cir. 2011). Neither *Stepnes* court's lottery "chance" analysis required or even touched upon "randomness." Instead, this District and the Eighth Circuit "correctly" focused on whether the information provided to paying contestants was sufficient for their skills to meaningfully impact their odds of winning the prize. *Id.*; *see also Stepnes*, 771 F. Supp. 2d at n.10. If not, then contestants were — as both courts found — paying to take blind guesses, and hoping that those blind guesses ultimately proved accurate enough to win. Such blind guessing constituted a contest of "chance" for purposes of lottery law.

Along the same lines, in *Wexler*, the Minnesota Court of Appeal overturned a trial court's determination that a purported trivia contest was ***not*** a lottery. The *Wexler*

defendants had operated a "TeleFun Trivia" contest, in which consumers paid to call a "976" phone number and answer trivia questions spanning several categories, such as sports and music. *Wexler*, 457 N.W.2d at 220. Consumers could select which category of trivia questions they wanted to answer, and accumulate points by answering questions correctly. *Id.* Consumers (much like DealDash bidders) could pay to call and answer questions as many times as they wanted, thereby accumulating as many points as they were willing and able to pay for. *Id.* The participant who accumulated the most points at the end of each month would receive a monthly "grand prize." *Id.* The *Wexler* plaintiff claimed, *inter alia*, that TeleFun Trivia was an illegal lottery that had cost him hundreds of dollars in phone charges, which were rapidly run up by his trivia-loving son. *See id.* at 223.

"The [*Wexler*] trial court concluded that [plaintiff's] gambling claim failed as a matter of law because [he] did not present any facts indicating that the TeleFun Trivia contest is a game of chance." *Id.* The Court of Appeal fairly acknowledged the obvious: namely, that "TeleFun Trivia points [and therefore prizes, were] awarded on the basis of correct responses to questions." *Id.* The Court of Appeal, however, also acknowledged that TeleFun Trivia "competitors [did] not know how many points [were] needed to win, nor [did] they know how the other competitors [were] doing." *Id.* at 220. Consequently, the Court held that:

> [F]actors of chance, including the number of players in a given month and the number of calls made by various players, thwart the elements of skill. These factors of chance create a factual issue as to whether TeleFun Trivia is [an] illegal [lottery].

*Id.* at 223.  The state court in *Wexler*, like both federal courts in *Stepnes*, focused not on the presence or absence of randomness in ***the operator's rule-based selection*** of who would win after the contest ended, but rather, on whether "chance" or "skill" predominated in determining who would win ***during the contest***.  By law, participants' blind guesses and hopes are just as good as operators' blind drawings or shufflings to establish the lottery element of "chance."  Contrary to Defendant's argument, "chance" has never meant pure, physical "randomness" under the law.

For that very reason, the only federal court to have considered whether an online penny auction was an illegal lottery held the question to be a live one for the trier of fact.  *See generally Mendelsohn*, 2012 WL 1059702 (denying motion to dismiss allegations that online penny auctions were illegal lotteries).[13]  *Mendelsohn* presented a fact pattern similar to Plaintiffs' allegations here.

> In order to bid in an auction, a consumer must purchase "bids" from BidCactus.  Each bid costs seventy-five cents, and each bid placed by a consumer in an auction raises the purchase price of the auction item by one cent. When a consumer places a bid, the consumer pays seventy-five cents for each bid, regardless of whether or not the consumer actually wins the item.  Towards the end of an auction, each additional bid adds a number of seconds back to the clock to allow additional bidders to respond.  The last bidder wins the right to purchase the item at the final auction price.  The total price paid by the winning bidder equals the cost of all the bids he placed, plus the purchase price of the item, as determined by the auction, and shipping costs for the item.  Often, this final cost to the consumer is greater than the stated retail value of the item. Those consumers who bid on

---

[13] While the *Mendelsohn* court's analysis arose under Connecticut's lottery statutes, Connecticut law and Minnesota law — like the laws of Plaintiffs' home states — define illegal lotteries by the same three elements: (1) consideration, (2) chance, and (3) prize.  *See Mendelsohn*, 2012 WL 1059702, at *4 ("In Connecticut, a lottery is characterized by three elements: a prize, a chance, and a price.").

the item, but were not the final bidder, still lose the total cost of their bids.
(internal citations omitted)

*Mendelsohn*, 2012 WL 1059702, at *1.[14] BidCactus, much like DealDash here, argued that "the outcomes of its auctions are dependent upon human behavior, not chance." *Id.* at *4; DealDash's Motion to Dismiss (Dkt. 40) at 15 (arguing that "the only unknown element in a DealDash auction is the behavior of other [bidders]").

The *Mendelsohn* court, however, recognized that a lottery may exist "where the element of chance predominates over skill," and that "[t]he element of chance may exist where the financial gain of a participant is the result of factors outside his control." *Id.* at *3 (citing *Public Clearing House v. Coyne*, 197 U.S. 497, 513 (1904) ("[T]he amount of such return depends so largely, and, indeed, almost wholly, upon conditions which the member is unable to control, that we think it fulfills all the conditions of a distribution of money by chance.")).  The *Mendelsohn* plaintiff alleged a number of "chance" — but not necessarily random — factors outside of bidders' knowledge and control, such as the number of people actively bidding, and the number of unused bids that other players might have.  *Id.* at *4.  As a result, the plaintiff sufficiently alleged that BidCactus's penny auctions were illegal lotteries, and the court could not hold otherwise "as a matter of law." *Id.* at *5.

---

[14] The main difference between Bidcactus penny auctions and DealDash penny auctions is that, on Bidcactus, the final cost to penny auction winners was often higher than the *"stated"* retail value of the "auctioned" products.  By contrast, DealDash invents astronomically high, false and misleading retail values for most of its "auctioned" products so that the "stated" retail value almost always remains far higher than a winner's costs, even after the cost of bids is included.  The problem is that DealDash's stated retail values are fictitious and deceptive.  *See* Part III.C, *infra*.

This Court should follow the *Mendelsohn* court's (as well as the *Stepnes* and *Wexler* courts') reasoning. Here, Plaintiffs allege that "[w]hen consumers place a paid bid in a DealDash auction, they have no way of knowing, or even reasonably guessing, whether they will be the last bidder, *i.e.*, the auction winner. They place each and every bid hoping that ***this*** 10-second countdown will be the one that runs out, but as a practical matter, [consumers] have almost no relevant facts with which to judge whether the clock is likely to run out." ¶19. Along these lines, Plaintiffs further allege:

- that bidders have "no information whatsoever about the number of bids the other [participants] have in their DealDash accounts" (*see* ¶20);

- that "in practice, users cannot see or otherwise discern . . . how much 'skin' other users already have in the game" (*see* ¶21);

- that in DealDash auctions, "the penny-stacked offer price [rarely, if ever] rise[s] anywhere near the advertised value of the featured product," so the current offer price itself "is largely immaterial to the question of whether a subsequent bid will be placed," as "there is always an [economic] incentive for ***somebody*** to spend just one more bid, regardless of the current penny-built offer price" (*see* ¶22);

- that "DealDash auctions routinely go on for many hours or even several days" straight (*see* ¶24); and

- that bidders have no way of knowing whether they are "bidding" against live human beings or preprogrammed algorithms, or some combination of the two, "[n]or can bidders know whether other 'live' [auction] participants . . . are even sitting at their computers anymore" (*see* ¶23).[15]

---

[15] Plaintiffs also allege that DealDash operates, and that they have lost paid bids in, "promotional auctions" where the ultimate winner receives the featured prizes for no additional charge, which renders the penny-stacked offer price practically meaningless. All of DealDash's promotional auction participants blindly spend their paid bids hoping to win the featured product for "free," as everyone else loses their paid bids. DealDash's promotional auctions are quintessential lotteries, lacking even the façade of a normal "penny auction" structure.

Plaintiffs allege that for all of these reasons, "all competitors in any given [DealDash] auction are entirely unpredictable to each other," and "no amount of skill or strategy could inform an auction participant of the likelihood that the particular bid they are about to place will be the 'winning' bid." *See* ¶¶21, 24 (emphasis added).

Defendant counteralleges that DealDash bidders somehow "retain control over whether they win or lose the auction." Motion at 15.  That assertion is belied by simple logic as well as Defendant's own brief, which rightly recognizes that ***other*** human and/or computerized players' "strategies," "resources," and "behavior[s]" ultimately decide who wins each DealDash auction.   In this regard, DealDash auctions are much like the "TeleFun Trivia" game in *Wexler*.  No player can know or even reasonably predict — let alone control — what other players might do, or what they might have already done with their "Bid Buddy" functions, so skill cannot possibly have a meaningful or predominating impact on who ultimately wins.  A bidder cannot "control" an outcome that is defined only by what everyone ***but*** the bidder might do.  DealDash itself highlights this fact, as it jovially wishes all of its paying bidders "[g]ood luck" in "playing" its penny auctions.  Winning or losing a DealDash auction is, indeed, 100% "luck."

Defendant also improperly contradicts the Complaint's factual allegations by contending that "[a]t each point in a DealDash auction, the [bidder] must decide whether they personally value the product more highly than the current [auction] price, just as in any other auctions."   Motion at 15.   That counterfact is meritless for at least two interrelated reasons.   First, by definition, DealDash penny auctions are not won by

affirmatively bidding a particular sale price for the featured product; instead, DealDash auctions are won only by the happenstance of everyone else on Earth *not* bidding during a set 10-second interval in time.[16] Second, and importantly, everyone else's decision to not "bid" is independent of the current "auction" price of the featured product, because DealDash's auctions always (or almost always) end at an auction price far below the stated retail value of the product. For both of these reasons, any DealDash bidders' "personal valuation" of a featured product has little or nothing to do with their decision to "bid" or not bid at any point in time.

Defendant further asserts that DealDash bidders "have full control over (1) whether to place another bid, (2) when they place their bid(s), and (3) whether they wish to 'Buy It Now' and by pass the auction altogether." Motion at 15. Those first two arguments are also true of anyone who buys Powerball tickets. Furthermore, the mere fact that Defendant's "Buy It Now" victims might purchase a featured product at deceptively astromnomical prices — and get back only whatever *bids* they spent in the given auction — does not remove DealDash's penny auctions from the lottery statutes' purview. *Cf. State v. Schubert Theatre Players Co.*, 203 Minn. 366, 368-69 (1938) ("A game does not cease to be a lottery because some, or even many, of the players are

_____

[16] *Cf. Bell v. Disner*, 2016 WL 7007522, at *2 (W.D.N.C. Nov. 29, 2016) ("A 'penny auction' does not work like a typical auction.").

admitted to play for free, so long as others continue to pay for their chances.") (internal

citation omitted).[17]

Taken as a whole and as true, Plaintiffs' allegations plausibly suggest that "chance

predominates over skill" in determining the winners of DealDash's penny auctions.

*Stepnes*, 771 F. Supp. 2d at n.10; *see also Wexler*, 457 N.W.2d at 223.  Plaintiffs allege

facts showing that there could be no "definite fact or quantity" useful for predicting the

exact 10-second interval during which every DealDash player will ***stop*** bidding.

Therefore, "no amount of skill or strategy" on the part of players can help determine the

winner of any DealDash auction.  This reality is only crystallized by DealDash's routine

operation of so-called "promotional auctions," in which DealDash simply ***gives away*** its

featured prizes to winning "bidders" (read: "bettors") without further charge.

---

[17] Also notice that DealDash does not actually give any lost money back to its "Buy It Now" victims.  Instead, DealDash only gives the auction loser back his or her lost bids, so the consumer can live to play another day in DealDash's fraudulent lotteries.  The consumer will never get his or her money back by "Buying It Now."  Ultimately, the Buy-It-Now option for consumers amounts to a choice between: (1) immediately eating their lottery losses; or (2) immediately giving DealDash more cash in exchange for a grossly overpriced, "auctioned" prize, in exchange for the opportunity to re-bet on DealDash's ***other*** overpriced products.  This Buy-It-Now transaction is akin to a casino offering to return lost, non-refundable casino chips to all BlackJack losers, if only the losers will first give the casino $500 cash for a purportedly expensive t-shirt, which is cheaply manufactured by the casino itself (albeit indirectly).  Offering consumers the opportunity to exchange one certain financial loss for another certain financial loss for purposes of chasing yet another "chance" at glory does not eliminate the consumer's lottery losses.  If anything, it enhances their losses.  *Cf. Schubert Theatre Players*, 203 Minn. At 368 ("And, so far as the free distribution of coupons to participate upon request, we apprehend the jury could readily find that to be an attempted device to evade or circumvent the law.").  Not only is DealDash's Buy-It-Now option "an attempted device to evade or circumvent the law," it is also a deceptive device intended to extract more cash from already damaged, lottery-losing consumers.  *Id.*

The Court should sustain Plaintiffs' lottery allegations because they plausibly show "that chance predominates over a consumer's use of bidding skills." *Mendelsohn v. BidCactus,* 2012 WL 1059702, at \*4. Indeed, as Plaintiffs allege, even the U.S. Federal Trade Commission recognizes that "in many ways, a penny auction is more like a lottery than a traditional online auction." ¶26. The FTC further acknowledges that "the auction process can be unpredictable." *See* https://www.consumer.ftc.gov/articles/0037-online-penny-auctions (last visited Sep. 21, 2017). And in DealDash's "unpredictable" penny auctions, chance predominates over skill by an extra measure because the penny-stacked sale price is largely irrelevant to each and every "auction's" outcome. ¶22.

Plaintiffs plausibly allege that DealDash's penny auctions are illegal lotteries in disguise, and the Court should not hold otherwise "as a matter of law."[18]

C. **Under federal law and all four States' laws, Plaintiffs plausibly allege that DealDash's (purportedly) independent brands and their (purportedly) high-"value" retail prices are deceptive.**

---

[18] DealDash's counterallegation that it discloses on its website (most of) the logical mechanisms by which its penny auctions operate does not absolve DealDash of deceptively advertising "fair and honest auctions," when in truth, DealDash's "fair and honest auctions" are criminal lotteries. Such partial disclosures are akin to a commercial website selling a "safe and effective pain reliever," describing its chemical formula as $C_{18}H_{21}NO_4$ HCl, and explaining in favorable terms how this "safe and effective pain reliever" operates in the human body, but without disclosing to consumers that the chemical formula is one for Oxycontin. It "has long [been] decided that honesty should govern competitive enterprises, and that the rule of *caveat emptor* should not be relied upon to reward fraud and deception." *FTC v. Standard Education Soc*., 302 U.S. 112, 116 (1937). The law places the burden on companies to be truthful, not a burden on consumers to conduct their own independent research and learn that they are being hoodwinked.

Minnesota's Consumer Fraud Act ("CFA") and False Statement in Advertisement Act ("FSAA") generally prohibit false, misleading or otherwise deceptive statements to consumers in connection with the advertisement or sale of products. *See generally* Minn. Stat. §§ 325F.67, 325F.68, *et seq.* Minnesota's Unlawful Trade Practices Act ("UTPA") specifically prohibits advertising misstatements concerning "the usual retail price" of items and "price quotations in any form showing prices which are fictitiously in excess of the actual prices at which such merchandise is regularly and customarily sold." *See generally* Minn. Stat. §§ 325D.12. Similarly, Minnesota's Uniform Deceptive Trade Practices Act specifically defines "a deceptive trade practice" as occurring when a person "makes false or misleading statements concerning the reasons for, existence of, or amounts of price reductions." Minn. Stat. § 325D.44, subd. (1). Minnesota's "consumer protection statutes are remedial in nature and are to be liberally construed in favor of protecting consumers." *State by Humphrey v. Alpine Air Prods., Inc.*, 490 N.W.2d 888, 892 (Minn. App. 1992).

Likewise, California's Unfair Competition Law ("UCL") and False Advertising Law ("FAL") generally prohibit any "unfair, deceptive, untrue or misleading advertising." CAL. BUS. & PROF. CODE §§ 17200, 17500. The UCL further prohibits "fraudulent" business practices that are likely to deceive the public. *Massachusetts Mutual Life Ins. Co. v. Sup. Ct.* (2002) 97 Cal.App.4th 1282, 1290 *accord, Bank of the West v. Sup. Ct.* (1992) 2 Cal.4th 1254, 1267. Similarly, the California Consumer Legal Remedies Act ("CLRA") prohibits "unfair methods of competition and unfair or deceptive acts or practices," such as "[a]dvertising goods or services with intent not to

sell them as advertised" and "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reduction." CAL. CIV. CODE § 1770(a)(9), (13); *see also Khoday v. Symantec Corp.*, Civ. No. 11-180 (JRT/TNL), 2014 WL 1281600, at *22, 28 (D. Minn. Mar. 13, 2014).   Contrary to DealDash's erroneous "circularity" argument[19], violation of the California CLRA, FAL, or any other statute may well "form the predicate 'unlawful act' for the purposes of a [California] UCL claim." *Klein v. Chevron U.S.A., Inc.* (2012) 202 Cal.App.4th 1342, 1383.   Indeed, "[v]irtually any law — federal, state or local — can serve as a predicate for a [California UCL] action." *State Farm Fire & Cas. Co. v. Sup. Ct.* (1996) 45 Cal. App. 4th 1093, 1102-03, *abrogated on other grounds by Cel-Tech Commc'ns, Inc.,* 20 Cal. 4th 163; *see also Parino v. BidRack, Inc.*, 838 F.Supp.2d 900, 905 (N.D. Cal. 2011) (holding in a fraudulent penny auction case that any "violation of the False Advertising Law necessarily violates California's Unfair Competition law") (citing *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008), as well as California statutes).   "[C]laims under these California statutes are governed by the reasonable consumer test," namely, whether "members of the public are likely to be deceived." *Williams*, 552 F.3d at 938. This will "usually be a question of fact not appropriate for decision on [a motion to dismiss]." *Id.*

Texas's Deceptive Trade Practices Act ("DTPA") similarly prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." Tex.

---

[19] DealDash's Motion to Dismiss (Dkt. 40) at 39.

Bus. & Com. Code § 17.46(a).  The DTPA expressly outlaws, *inter alia*, the "making of false or misleading statements of fact concerning the reasons for, existence of, or amount of price reductions."  Tex. Bus. & Com. Code § 17.46(b)(11).  "This section of the act appears to be concerned with price advertising because it is an effective method to promote products and services and has been the subject of considerable abuse." *Enterprise-Laredo Assoc. v. Hachar's, Inc.*, 839 S.W.2d 822, 829 (Tex. App. 1992). "The use of . . . words such as discount, sale, special, or similar words which impliedly compare the selling price to a regular or prevailing price or which suggest that real savings are being offered are unlawful *if there is no regular or prevailing price* or if the reduced price is only nominally lower than the regular or prevailing price."  *Id.* at n.6 (quoting DAVID F. BRAGG, PHILLIP K. MAXWELL & JOE K. LONGLEY, TEXAS CONSUMER LITIGATION § 3.05.011 (2nd ed. 1983)).

Pennsylvania's UTPCPL also expressly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce as defined by subclauses (i) through (xxi) of clause (4) of section 21 of this act." 73 P.S. § 201-3.   Among other relevant prohibitions, that "clause (4)," *inter alia*, contains substantially identical prohibitions against deceptive pricing representations: specifically, "[m]aking false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions."  73 P.S. § 201-2, subd. (4)(xi).

Federal law also makes clear that comparatively higher retail values and prices are "fictitious"and deceptive to consumers when such advertised prices/values have no substantial basis in economic reality.  ¶49 (quoting 16 C.F.R. §§ 233.2(a), 233.3(a) and

(d)); *see also Benrus Watch Co. v. F.T.C.*, 352 F.2d 313, 318 (8th Cir. 1965) ("It is settled that deceptive preticketing of retail prices by a manufacturer of a product is unlawful, and it is immaterial that the actual marking from the preticketed price is done by a retailer rather than the manufacturer."). "Whether a trade practice such as preticketing of list prices or advertising with respect to manufacturers' list prices is deceptive depends in the last analysis on the impression which such a practice makes on the minds of the consuming public." *Benrus Watch Co.*, 352 F.2d at 318. "What impression is made by a given practice is a question of fact," not a question of law for the Court to adjudicate on a motion to dismiss. *Id.*[20]

Here, the Complaint alleges that DealDash duped Plaintiffs and other consumers into spending paid bids and cash to obtain purportedly high-priced, high-"value" merchandise. ¶¶35-78. The truth, however, is that DealDash's purportedly expensive, independent brands are worthless brands recently invented and owned by DealDash's controlling owner. *Id.* Furthermore, while DealDash represents these brands' products as having outrageously high retail prices and values, the truth is that these prices are entirely fictitious; these items have not been sold in substantial volumes at the advertised prices to U.S. consumers (or consumers anywhere for that matter). *Id.*

DealDash argues that the Plaintiffs' "Brand Fraud" allegations are "conclusory," and that "[n]owhere do Plaintiffs explain why the goods they purchased should cost so

---

[20] DealDash offers no real argument against Plaintiffs' allegations that the "fictitious" retail and regular prices/values advertised for Galton Voysey-branded products violate 16 C.F.R. §§ 233.2(a), 233.3(a) and (d).

much less than the amounts they voluntarily paid and bid." Motion at 11.  Defendant is simply ignoring the Complaint's well pleaded allegations that, *inter alia*: (1) the U.S. Federal Trade Commission holds that advertised retail values and list prices are "fictitious" and "misleading" where they "appreciably exceed the price[s] at which substantial sales of the article are being made in the [geographic] area" (¶49); (2) in fact, DealDash's deceptively branded "Galton Voysey" products have **no substantial sales** to U.S. consumers at their advertised retail values and list prices; and (3) in fact, DealDash's DealDash's deceptively branded "Galton Voysey" products are so devoid of high-priced retail sales that DealDash has to secretly buy these products at full price **for consumers** just to make it appear publicly that somebody — somewhere — is buying this stuff at full price.[21]

Furthermore, both federal law and the four States' consumer protection statutes expressly prohibit deceptive endorsements and representations regarding one's connections with someone else's products.  Specifically, in 16 C.F.R. § 255.5, the FTC has provided the following guidance:

> When there exists a connection between the endorser and the seller of the advertised product that might materially affect the weight or credibility of the endorsement (*i.e.*, the connection is not reasonably expected by the audience), such connection **must be fully disclosed**.

---

[21] DealDash mistakenly treats Plaintiffs' Amazon.com allegations (*see* ¶¶51-66) as asserting an independent factual basis for Plaintiffs' injury.  Motion at 22.  Rather, Plaintiffs assert their "Buy It Now Get Cash Back" allegations as further factual support for their allegation that Galton Voysey-branded products lack legitimate, high-priced sales to U.S. consumers.

*See also* Minn. Stat. §325D.44, subd. 1 (prohibiting deceptive conduct that, *inter alia*, "causes likelihood of confusion or misunderstanding as to **affiliation**, **connection**, or **association** with . . . another"); Cal. Bus. & Prof. Code § 1770(a)(3) (expressly prohibits "[m]isrepresenting the affiliation, connection, or association with . . . another"); Tex. Bus. & Com. Code § 17.46(b)(3) (substantially the same); 73 P.S. § 201-2, subd. (4)(iii) (same).

Here, the Complaint alleges that DealDash affirmatively promotes (purportedly) high-priced, high-value products as being manufactured by a series of independent, established companies, totally unrelated to DealDash or to each other, when the truth is:

- that all of these seemingly disparate brand names were recently invented, owned and trademarked within the last two years by the same company, Galton Voysey;

- that Galton Voysey is predominantly owned and controlled by its "Chairman," William Wolfram, who is DealDash's controlling owner;

- that none of these purportedly high-end, independent companies "have any substantial offices, phone numbers, distribution or U.S. retail sales channels outside of DealDash and its affiliates;

- that someone has recently created a "bare bones" website for each faux-luxury, Galton Voysey brand to create the false and misleading appearance that each brand is an independent, legitimate business;

- that these brands are "nothing but the cheap, recent inventions of DealDash and its principal(s)," who are merely "using their own faux-luxury brands to fraudulently induce participation in their unlawful lottery games";

- that "DealDash is secretly bankrolling Galton Voysey—both directly and indirectly—for the primary purpose of creating a false appearance that DealDash's newly invented lottery prizes are extremely valuable items," when in fact, they are cheap, generic items; and

- that "DealDash doesn't mind paying (if it actually does) Galton Voysey's outrageous prices" only because: (1) unlike consumers, DealDash makes more than enough money off the backs of its lottery losers to justify grossly overpaying for Galton Voysey-branded items; and (2) an economic loss for DealDash combined with an economic gain for Galton Voysey is "essentially a wash" for Mr. Wolfram, in his ongoing quest to grow two fraudulent, interdependent start-ups into something of a global retail-alchemy machine.

*See generally* ¶¶35-78.

DealDash's scheme works as follows: (1) induce widespread, paid "bidding" (read: "betting") based on the false promise of obtaining high-value, luxury items made by numerous, independently established companies; (2) use consumers' "bidding" money to cheaply manufacture more, purportedly high-value prizes that have never been sold to U.S. consumers at high prices; (3) thereby inducing *more* widespread betting, which can then be reinvested to manufacture *more* purportedly high-value prizes that have never been sold to consumers; (4) take some profits off the table along the way; (5) and perhaps, somewhere in this tumultuous cycle — of fraudulent lottery losses funding future fraudulent inducements to suffer more fraudulent lottery losses — unwitting consumers might actually start buying Galton Voysey's cheaply-made products at outrageously high, "fictitious" prices; (6) thereby transforming William Wolfram into a transnational, "luxury" goods magnate (in addition to Penny-Auction King) with incomparable gross margins across substantially every retail sector: practically overnight.

A scheme like this from DealDash epitomizes why Minnesota's legislature and many others have expressly provided for private, non-exclusive rights of action for defrauded consumers nationwide. It is not only DealDash's fictitious retail prices and

valuations that are independently deceptive.  It is not only DealDash's fake, independent luxury suppliers that are independently deceptive.  It is the combination of DealDash's deceptive pricing and branding representations that is so commercially toxic to millions of U.S. consumers: especially those many vulnerable retirees who DealDash targets for exploitation more than any other group.

At bottom, Plaintiffs Pstikyan, Bennett and Ford plausibly allege that DealDash's "Brand Fraud" is objectively false, misleading and deceptive to consumers under any state's consumer protection laws, and the Court should not hold otherwise here.[22]

### D. DealDash's perpetual bidpack sales representing 60 cents-per-bid as its former bidding price were materially false, misleading and deceptive.

The FTC has expressly identified the following type of former price advertisements as deceptive to consumers: "[An advertiser] might feature a price . . .

---

[22] Defendant offers a short-shrift argument against Plaintiffs' allegations that DealDash's in-"auction" advertisements of the "prices" paid by recent winners are false and misleading, because such "prices" omit the substantial costs of bidding expended by the winners.  *See* Motion at 17-18.  Defendant asserts that "simple math" could inform consumers of the maximum and minimum bidding costs paid by recent winners, but Defendant's own example shows how utterly uninformative such "simple math" would be to consumers.  *Id.*  For a $20.92 cent advertised "price" paid by a recent winner, consumers could (DealDash counteralleges) easily calculate that the winner spent somewhere between 1 and 1,046 bids.  So, according to the Complaint, a consumer could calculate that the recent winner's *bidding costs* were somewhere between 12 cents (a minimal amount relative to the winning "price" of $20.92) and *$156.90* (1,046 bids times 15 cents per bid), nearly *eight times* the advertised "price" paid by that winner. ¶¶33-34.  Defendant's "simple math" argument is unavailing.  DealDash offered Plaintiffs and the Class one, and only one, piece of seemingly useful information about the recent outcomes of its auctions, and that one piece of information was the final "price" paid.  These standalone prices are objectively deceptive because they materially understate — often by an order of magnitude — the true "prices" paid by recent winners of the featured product.

which was not used in the recent past but at some remote period in the past, without making disclosure of that fact."   ¶67 (quoting 16 C.F.R. §§ 233.1(a), (d)).  This is not only deceptive, but damaging to consumers because "the purchaser is not receiving the unusual value he expects."  *Id.*  California statutes codify similar, and even more specific, requirements relative to the FTC's:

> No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

Cal. Bus. & Prof. Code § 17501.

Here, DealDash advertised to Plaintiffs and the Class a former, strike-through price for its bidpacks amounting to 60 cents per bid.  *See* ¶¶31, 68.  This practice reasonably led consumers to believe that they were receiving an "unusual value," in the form of a 75%-80% discount off of DealDash's normal bidpack pricing.  *Id.*; 16 C.F.R. §§ 233.1(a), (d).  DealDash further advertised that its 75%-80%-off bidpack sales would "end soon."   ¶¶31, 68, 69.   According to the FAC, however, while DealDash continuously made these 75%-80% off ,"sale end[ing] soon" representations well into 2017, the truth was that "DealDash ha[d] not been charging its players anywhere near 60 cents per bid since before 2015 (at latest)."   ¶69.   Such fictitious, former price comparisons are deceptive not only under FTC regulations and California's particularized former-price statute, but also under the other three States' general prohibitions concerning the deceptive advertisement of price reductions.  *See* Part III.C, *supra*.

DealDash contends that despite the objective falsity and misleading nature of its 60-cent bidding price comparison, Plaintiffs cannot state a misrepresentation claim because they "all had experience using DealDash's website, including the purchasing of bids, and did so over an extended period of time."   Dkt. 40 at 23.   Defendant's implication seems to be that Plaintiffs' all bought bids on DealDash over a long enough period of time to become aware that DealDash's bidpack sales were perpetual and would not "end soon."   *Id.*   That argument appears to go to reliance, not falsity, and the argument is unpersuasive for several reasons.

First, consumers cannot predict the future.   When a retailer affirmatively states that a sale is "ending soon," reasonable consumers would believe that "soon" means a few days, weeks, or at most months: but certainly not "never."   And "never" was always the real truth.   Second, Plaintiff Pstikyan only purchased bidpacks over a two-month period (at most), Plaintiff Bennett over a five-month period (at most), and Plaintiff Ford over a seven-month period (at most).[23]   Under 16 C.F.R. §§ 233.1(a), (d), the Court should not construe "some remote period in the past" to mean "a few months ago."   And at the very least, Plaintiff Pstikyan's bidpack purchases over a two-month period do not subsume the express three-month period provided by California's former-price statute.   Third, Plaintiffs expressly allege that they made their bidpack purchases "in large part on

---

[23] The Complaint alleges these limited time periods as the periods in which Plaintiffs "purchased ***and*** lost thousands of dollars worth of bids on DealDash.com." ¶¶7-9.  One must buy bidpacks first in order to play, and then dispose of the many bids in those bidpacks over time.   ¶13.  The Complaint does not suggest that Plaintiffs' bidpack purchases occurred over the entire periods alleged.

the false premise that they were receiving 75%-80% discounts off of DealDash's regular bid pricing, when in fact, they were simply paying DealDash's regular bid prices, which had been continuously offered to the public *for years*." ¶76. Plaintiffs allege that they were duped; DealDash cannot properly counterallege that they were not duped.

DealDash's perpetual bidpack "sales," premised on the deceptive, ancient bidding price of 60 cents per bid, were objectively deceptive to consumers. They were also damaging, along with the rest of DealDash's fraud.

### E. Under any State's statutes, Plaintiffs sufficiently allege reliance (to the extent necessary), causation and economic damages in accordance with their factual theories of liability.

Throughout its Motion to Dismiss, DealDash argues in various ways that Plaintiffs have not sufficiently alleged reliance, causation or injury under any of Plaintiffs' proffered legal theories. DealDash is simply ignoring the Complaint's allegations. *See generally* ¶¶35, 70-78, 121, 129, 137, 147.[24]

For their injuries, Plaintiffs allege that they have "purchased and lost thousands of dollars worth of bids on DealDash.com," and further, "lost money by spending both cash and paid bids in various penny auctions to acquire DealDash's falsely and misleadingly advertised merchandise." ¶¶7-9. Plaintiff Pstikyan alleges that he purchased and lost "tens of thousands of bids" in DealDash's illegal lotteries. ¶70. Plaintiff Bennett alleges

---

[24] The Court should note that individual reliance is an element of some, but not all, of Plaintiffs' private rights of action and theories of recovery. But the Court need not decide here which claims require reliance and which claims do not because, as explained *infra*, Plaintiffs have sufficiently alleged reliance upon DealDash's fraudulent misrepresentations.

that she purchased and lost bids "in over 600 losing [lotteries], losing thousands of

dollars in the process and obtaining nothing."   ¶72.  Plaintiff Ford "purchased and lost

DealDash bids in over 3,000 losing [lotteries], losing thousands of dollars in the process

and obtaining nothing."   ¶74.  Plaintiffs also identify particular transactions in which they

suffered financial losses by paying significant sums of money, only on the basis that they

would receive extremely valuable items in return, when in fact, the sums they paid far

exceed the true values of the items obtained.  ¶¶71, 73, 75.[25]

---

[25] Those "true values" are likely to be roughly equal to or less than Galton Voysey's
cheap costs of production and shipping, since the items Plaintiffs purchased have no
substantial consumer market that could justify any premium retail valuation whatsoever;
moreover, the prices paid by Plaintiffs far exceed any rational valuation of the mere
utility derived from such products. *See, e.g.,* ¶71(a) ($879 for a simple handbag); ¶73(d)
& n.17 ($110 for a pair of ceramic kitchen knives that immediately break apart upon
ordinary use); ¶75(a), (c) and (e) ($245 for a necktie, $50 for a flashlight, and $400 for a
kitchen knife).  The "true values" of Galton Voysey-branded products will be the subject
of fact discovery and, perhaps, expert testimony at some later stage of the litigation.  At
the pleading stage, however, Plaintiffs need not quantify their damages to prevail.  *See
Lexmark Int'l*, 134 S.Ct. at 1395 ("Although we conclude that [the plaintiff] has ***alleged***
an adequate basis to proceed . . . , it cannot obtain relief without ***evidence*** of injury
proximately caused by [the defendants'] alleged misrepresentations.  We hold only that
[the plaintiff] is entitled to a chance to prove its case.") (emphasis in original).   Plaintiffs
paid enormous premiums over and above DealDash's/Galton Voysey's costs of
production — and over and above any rational economic valuation of the utilities
obtained — only because DealDash represented that these lofty valuations were, in fact,
the going rates for its super-special, independently manufactured and sought-after brand
names.  Plaintiffs did not get anything close to what they paid for.  Instead, Plaintiffs
received only "low-value, generic merchandise that [was] only of DealDash, by
DealDash, and for DealDash and its principals."  ¶78.  If that is not real economic harm,
it is difficult to imagine what would be outside of merchandise that spontaneously
combusts or disintegrates.  *Cf.* 16 C.F.R. § 233.2(a) (consumers aren't receiving the
"genuine bargain" they paid for); 16 C.F.R. § 233.3(a),(d) ("[M]any people will believe
that they are being offered a genuine bargain."); 16 C.F.R. § 233.1(a),(d) ("purchaser is
not receiving the unusual [economic] value" that he paid for).

For individual reliance (to the extent necessary) and causation, Plaintiff Pstikyan alleges that:

> Plaintiff participated in and lost his money in DealDash's auctions because he believed that he was, in fact, participating in proper retail auctions rather than the entirely fraudulent lottery scheme that is DealDash. Plaintiff also participated in and lost DealDash auctions because he believed he was bidding on high "value," brand name, luxury merchandise: rather than a bunch of generic, low-value products recently invented by DealDash's (indirect) controlling owner and his associates.

¶70.

Similarly, all three Plaintiffs allege that they and many other consumers have:

> lost substantial sums of money—at least tens of millions of dollars—purchasing and losing bids in DealDash's daily lotteries, and walking away from those lotteries with nothing. Moreover, Plaintiffs and the putative Class purchased their tens of millions of dollars (per year) in "bidpacks" based in large part on the false premise that they were receiving 75%-80% discounts off of DealDash's regular bid pricing, when in fact, they were simply paying DealDash's regular bid prices, which had been continuously offered to the public for years.
>
> Numerous consumers like Plaintiffs have also suffered sizable economic losses by purchasing and spending bids to *win* DealDash's daily lotteries, and then spending additional cash to acquire their products at purportedly steep discounts that are entirely false, misleading and imaginary.
>
> Plaintiffs—like substantially all DealDash customers—would not have purchased bids from DealDash or entered any of DealDash's purported retail "auctions" had they known the fact that they were entering an illegal and fraudulent lottery scheme. Moreover, Plaintiff and other "winning" DealDash users would not have purchased bids, played in DealDash's illegal lotteries, and spent *additional* cash to acquire purportedly high-"value," brand name merchandise, had they known that they were betting on and buying low-value, generic merchandise that is only of DealDash, by DealDash, and for DealDash and its principal(s), and for which there exists no legitimate U.S. consumer market.

At bottom, DealDash lures consumers onto its website with phony bid sales and phony discounts on phony luxury products, and then proceeds to fleece them in its lotteries and thank them for their business.

¶¶76-79.

In the face of such allegations, DealDash seems to think that Plaintiffs' financial losses were the result of their own informed choices, or perhaps random coincidences, rather than DealDash's own malfeasance.   Yet viewing the above allegations in a light most favorable to Plaintiffs Pstikyan, Bennett and Ford, they have sufficiently alleged reliance, causation and economic injury under any of the four States' consumer protection statutes.

And for avoidance of doubt, Plaintiffs' Complaint easily satisfies the pleading requirements of Fed. R. Civ. P. 9(b), as Plaintiffs specifically allege:

- The "who" — DealDash, William Wolfram, and the previously undisclosed "Galton Voysey Ltd.";

- The "what" — a series of illegal lotteries masquerading as "fair and honest auctions" that can only be won with "[g]ood luck" (¶¶12-30, 94); a breathtaking "Brand Fraud" in which DealDash pretends to auction off high-priced luxury items made by independent retailers, while auctioning off its own low-value, generic items only recently and cheaply made by one company, which is owned and controlled by DealDash's controlling owner (¶¶35-66); deceptively perpetual sales on DealDash's gambling prices (¶¶67-69); and materially deceptive advertisements regarding the outcomes of DealDash's latest penny auctions (¶¶31-34);

- the "when" — for Plaintiff Pstikyan, between November and December 2016; for Plaintiff Bennett, between January 2017 and June 2017; and for Plaintiff Ford, between December 2016 and July 2017 (¶¶7-9, 70-78);

- the "where" — on DealDash's website, www.dealdash.com, and DealDash's mobile device application(s) (¶10);

- the "how" — by deceiving vulnerable visitors to DealDash's website, mostly American retirees, at substantially every click (¶2); by representing and selling lottery bets as auction "bids" (¶¶12-30, 94); by cheaply manufacturing fake, super-luxury brands that have no legitimate consumer demand anywhere (¶¶35-66); by trademarking those fake brands with the United States Patent & Trademark Office and pretending that Galton Voysey is a self-sufficient business, while not disclosing anywhere on DealDash.com that Galton Voysey even exists (*id.*); by creating a series of bogus websites that purport to represent independent companies, without disclosing the existence of, let alone the companies' complete financial dependence upon, Galton Voysey and DealDash (*id.*); by employing unwitting American consumers **and commandeering Amazon.com**, America's largest online retailer, to create positive consumer endorsements of fake super-luxury brands, facially backed by false "Verified Purchases," which only create the false appearance of brand legitimacy and real consumer demand (*id.*); and by advertising *ad nauseum* on American late-night television and social media (¶51 & n.11).

Roughly speaking, that is the "who, what, when, where and how."  Motion at 12; *see also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").   In the final analysis, "chance," deception, reliance, causation and damages are all fact-dependent issues in this case that should be resolved by jurors.  They are not questions to be answered here as a matter of law.

## IV.   CONCLUSION

For all of the foregoing reasons, Plaintiffs Pstikyan, Bennett and Ford respectfully request, on behalf of a nationwide Class of seriously and increasingly damaged consumers, that the Court deny DealDash's Motion to Dismiss (Dkt. 40) in its entirety.

Dated: September 21, 2017

Respectfully submitted,

FINKELSTEIN & KRINSK LLP
Jeffrey R. Krinsk, Esq. (*pro hac vice*)
jrk@classactionlaw.com
David J. Harris, Jr., Esq. (*pro hac vice*)
djh@classactionlaw.com
Trenton R. Kashima, Esq. (*pro hac vice*)
trk@classactionlaw.com

By:   s/ David J. Harris, Jr.
          David J. Harris, Jr., Esq.

550 West C Street, Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile:  (619) 238-5425

*Lead Counsel for Plaintiffs and the
Putative Class*

GUSTAFSON GLUEK PLLC
Daniel E. Gustafson (#202241)
dgustafson@gustafsongluek.com
Daniel C. Hedlund (#258337)
dhedlund@gustafsongluek.com
Eric S. Taubel (#392491)
etaubel@gustafsongluek.com
Canadian Pacific Plaza
120 South 6th Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 333-8844
Facsimile: (612) 339-6622

*Liaison Counsel for Plaintiffs and
the Putative Class*